

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHN WARD, JR. | § | |
| | § | |
| | § | |
| v. | § | MISC. NO. 35042 |
| | § | |
| CISCO SYSTEMS, INC. | § | 3-09MC 106-L |

## CISCO SYSTEMS, INC.'S MOTION TO COMPEL RESPONSES FROM NONPARTY ROBERT CHIAVIELLO, JR.

TO THE HONORABLE COURT:

Defendant Cisco Systems, Inc. ("Cisco") hereby files this Motion to Compel pursuant to Rules 26, 30, 37, and 45 of the Federal Rules of Civil Procedure and would show the Court the following:

### I.    FACTUAL BACKGROUND

Plaintiff John Ward, Jr. is an attorney who, along with attorney Eric M. Albritton, filed a patent infringement lawsuit against Cisco on behalf of ESN, LLC, *ESN, LLC v. Cisco Systems, Inc. and Cisco-Lynksys, LLC*, Civil Action No. 5:07-cv-156-DF-CMC, in the United States District Court for the Eastern District of Texas-Texarkana Division (the "ESN Litigation"). Ward then sued Cisco in the United States District Court for the Western District of Arkansas, Civil Action No. 08-4022, for defamation, alleging that a Cisco employee, Richard Frenkel, published articles on the Patent Troll Tracker blog that falsely accused Ward of conspiring with a court clerk to alter the filing date of the complaint in the ESN Litigation. In the Arkansas federal lawsuit, Ward claims that the alleged defamation damaged his reputation. Specifically, he alleges that Frenkel's statements "expose Plaintiff to public hatred, shame, and ridicule, have harmed his reputation, and have caused Plaintiff mental anguish." Plaintiff's First Amended

Complaint (Doc. #66), ¶ 35, at 9. Plaintiff also alleges that he "has and will in the future be seriously injured in his personal reputation[.]" *Id.* ¶ 99, at 23.

In his First Supplemental Disclosures in the Arkansas federal lawsuit (attached here as Exhibit 1), Plaintiff identified Robert Chiaviello of the Dallas, Texas, office of the law firm Fulbright & Jaworski, L.L.P. as a person with knowledge of "damage done to Plaintiff's reputation by Defendant's statements" and "Plaintiff's reputation in the legal community." Exhibit 1, at 7. In addition, in his deposition in the Arkansas federal lawsuit, Mr. Ward testified about Mr. Chiaviello as follows:

> Q.   . . . You say there was another instance . . . where somebody was reporting what somebody else had said?
>
> A.   Right.
>
> Q.   And who was that?
>
> A.   Bob Chiaviello at Fulbright & Jaworski.
>
> Q.   And what did Mr. Chiaviello say?
>
> A.   Same general type of thing. They were enrolled in a beauty contest, and he brought up that: Hey, we use Johnny Ward as local counsel. We could help you out.
>
>    . . . .
>
> And whoever his contact -- and he said it happened on more than one occasion. He didn't give a client name to me. He just said that people have said: We've -- we've heard about that guy; we've read about him; we're not going to use him.
>
> And he attributed it to the Patent Troll Tracker specifically.
>
> Q.   Okay.
>
> A.   So I assume that these folks raised the articles to him.
>
> Q.   Okay. And Chiaviello said that he heard about it from how many clients?

A.   I don't know if it was one or several.  It seems like it was on more -- more than one occasion that he had been trying to land some business and had referenced me by name and --

Q.   Okay.

A.   He did not specify a client, though.

Q.   Okay.

A.   And I kind of had the same conversation:  Bob, I hate to put you in this situation, but can I give your name to my lawyers?  Would you be willing to talk to them about what's happened?

Q.   Uh-huh.  And he -- he said yes?

A.   He said --

Q.   Okay.

A.   -- whatever you need to do.

Exhibit 2 (Ward Deposition), at 84:13-86:5.

Accordingly, Cisco took Mr. Chiaviello's deposition in Dallas, Texas, on September 23, 2009.  The subpoena for that deposition issued from the Northern District of Texas.  *See* Exhibit 3 (Chiaviello Deposition Notice and Subpoena).  In his deposition, Mr. Chiaviello repeated the statements he claims that clients made to him about Mr. Ward, but, having revealed the substance of those clients' statements, refused to disclose the identity of the clients or otherwise answer any other questions about them:

Q.   Mr. Ward has testified that you told him that there were clients or potential clients, and I believe he's testified that -- that there were -- in his recollection, that this happened more than once, but in any event, that there was at least one client who – who refused to hire Mr. Ward because of the patent troll -- Patent Troll Tracker blogs.  Is that true?

A.   Yes, sir.

Q.   And do you recall how many -- first, how many clients or potential clients there were?

A.   By my recollection, there were three instances.

. . . .

Q.   Okay.  And who were those clients?

MS. COLLINS:  Objection, privileged.

A.   Yeah, I'm not going to reveal the names.

Q.   (BY MR. SCHWARZ)  Okay.  When did these -- when did these events occur?

A.   My recollection is it was at the end of 2007, early part of 2008.

Q.   Without naming the clients -- let me back up for a moment.  Let's just make sure our record's clear.

Would you please name those clients for us?

MS. COLLINS:  Objection, privileged.

A.   I will not name the clients.

Q.   (BY MR. SCHWARZ)  Okay.

MR. SCHWARZ:   Are you instructing your client not to answer the question?

MS. COLLINS:  Yes, sir.

MR. SCHWARZ:  Okay.

Q.   (BY MR. SCHWARZ)  Did these clients -- if -- did any of these clients say that they did not want to retain Mr. Ward solely because of the Patent Troll Tracker blogs?

A.   In all three instances, that was identified as the reason, yes, sir.

Q.   When you said "the reason," was it the only reason?

A.   To the best as I recall, that was the stated reason.

Q.   Okay.  Did you try to convince them otherwise?

A.   Yes, sir.

Q.   Okay.  And could I ask you first what it was that they said was their reason for not wanting to retain Mr. Ward?

A. Well, again, I -- the specific communication is privileged, and I don't remember the exact – exact words. But in all three instances, there was – there was mention of these statements and the concern about Mr. Ward being somebody to -- a concern about his honesty and their willingness to have him act as their attorney.

Q. Okay. And what did you tell them, to the extent that you can, to disabuse them of the notion that there was a problem with Mr. Ward's integrity?

A. Well, again, in all three cases, I was outraged and tried to defend Mr. -- Mr. Ward's integrity. But in those cases, I was unsuccessful.

Q. Okay. Did you say that the blogs were untrue?

A. Yes.

Exhibit 4 (Chiaviello Deposition), at 58:1-60:13. Later in his deposition, Mr. Chiaviello testified

as follows:

Q. . . . And could I ask you to describe any other instances where you heard of something or otherwise received information that suggested that Mr. Ward's reputation had been – had been injured or diminished in any way?

A. You know, in -- as a result of your questions, I do recall another instance where we gave a presentation to a client and had recommended Mr. Ward and received a very harsh response. And it was very -- it was a troubling meeting because one of my colleagues mentioned to me later that I was probably too aggressive in trying to defend him in that meeting.

Q. Did anyone in -- well, first, let's run through this. Would you please identify the folks that you were speaking with?

A. I will not. It's a client of the firm.

Q. Okay. And so you're invoking privilege?

A. Yes, sir.

Q. Okay. You said there was a harsh response and that it was -- it was a troubling meeting. Did anyone in that meeting make reference to the Patent Troll Tracker blog?

A. As I'm recalling it now, yes, sir.

Q. And could you tell us what was said about the Patent Troll Tracker blog?

A.   Again, without disclosing a privileged communication, it was cited again as an authority for -- a reason for not wanting Mr. Ward to be on the trial team.

Q.   And I believe you said that you defended Mr. Ward's reputation in that meeting?

A.   I was -- I was, again, truly outraged by it.

Q.   I take it Mr. Ward was not retained in that case?

A.   That's correct.

Q.   Okay.  I just want to make sure.  I don't think we had covered that -- that small detail.

So that makes a total of four clients who have declined to retain Mr. Ward?

A.   Yeah.  And just to be specific, one of them is not a client.  It was a -- it was another lawyer who would -- who we were investigating co-counsel together.

Q.   Okay.  But someone had come to you with the intention of at least possibly retaining your services and those of Mr. Ward?

A.   That's correct, yes, sir.

Q.   Okay.  Can you think of any other instances, now that we've gone through those four, where anyone has declined to retain Mr. Ward?

A.   No, sir.

Exhibit 4 (Chiaviello Deposition), at 76:22-78:21.

The only stated grounds for Mr. Chiaviello's refusal to answer these question is attorney-client privilege.  Mr. Chiaviello's refusal to answer questions about conversations with clients (or a potential client) is improper and without legal basis, in light of the fact that he has voluntarily disclosed the substance of his clients' statements, and his responses to those statements.  The information sought by Cisco is not privileged, so Mr. Chiaviello should be compelled to answer Cisco's legitimate questions.  Furthermore, having voluntarily waived any

privilege which could have existed, Mr. Chiaviello cannot refuse to answer questions about the conversations he voluntarily disclosed.

## II.     ARGUMENT AND AUTHORITIES

### A.     The Information Sought is Relevant and Discoverable.

Under the Federal Rules of Civil Procedure, a party may obtain discovery from a non-party through a subpoena. FED. R. CIV. P. 45(a)(1)(D). The scope of discovery from a non-party is the same as the scope of discovery from a party under Rule 26(b)(1) of the Federal Rules of Civil Procedure. *Hussey v. State Farm Lloyds Ins. Co.*, 216 F.R.D. 591, 596 (E.D. Tex. 2003). Thus, a non-party is subject to discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party," and the information sought need not be admissible at trial as long as "the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1); *see Hussey*, 216 F.R.D. at 594 (applying Rule 26(b)(1)'s discovery standard to a non-party subpoena).

The Federal Rules of Civil Procedure create a "broad right to discovery" because "wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993). The question of relevancy is construed "liberally and with common sense," and discovery should be allowed unless the information sought has absolutely no conceivable bearing on the case. *Soto v. City of Concord*, 162 F.R.D. 603, 610 (C.D. Cal. 1995). Indeed, a relevant matter is "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Under the Federal Rules of Civil Procedure, the information sought by Cisco's questions to Mr. Chiaviello is relevant and discoverable. Mr. Ward has put his reputation at issue in this

case.  Mr. Chiaviello has on at least two occasions – first when he conveyed the information to Mr. Ward, then in his deposition – disclosed the substance of his conversations with clients (and potential client).  Mr. Chiaviello has also disclosed that he told these clients (and potential client) that Mr. Ward is an honorable person and that the statements made about him by Mr. Frenkel were untrue, as well as other matters about litigating cases in the Eastern District of Texas. Cisco is entitled to depose those clients, and the potential client, to further explore what they said and whether they, in fact, declined to hire Mr. Ward because of anything Mr. Frenkel said on the patent Troll Tracker blog.  Mr. Chiaviello cannot hide the identity of his clients (and potential client) by invoking an attorney-client privilege which does not cover the information sought by Cisco and which Mr. Chiaviello voluntarily waived.

B.    **The Information Sought is Not Privileged.**

      The attorney-client privilege does not cover all communications between a client and his or her attorney; rather, it extends only to *confidential* communications from a client to his or her attorney.   The United States Supreme Court has defined "confidential communications" as encompassing "only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577.  Accordingly, the identity of a client falls outside the privilege:  "There is generally no attorney-client privilege as to the identity of the client, conditions of employment or matters involving receipt of fees."  *Klein v. Henry S. Miller Residential Services, Inc.*, 82 F.R.D. 6, 9 (N.D. Tex. 1978), *citing, inter alia, United States v. Ponder*, 475 F.2d 37, 39 (5th Cir. 1973); *see also In re Grand Jury Proceedings (85 Misc. 140),* 791 F.2d 663, 665 (8th Cir.1986) (same). Furthermore, none of the questions asked of Mr. Chiaviello by Cisco concerned confidential information, or information which would not have been disclosed but for the privilege – as

evidenced by Mr. Chiaviello's voluntary disclosures of the substance of his conversations with his client and potential client. In addition, the information sought by Cisco cannot seriously be deemed to be privileged – all Cisco wants to know is whether the undisclosed entities actually read Mr. Frenkel's blog and, if they did, whether it impacted their view of Mr. Ward or willingness to hire him; and their response to Mr. Chiaviello's defense of Mr. Ward.

Because the information sought by Cisco is not privileged and is highly relevant to the allegations in this case, the Court should grant Cisco's Motion to Compel, overrule Mr. Chiaviello's assertion of the attorney-client privilege, and compel him to answer Cisco's questions about Mr. Ward, his reputation, and litigating cases in the Eastern District of Texas.

**C.    Mr. Chiaviello Waived Any Privilege Which May Have Existed.**

Mr. Ward put his reputation at issue in this case by claiming that Cisco damaged his reputation. Mr. Chiaviello voluntarily disclosed information obtained from his clients which is relevant to Mr. Ward's claim that his reputation has been damaged, but he refused to disclose the identity of his clients (and potential client), notwithstanding the fact that by disclosing the substance of the attorney-client conversations, he waived any privilege which may have attached to them and to any related matters. As this Court has held,

> Generally, a party waives the attorney-client privilege when it voluntarily discloses the privileged communication to a third party. *See Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th Cir.1993). When a party waives the attorney-client privilege, it waives the privilege as to all communications that pertain to the same subject matter of the waived communication. *See S.E.C. v. Brady,* 238 F.R.D. 429, 441 (N.D. Tex. 2006) (Ramirez, J.).

*S.E.C. v. Microtune, Inc.*, 258 F.R.D. 310, 317 (N.D. Tex. 2009) (Kaplan, J.); *see also PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership*, 187 F.3d 988, 992 (8th Cir. 1999) ("The attorney/client privilege is waived by the voluntary disclosure of privileged

communications, and courts typically apply such a waiver to all communications on the same subject matter.").

Here, Mr. Chiaviello volunteered allegedly privileged information from discussions he had with his clients and a potential client about Mr. Ward, his reputation, and litigating cases in the Eastern District of Texas. Any privilege which may have attached to communications Mr. Chiaviello had with his clients about Mr. Ward, his reputation, and litigating cases in the Eastern District of Texas, has been waived by Mr. Chiaviello's voluntary disclosures.

Because Mr. Chiaviello waived any privilege which may have attached to the information sought by Cisco, that information is no longer privileged, and the Court should grant Cisco's Motion to Compel, overrule Mr. Chiaviello's assertion of the attorney-client privilege, and compel him to answer Cisco's questions about Mr. Ward, his reputation, and litigating cases in the Eastern District of Texas.

### III.    CONCLUSION

For the reasons set forth above, Cisco requests that the Court grant Cisco's Motion to Compel, overrule Mr. Chiaviello's assertion of the attorney-client privilege, and compel Mr. Chiaviello to answer Cisco's questions about Mr. Ward, his reputation, and litigating cases in the Eastern District of Texas, including the identities of the clients and potential client to which he alluded in his deposition. Cisco also requests such further relief to which it may be justly entitled.

Respectfully submitted,

JACKSON WALKER L.L.P.

By: _____

Charles L. Babcock
Federal Bar No.: 10982
Email: cbabcock@jw.com
Crystal J. Parker
Federal Bar No.: 621142
Email: cparker@jw.com
1401 McKinney
Suite 1900
Houston, Texas 77010
(713) 752-4200
(713) 752-4221 – Fax
Kurt A. Schwarz
Texas Bar No.: 17871550.
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone: (214) 953-6000
Telecopier: (214) 953-5822
Email: kschwarz@jw.com

ATTORNEYS FOR DEFENDANT
CISCO SYSTEMS, INC.

## CERTIFICATE OF CONFERENCE

Counsel for Cisco has complied with the meet and confer requirement in Local Rule 7.1(b) as of the date of filing this Motion.  On September 28 and 29, 2009, Kurt Schwarz and Crystal Parker, counsel for Cisco, Conferred with counsel for Mr. Chiaviello, who opposes this motion because he maintains that the undisclosed information is privileged, and counsel for Plaintiff, who neither supports nor opposes the motion.  Accordingly, Cisco now seeks the Court's assistance.

Certified this 2nd day of October, 2008.

Kurt Schwarz

## CERTIFICATE OF SERVICE

This is to certify that on this 2nd day of October, 2009, a true and correct copy of the foregoing was served, pursuant to the parties' agreement, via electronic mail upon:

Patricia L. Peden                     Nicholas H. Patton
Law Offices of Patricia L. Peden      Patton, Tidwell & Schroeder, LLP
5901 Christie Avenue                  4605 Texas Boulevard
Suite 201                             P.O. Box 5398
Emeryville, CA 94608                  Texarkana, TX 75505-5398
*Attorney for Plaintiff John Ward, Jr.*   *Attorney for Plaintiff John Ward, Jr.*

In addition, this motion was served on counsel for Robert Chiaviello by certified mail, return receipt requested, and electronic mail:

Joni Collins
Fulbright & Jaworski, LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201-2784

Kurt Schwarz



# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| JOHN WARD, JR. | § | |
| | § | |
| v. | § | |
| | § | C.A. NO. 08-4022 |
| CISCO SYSTEMS, INC. AND RICK | § | JURY TRIAL DEMANDED |
| FRENKEL | § | |

**PLAINTIFF'S FIRST SUPPLEMENTAL DISCLOSURES**

Pursuant to Fed. R. Civ. P. 26(a)(1), Plaintiff John Ward, Jr. ("Ward"), through

counsel, provides the following Initial Disclosures to Defendant Cisco Systems, Inc.

("Cisco").

**PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS**

Ward makes these disclosures based on his current knowledge, based on

information that is reasonably available to him at this time, and upon information that is

within his possession, custody or control. Ward is under no obligation to produce

documents that are within the possession, custody or control of third parties. Ward's

investigation and analysis is ongoing and Ward reserves the right to amend or supplement

his disclosures consistent with Fed. R. Civ. P. 26(e).

By making these disclosures, Ward does not represent that he is identifying every

document, tangible thing, or witness possibly relevant to this lawsuit. Ward's initial

disclosure are further made without waiving in any way: (i) the right to object on the

grounds of competency, privilege, the work product doctrine, relevancy, materiality,

hearsay, undue burden, or any other proper ground, to the use of any such information for

any purpose, in whole or in part, in this action or any other action or proceeding; and (ii)

the right to object on any grounds, at any time, or any other discovery request or

proceeding involving or relating to the subject matter of these disclosures.    All the

disclosures set forth below are made subject to the above objections and qualifications.

**Rule 26(a)(1)(A):**   "[T]he name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subject of information."

**Disclosure**:    The following individuals may have potentially discoverable

information Ward may use to support his claims.

1.    John Ward, Jr.
      111 W. Tyler Street
      Longview, Texas 75601
      (903) 757-6400

      Mr. Ward is the Plaintiff.

2.    Richard Frenkel
      3229 Morris Drive
      Palo Alto, CA 94303

      Rick Frenkel wrote the blog which contained the defamatory comments causing damage to Defendant's reputation and all matters relating to the causes of action in this case.

3.    Corporate Representative of Google, Inc.
      1600 Amphitheatre Pkwy
      Mountain View, California 95051

      Google has knowledge of the filing of Plaintiff's original proceeding against John Doe in Gregg County, Texas.  Based upon information and belief, it would have informed Rick Frenkel that Plaintiff sought to discover his identity. Google may also have knowledge about the dissemination of the articles at issue.

4.    Corporate Representative of Cisco Systems, Inc.
      San Jose, California

      Cisco is the Defendant.



5.      Mark Chandler
        c/o Jackson Walker, LLP
        1401 McKinney
        Suite 1900
        Houston, TX 77010
        713.752.4200

        General Counsel to Cisco Systems Inc.

6.      Eric M. Albritton
        111 W. Tyler Street
        Longview, Texas 75601
        (903) 757-8449

        Mr. Eric M. Albritton also is local counsel on Civil Action No. 5:07cv156, the civil action that resulted in the defamatory comments by Defendant. Mr. Albritton likely has knowledge of all issues in this case. He has knowledge of Plaintiff's reputation in the legal community. He also has knowledge of Plaintiff's damages.

7.      Amie J. Mathis
        1903 Inglewood Street
        Henderson, Texas 75654

        Mrs. Mathis filed the Complaint in Civil Action No. 5:07cv156 on behalf of Eric M. Albritton.

8.      David Maland
        United States District Clerk's Office
        211 West Ferguson Street, Room 106
        Tyler, Texas 75702

        David Maland has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156. Mr. Maland has knowledge of the Local Rules, the court's software system, the Notice of Electronic Filing, local filing procedures and several facts concerning the issues in this case.

9.      Rhonda Lafitte
        United States District Clerk's Office
        500 N State Line Ave
        Texarkana, Texas 75504

        Rhonda Lafitte has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156. Ms. Lafitte has knowledge

about her conversation with Jillian Powell, who called the clerk's office on behalf of Cisco.

10.    Shelly Moore
United States District Clerk's Office
500 N State Line Ave
Texarkana, Texas 75504

Shelly Moore has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156.

11.    Peggy Thompson
United States District Clerk's Office
211 West Ferguson Street, Room 106
Tyler, Texas 75702

Peggy Thompson has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156.

12.    Faye Thompson
United States District Clerk's Office
211 West Ferguson Street, Room 106
Tyler, Texas 75702

Faye Thompson has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156.

13.    David Provines
United States District Clerk's Office
211 West Ferguson Street, Room 106
Tyler, Texas 75702

David Provines has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156. Mr. Provines has knowledge of the Eastern District of Texas' ECF software.

14.    Rachel Wilson
United States District Clerk's Office
211 West Ferguson Street, Room 106
Tyler, Texas 75702

Rachel Wilson has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156.

---

**PLAINTIFF'S FIRST SUPPLEMENTAL DISCLOSURES**

15.    Cindy Paar
United States District Clerk's Office
211 West Ferguson Street, Room 106
Tyler, Texas 75702

Cindy Parr has knowledge of the circumstances surrounding the filing of the Complaint in Civil Action No. 5:07cv156.

16.    Peter McAndrews
McAndrews Held & Malloy
500 W Madison Street
Suite 3400
Chicago, IL 60661
(312) 775-8000

Peter McAndrews is an attorney and represents the Plaintiff in Civil Action No. 5:07cv156. Mr. McAndrews has knowledge of the facts concerning multiple issues in this case, including communication ESN had with Cisco, the filing of the ESN complaint, Cisco's declaratory judgment action, various motions in the ESN v. Cisco case, the issuance of the ESN patent, and the falsity of Defendant's statements. Mr. McAndrews also has information regarding Cisco's conduct, including negligence, actual malice, recklessness and common law malice. Additionally, Mr. McAndrews may have knowledge of Plaintiff's damages.

17.    Paul McAndrews
McAndrews Held & Malloy
500 W Madison Street
Suite 3400
Chicago, IL 60661
(312) 775-8000

Paul McAndrews is an attorney and represents the Plaintiff in Civil Action No. 5:07cv156. Mr. McAndrews has knowledge of the facts concerning multiple issues in this case, including communication ESN had with Cisco, the filing of the ESN complaint, Cisco's Declaratory Judgment action, various motions in the ESN v. Cisco case, the issuance of the ESN patent, and the falsity of Defendant's statements. Mr. McAndrews may have information regarding Cisco's conduct, including negligence, actual malice, recklessness and common law malice. Additionally, Mr. McAndrews may have knowledge of Plaintiff's damages.

---

**PLAINTIFF'S FIRST SUPPLEMENTAL DISCLOSURES**

18. George P. McAndrews
McAndrews Held & Malloy
500 W Madison Street
Suite 3400
Chicago, IL 60661
(312) 775-8000

George P. McAndrews is an attorney and represents the Plaintiff in Civil
Action No. 5:07cv156. Mr. McAndrews has knowledge of the facts
concerning multiple issues in this case, including communication ESN had
with Cisco, the filing of the ESN complaint, Cisco's Declaratory Judgment
action, various motions in the ESN v. Cisco case, the issuance of the ESN
patent, and the falsity of Defendant's statements. Mr. McAndrews may have
information regarding Cisco's conduct, including negligence, actual malice,
recklessness and common law malice. Additionally, Mr. McAndrews may
have knowledge of Plaintiff's damages.

19. Gerald C. Willis
McAndrews Held & Malloy
500 W Madison Street
Suite 3400
Chicago, IL 60661
(312) 775-8000

Gerald C. Willis is an attorney and he represents the Plaintiff in Civil Action
No. 5:07cv156. Mr. Willis may have knowledge of the facts concerning
multiple issues in this case, including communication ESN had with Cisco,
the filing the ESN complaint, Cisco's Declaratory Judgment action, various
motions in the ESN v. Cisco case, the issuance of the ESN patent, and the
falsity of Defendant's statements. Mr. Willis may have information regarding
Cisco's conduct, including negligence, actual malice, recklessness and
common law malice. Additionally, Mr. Willis may have knowledge of
Plaintiff's damages.

20. Michael C. Smith
Siebman, Reynolds, Burg, Phillips & Smith, LLP
713 South Washington Avenue
Marshall, Texas 75671
(903) 938-8900

Michael C. Smith had communications with Rick Frenkel about the libelous
statements and he allegedly investigated the facts surrounding the filing of
Civil Action No. 5:07cv156. Mr. Smith has knowledge about the Local Rules,
and the electronic filing procedures in place at the time the ESN complaint
was filed. Mr. Smith has knowledge regarding the falsity of Defendant's
statements.

21.   Nell Cooley Ward
      101 Fountain Valley Ct.
      Longview, Texas 75601
      (903) 757-6701

      Nell Cooley Ward is Plaintiff's spouse. She has knowledge of Plaintiff's
      damages.

22.   The Honorable T. John Ward
      100 East Houston Street
      Marshall, Texas 75670
      (903) 935-3868

      The Honorable T. John Ward is Plaintiff's father. He has knowledge of
      Plaintiff's damages.

23.   Bob Chiavello
      Fulbright & Jaworski - Dallas
      2200 Ross Avenue, Suite 2800
      Dallas, Texas 75201
      (214) 855-8000

      Bob Chiavello has knowledge of damage done to Plaintiff's reputation by
      Defendant's statements. He also has knowledge of Plaintiff's reputation in the
      legal community. Mr. Chiavello may have additional info regarding the facts
      of this case.

24.   Raymond P. Niro
      Niro, Scavone, Haller & Niro
      181 West Madison, Suite 4600
      Chicago, Illinois 60602 -4635
      (312) 236-0733

      Ray Niro may have knowledge of damage done to Plaintiff's reputation by
      Defendant's statements. He may have knowledge of Plaintiff's reputation in
      the legal community. Mr. Niro also has knowledge of false statements made
      by the Troll Tracker. Mr. Niro has knowledge about the reasons the Troll
      Tracker publically disclosed his identity. Mr. Niro may have additional
      information regarding facts in this case.

25.   Danny Williams
      Williams, Morgan & Amerson, P.C.
      10333 Richmond, Suite 1100
      Houston, Texas 77042
      (713) 934-4060

---

**PLAINTIFF'S FIRST SUPPLEMENTAL DISCLOSURES**

Danny Williams has knowledge of damage done to Plaintiff's reputation by Defendant's statements. He also has knowledge of Plaintiff's reputation in the legal community. Mr. Williams may have additional information regarding the facts underlying this lawsuit.

26.    Sam Baxter
       McKool Smith, P.C.
       104 E. Houston Street, Suite 300
       Marshall, Texas 75670
       (903) 923-9000

Sam Baxter has knowledge about the facts surrounding the filing of the ESN complaint, knowledge that ESN did not violate any local rule, custom or practice in the filing of the ESN complaint. Mr. Baxter has knowledge of the filing procedures in place on October 2007. Mr. Babcock may have knowledge about the date the ESN patent issued. Mr. Baxter has knowledge regarding Defendant's negligence, recklessness and malice in defaming by Troll Tracker. Mr. Baxter may have knowledge regarding the falsity of Defendant's accusations. Sam Baxter has knowledge of Plaintiff's reputation in the legal community. Mr. Baxter may also have information regarding Plaintiff's damages.

27.    The Honorable Robert Parker
       100 E. Ferguson St., Ste 1114
       Tyler, Texas 75702
       (903) 531-3535

The Honorable Robert Parker has knowledge of Plaintiff's reputation in the legal community.

28.    The Honorable Lauren Parish
       405 North Titus
       Gilmer, Texas 75644
       (903) 843-2836

The Honorable Lauren Parish has knowledge of Plaintiff's reputation in the legal community.

29.    Larry Carlson
       Baker Botts, LLP
       2001 Ross Avenue
       Dallas, Texas 75201-2980
       (214) 953-6525

Larry Carlson has knowledge of Plaintiff's reputation in the legal community.

30.    Jim Knowles
       909 ESE Loop 323, Suite 410
       Tyler, Texas 75701
       (903) 534-3800

       Jim Knowles has knowledge of Plaintiff's reputation in the legal community.

31.    Greg Love
       Love Law Firm
       109 W. Tyler Street
       Longview, Texas 75601
       (903) 230-5683

       Greg Love has knowledge of Plaintiff's reputation in the legal community.

32.    Rich Norman
       Three Riverway, Suite 1775
       Houston, TX 77056
       (713) 651-1771

       Rich Norman has knowledge of Plaintiff's reputation in the legal community.

33.    John Noh
       3663 S. Bascom Avenue
       Campbell, CA 95008
       408.558.9573

       Mr. Noh participated in the dissemination of the accused articles. Mr. Noh has
       factual information regarding many of the issues in this case.

34.    Matthew Tanielian
       900 7th Street NW
       Suite 750
       Washington, DC 20001

       Troll Tracker believes Mr. Tanielian has information concerning its motive to
       defame by Troll Tracker. Mr. Tanielian likely has additional relevant
       information.

35.    Kurt Pankraz
       Bart Showalter
       Kevin Meek
       Steve Shortgen
       Baker Botts, LLP
       2001 Ross Avenue
       Dallas, Texas 75201
       214.953.6500

Counsel to defendant. The individuals have knowledge about the facts surrounding the filing of the ESN complaint, knowledge that ESN did not violate any local rule, custom or practice in the filing of the ESN complaint. They have knowledge of the filing procedures in place on October 2007 and knowledge that Defendant's statements were false. They have knowledge about the date the ESN patent issued. On information and belief, they have knowledge regarding Defendant's negligence, recklessness and malice in defaming by Troll Tracker.

36.     Jillian Powell
        Baker Botts, LLP
        2001 Ross Avenue
        Dallas, Texas 75201
        214.953.6500

        Ms. Powell acting as Cisco's agent, contacted the clerk's office and learned information bearing on the falsity of Defendant's statements, Defendant's negligence, recklessness, malice and intent to defame.

37.     J. Anthony Downs
        Goodwin Procter, LLP
        Exchange Place
        53 State Street
        Boston, MA 01209

        Mr. Downs has knowledge about the *Hertz v. Enterprise* case.

38.     Mallun Yen
        Marta Beckwith
        Michael Timmeny
        John Corcoran
        John Earnhardt
        Dan Lang
        Mark Michels
        Neal Rubin
        Terry Anderson
        Robyn Nicole Blum
        Heather Dickinson
        Lisa Domingo
        William Friedman
        Mary Ooley
        Jennifer Greeson
        Dan Lang
        Kenneth M. Lotich
        Mark Michels
        Marc Musgrove

Paul Redifer
Richard Renfree
Michael Ritter
Neal Rubin
Anita Kirsten Weeks
Cisco Systems, Inc.
c/o Jackson Walker LLP
1401 McKinney
Suite 1900
Houston, Texas 77010
713.752.4200

All employees of Defendant who may have factual information regarding the filing of the ESN complaint, the Troll Tracker blog posts, and Cisco's conduct.

**Rule 26(a)(1)(B):**  "[A] copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support is claims or defenses, unless solely for impeachment."

**Disclosure**:  See documents bearing Bates Numbers Ward 000001 – 000386,

previously produced.  Ward reserves the right to identify additional documents as

discovery proceeds.

**Rule 26(a)(1)(C):**  "[A] computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered."

**Disclosure**:  Ward does not seek economic damages.  The damages sought by

Ward, as set forth in his Complaint, are within the discretion of the jury.

**Rule 26(a)(1)(D):**  "[Produce] for inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."

**Disclosure**:  Not Applicable.

---

**PLAINTIFF'S FIRST SUPPLEMENTAL DISCLOSURES**

Respectfully Submitted,

*/s/ Nicholas H. Patton*
Nicholas H. Patton (SBN 63035)
Geoffrey Culbertson
Courtney Towle
Patton, Tidwell & Schroeder, LLP
4605 Texas Boulevard
Texarkana, Texas 75503
903.792.7080 / 903.792.8233 (Fax)

Patricia L. Peden
LAW OFFICES OF PATRICIA L. PEDEN
1316 67th Street
Suite 6
Emeryville, CA 94608
Telephone: 510-268-8033

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that on this 11th day of September, 2009, a true and correct copy of Plaintiff's Initial Disclosures was served via electronic mail upon counsel below:

Richard E. Griffin
Charles Babcock
Crystal Parker
JACKSON WALKER, LLP
1401 McKinney
Suite 1900
Houston, Texas 77010

Attorneys for Defendant Cisco Systems, Inc.

*/s/ Nicholas H. Patton*
Nicholas H. Patton

PLAINTIFF'S FIRST SUPPLEMENTAL DISCLOSURES



# Exhibit 2

Ward, John 8/10/2009 1:21:00 PM

**Page 1**

```
1       IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF ARKANSAS
2              TEXARKANA DIVISION
3     JOHN WARD, JR.,          *
                               *
4     V.              * C.A. NO. 08-4022
              * JURY TRIAL DEMANDED
5     CISCO SYSTEMS, INC.      *
6
7
8
9     ------------------------------
10        ORAL AND VIDEOTAPED DEPOSITION OF
11             THOMAS JOHN WARD, JR.
12               AUGUST 10, 2009
13    ------------------------------
14
15
16        ORAL AND VIDEOTAPED DEPOSITION of THOMAS JOHN WARD,
17    JR., produced as a witness at the instance of the
18    Defendant, and duly sworn, was taken in the above-styled
19    and -numbered cause on the 10th day of August, 2009,
20    from 9:44 a.m. to 1:21 p.m., before Stacy L. Jordan, CSR
21    in and for the State of Texas, reported by machine
22    shorthand, taken in the law offices of John Ward, Jr.,
23    111 West Tyler Street, City of Longview, County of
24    Gregg, State of Texas, pursuant to the Federal Rules of
25    Civil Procedure.
```

**Page 3**

```
1                    I N D E X
2     Appearances ...................... 2
3     THOMAS JOHN WARD, JR.
4        Examination by Mr. Babcock ............... 6
5     Changes and Signature ................... 142-143
      Reporter's Certificate ...................... 144
6
7
              VIDEOTAPES
8
      BEGINNING OF TAPE 1 ............................ 5
9     BEGINNING OF TAPE 2 .......................... 105
10
11
12              E X H I B I T S
13    NO.  DESCRIPTION                  MARKED
14    Exhibit 2  Deposition Notice            5
15    Exhibit 3  10/17/07 and 10/18/07 Patent Troll   34
                 Tracker Articles
16               (Bates Ward 000003 to 06)
17    Exhibit 4  11/5/07 Olivo e-mail string to Ward  52
                 (Bates Ward 000011 to 12)
18    Exhibit 5  12/4/07 Pridham e-mail to Ward       52
                 (Bates Ward 000200)
19
      Exhibit 6  2/29/08 Niro e-mail string to Ward,  52
20               with attachment
                 (Bates Ward 000077 to 78)
21
      Exhibit 7  3/6/08 Crouch e-mail to Ward        52
22               (Bates Ward 000080)
23    Exhibit 8  3/12/08 Fokas e-mail to Ward, et al. 52
                 (Bates Ward 000369)
24
      Exhibit 9  3/12/08 Fokas e-mail string to Ward  52
25               (Bates Ward 000370 to 371)
```

**Page 2**

```
1            A P P E A R A N C E S
2
3     FOR THE PLAINTIFF:
4        Patricia L. Peden, Esq.
         LAW OFFICES OF PATRICIA L. PEDEN
5        5901 Christie Avenue, Suite 201
         Emeryville, California  94608
6        Phone: 510.268.8033  Fax: 510.547.2446
         E-mail: ppeden@pedenlawfirm.com
7
         Nicholas H. Patton, Esq.
8        PATTON, TIDWELL & SCHROEDER, LLP
         4605 Texas Boulevard
9        Texarkana, Texas  75503
         Phone: 903.792.7080  Fax: 903.792.8233
10       E-mail: nickpatton@texarkanalaw.com
11
12    FOR THE DEFENDANT:
13       Charles L. Babcock, Esq.
         Crystal J. Parker, Esq.
14       JACKSON WALKER, LLP
         1401 McKinney Street, Suite 1900
15       Houston, Texas  77010
         Phone: 713.752.4200  Fax: 713.752.4221
16       E-mail: cbabcock@jw.com
         E-mail: cparker@jw.com
17
18
      ALSO PRESENT:
19       Thad Strobach, Videographer
20
21
22
23
24
25
```

**Page 4**

```
1           E X H I B I T S (Continued)
2     NO.  DESCRIPTION                  MARKED
3     Exhibit 10  3/14/08 Smith e-mail to Ward and    52
                  Albritton, with attachments
4                 (Bates Ward 000088, Ward 000247 to 255)
5     Exhibit 11  Law.com article: Patent Attorneys Sue 52
                  Cisco and Blogging In-House Lawyer for
6                 Defamation
                  (Bates Ward 000228 to 232)
7
      Exhibit 12  3/17/08 Ward e-mail string to Fenner  52
8                 (Bates 000346)
9     Exhibit 13  3/17/08 Gilstrap e-mail to Ward,      52
                  with attachment
10                (Bates Ward 000092 to 96)
11    Exhibit 14  3/28/08 Ward e-mail string to Fokas,  52
                  with attachment
12                (Bates Ward 000348 to 352)
13    Exhibit 15  4/7/08 McAndrews letter to Chandler   52
                  (Bates Ward 000359 to 368)
14
      Exhibit 16  4/18/08 Strachan e-mail to Ward,      52
15                with attachment
                  (Bates Ward 000098 and Ward 000256)
16
      Exhibit 17  10/17/07 and 10/18/07 Patent Troll    52
17                Tracker Articles
                  (Bates Ward 000009 to 10)
18
      Exhibit 18  11/7/07 Patent Troll Tracker Article  52
19                (Bates Ward 000015 to 29)
20    Exhibit 19  Web site Printouts           52
                  (no Bates)
21
22
23
24
25
```

Ward, John  8/10/2009  1:21:00 PM

5

```
1            P R O C E E D I N G S
2         (Exhibit 2 marked.)
3         (Videotape 1.)
4            THE VIDEOGRAPHER:  Here begins the
5    videotaped deposition of John Ward, Jr., Tape 1, Volume
6    1, in the matter of John Ward, Jr. versus Cisco Systems,
7    Inc., in the U.S. District Court, Western District of
8    Arkansas, Texarkana Division, Case Number 08-4022.
9         Today's date is August the 10th, 2009.
10   The time on the video monitor is 9:44 a.m.
11        The video operator today is Thad Strobach;
12   the court reporter is Stacy Jordan, both of them
13   representing West Reporting.
14           Will counsel please state their agreements
15   and appearances.
16           MR. BABCOCK:  Mr. Patton will be in the
17   camera shortly.
18           MS. PEDEN:  Yeah.
19           Come -- come across.
20           Patricia Peden, representing plaintiff.
21           MR. PATTON:  Nick Patton, representing
22   the plaintiff.
23           MR. BABCOCK:  Charles Babcock and Crystal
24   Parker, representing the defendant.
25           THOMAS JOHN WARD, JR.,
```

6

```
1    having been first duly sworn, testified as follows:
2                    EXAMINATION
3    BY MR. BABCOCK:
4       Q.  Will you state your name, sir.
5       A.  Thomas John Ward, Jr.
6       Q.  Mr. Ward, right in front of you is -- is the
7    deposition notice for your wife, which I forgot to
8    introduce.
9       A.  Okay.
10      Q.  But here's Exhibit 2.  That's your notice.
11      A.  Okay.
12      Q.  The only reason I do this is so I can keep
13   track of depositions by numbers.
14          Would you tell us how you're employed?
15      A.  I'm an attorney working for Ward & Smith law
16   firm, which is an assumed name.
17      Q.  Okay.
18      A.  T. John Ward, Jr., P.C. is the business entity
19   that I'm employed by.
20      Q.  And T. John Ward, P.C. is the owner of the
21   Ward & Smith law business; is that right?
22      A.  Jr. Yes.
23      Q.  T. Ward [sic], Jr., P.C.
24          I take it there is a Smith?
25      A.  There is.
```

7

```
1       Q.  Okay.  And what's his relationship, if any, to
2    the T. Ward [sic], Jr., P.C.?
3       A.  He is a shareholder in my professional
4    corporation.
5       Q.  Are there any shareholders besides yourself
6    and Mr. Smith?
7       A.  Yes, one more, Thomas Reardon.  That happened
8    about two months ago.
9       Q.  Okay.  And the current percentage ownership is
10   what?
11      A.  There's 2,000 shares, and Mr. Smith and
12   Mr. Reardon each have one share.  So whatever that
13   percentage is.
14      Q.  Okay.
15      A.  A benevolent dictatorship.
16      Q.  So you own 1,998 of the 2,000 shares of
17   T. John Ward, Jr., P.C.?
18      A.  I do.
19      Q.  All right.  T. John Ward, Jr., P.C. is not a
20   plaintiff in this case, correct?
21      A.  Correct.
22      Q.  Is -- are you claiming damages to T. John
23   Ward, Jr., P.C. indirectly in this case?
24      A.  No.
25      Q.  Have you practiced law since 2007 -- since
```

8

```
1    October 2007 in any -- with any entity or in any way
2    other than through the T. John Ward, Jr., P.C.?
3       A.  No.
4       Q.  Okay.  How are you compensated by the -- by
5    the law practice?
6       A.  I take a paycheck when there's money to be
7    taken.
8       Q.  Since October of 2007, have your paychecks
9    decreased?
10      A.  No.  I made more in 2008 than I did in 2007.
11      Q.  Okay.
12      A.  Probably less in 2009 than I made in 2007.
13      Q.  Although, there's still hope for 2009.
14      A.  We've still got some -- we've still got some
15   time left.
16      Q.  It -- it looks, to me, from looking at the
17   new-case filings in the Eastern District of Texas, that
18   you are a very active litigant there.  Is that fair to
19   say?
20      A.  I --
21          MS. PEDEN:  Objection to form.
22      A.  I'm not an active litigant.  I --
23      Q.  (BY MR. BABCOCK)  I mean --
24      A.  I represent --
25      Q.  -- represent people.  Yeah.
```

**9**

1    A.  I represent a number of individuals and
2  entities.
3    Q.  I should say you have an active practice.
4    A.  I have an active practice, yes.  I'd agree
5  with that characterization.
6    Q.  And has -- do you think your practice has
7  suffered since October 17th and 18th of 2007?
8    A.  Now, what do you mean when you say "suffered"?
9    Q.  Well, are you sitting in -- sitting in your
10  office, twiddling your thumbs, waiting for the next case
11  to come in?
12    A.  No.  I've stayed very busy.
13    Q.  Yeah.  And I'm just guessing, based on my own
14  practice, that you probably work more than 2,000
15  billable hours a year?
16    A.  I have a feeling that I do.  I think I work
17  pretty hard.
18    Q.  Yeah.  And one of my client -- one of my
19  partners, Richard Griffin, says:  Great lawyers are made
20  by great clients.  Do you agree with that?
21    A.  And hard work, yeah.
22    Q.  Hard work and great --
23    A.  And some luck.
24    Q.  And luck.
25      I've heard it said about you that you're a

**10**

1  great lawyer.  Do you agree with that?
2    A.  You know, I'm not going to toot my own horn.
3  I'll let other people make that determination.
4    Q.  Okay.  Let me see if I can see a description
5  that I saw.  We'll get to it in a minute.
6      How about giving me your educational
7  background?
8    A.  Where do you want me to start?  High school?
9    Q.  You can start --
10    A.  College?
11    Q.  You can start with high school, sure.
12    A.  I graduated from Longview High School in 1988.
13  I went to the University of Oklahoma and graduated from
14  there in 1992 with a bachelor of arts in economics.
15    Q.  Phi Beta Kappa, I might add.
16    A.  Yes, sir.  And went directly to law school at
17  Texas Tech University School of Law.  Graduated from
18  there in 1995.
19    Q.  Okay.  And after law school, you clerked for
20  Judge Parker in the Fifth Circuit, I think?
21    A.  I did.
22    Q.  And then you went to work for McKool & Smith,
23  correct?
24    A.  Correct.
25    Q.  And what did you do for McKool & Smith?

**11**

1    A.  I looked at documents all day, most of the
2  time.  That's what ran me out of there in nine months.
3    Q.  Okay.  McKool & Smith is, as I understand it,
4  a Dallas-based litigation firm, correct?
5    A.  Correct.
6    Q.  Commercial litigation?
7    A.  Primarily, yes.
8    Q.  Okay.  And then -- and then after nine months
9  with McKool & Smith, you came out to Longview and set --
10  set up your practice?
11    A.  No.  I -- I moved to Longview, but I worked in
12  Marshall for Mike Miller.
13    Q.  All right.  And how long did you work for
14  Mr. Miller?
15    A.  Two years.  Right about two years.
16    Q.  Okay.  And were you an employee or a partner,
17  or what was your --
18    A.  I was an employee.
19    Q.  Okay.  And after that two-year period with
20  Mr. Miller, what did you do?
21    A.  I became a partner in Holmes, Albritton &
22  Ward.  I moved my practice back to Longview.
23    Q.  Okay.  And the "Holmes" is which Holmes?
24    A.  Clifton, better known as Scrappy.
25    Q.  Scrappy.  Okay.  Not Jam- -- Jamie, who is --

**12**

1    A.  Not Jamie Holmes, no.
2    Q.  Okay.  And the "Albritton" was Eric Albritton,
3  correct?
4    A.  Correct.
5    Q.  Okay.  And how long did that partnership last?
6    A.  A little less than two years.
7    Q.  Why did it -- why did it dissolve?
8    A.  Oh, we were going different directions.  I had
9  gone to work with Scrappy and Eric because Scrappy had
10  said he had a lot of personal injury business.  And I
11  think he had some, but it was -- I was probably carrying
12  as much of my own business as I was getting from
13  Scrappy.  Their practice was really criminal.  And what
14  sounded like a good idea probably wasn't the best
15  business move.  And so we split up.  Eric went out on
16  his own, and I went in with Glenn Perry and Tim Womack.
17    Q.  Okay.  And how long did the Womack, Perry &
18  Ward practice last?
19    A.  Until the tort deform [sic] hit and I went out
20  on my own.  So a couple of years.
21    Q.  Okay.
22    A.  But it was an amicable split.
23    Q.  Okay.  And then your current practice started
24  what year?
25    A.  I'm not positive, but I'm thinking it was

Ward, John  8/10/2009  1:21:00 PM

13

```
1    2002
2        Q.  Has your practice changed since 2002?  Is it
3    still the same mix of cases, or is it different?
4        A.  It's changed a lot since 2002.
5        Q.  What was it in 2002?
6        A.  Personal injury.
7        Q.  Okay.
8        A.  90 -- 95 percent of my -- my practice was.
9        Q.  And what -- how did -- what did it morph into?
10       A.  Well, we still have -- Bruce Smith and Tom
11   Reardon still maintain that personal injury docket.  But
12   my personal docket has really transformed into probably
13   90 percent patent litigation.
14       Q.  Okay.
15       A.  It started as a small percentage and grew and
16   grew and grew until that's all I've got time for.
17       Q.  All right.  And when did it -- when did it
18   change from personal injury to 90 percent patent
19   litigation for you, personally?
20       A.  It's taken place over the years.  So it's over
21   five or six years.  Each year, the intellectual
22   property/patent litigation for me grew.
23       Q.  All right, sir.
24       A.  Became a larger and larger portion of my
25   personal practice.
```

14

```
1        Q.  Okay.  In -- in 2007, what percentage of your
2    work was patent litigation?  I know roughly.  I mean,
3    you can't do it precisely.
4        A.  No.  I'm guessing it was probably 70,
5    75 percent.
6        Q.  Okay.  And 2008?
7        A.  It -- it's hard to break it down in percentage
8    because I still have my hand in the personal injury
9    business.  I still --
10       Q.  Sure.
11       A.  -- get those clients and go to mediations.
12   And if we go to trial, I go to trial.  So, you know,
13   I've still got a per -- -- I don't know if we're talking
14   about a percentage of income or a percentage of my time
15   that I spend on cases.
16       Q.  Sure.
17       A.  So I don't know how you want to break that
18   out.
19       Q.  Well, it's -- it's good enough.  I mean, it's
20   hard to -- I mean, I'd be hard-pressed if anybody asked
21   me the question.
22            But in 2007 to -- to today, it's -- it's
23   grown from 70 or 75 percent to 90 percent?
24       A.  As far as the day-in, day-out time that I
25   devote to practice, yes.
```

15

```
1        Q.  Okay.  And what about the revenue derived from
2    patent litigation; is that the -- is that the same
3    percentage, or is it more or less?
4        A.  I haven't looked at that.  I'd be guessing.
5    I -- I would guess it's -- well, I know it's more.  I've
6    generated more revenue from intellectual property than I
7    have from personal injury.
8        Q.  Okay.
9        A.  How much more, I'd have to go pull the books.
10       Q.  Okay.  Here's the -- here's the comment that I
11   was -- had been searching for earlier.  Quote:  Many
12   lawyers talk about their ability to try cases, but few
13   can match the results obtained by Johnny Ward.  He has
14   "first chair" (the attorney with ultimate responsibility
15   at trial) trial experience in over 30 jury -- jury
16   trials, covering a variety of challenging cases.
17            Is that an accurate description of you?
18       A.  I told you I wasn't going to toot my own horn,
19   but I was tooting my own horn there.  Yes, I had kind
20   words to say about myself.
21       Q.  Yeah, this is from your -- from your Web site.
22       A.  Correct.
23       Q.  It goes on to say, quote:  Not only has he
24   tried a wide variety of cases, he has done so with
25   success.  He obtained his first verdict in excess of a
```

16

```
1    million dollars at the age of 34.
2            True?
3        A.  True.
4        Q.  Mr. Ward turned down a settlement offer, took
5    the case to trial, and the jury awarded his client
6    $1,010,000.
7            Also true?
8        A.  Absolutely.
9        Q.  Okay.
10           In the years that followed, Mr. Ward
11   obtained several multimillion-dollar verdicts, including
12   a $133 million verdict in a patent infringement case
13   against Microsoft.
14           Also true?
15       A.  True.
16       Q.  Okay.
17       A.  I had some help doing it, but yes.
18       Q.  Okay.  It also talks about a case where you
19   were appointed as a special prosecutor in Cass County
20   and that maybe the criminal trial is going to go forward
21   like right about now?
22       A.  It keeps getting bumped, but we're trying to
23   get it done in the fall of this year.
24       Q.  Okay.  And in that case -- on the civil side
25   of that case, you recovered a verdict in excess of 13
```

Ward, John 8/10/2009 1:21:00 PM

17

```
1    million for the family?
2       A.  I did.  Probably my favorite case, most
3    rewarding case I've ever --
4       Q.  And the reason for that is because the
5    district attorney had refused to prosecute somebody that
6    you believed was responsible for the death of a family
7    member that you were representing?
8       A.  The family initially believed, and they
9    convinced me, that that's what had had happened to them.
10   The deeper I dug, the more convinced I was.
11      Q.  And you convinced a civil jury of that, I take
12   it?
13      A.  The facts did.  The facts --
14      Q.  The facts did.
15      A.  -- speak pretty loud.
16      Q.  And -- are you aware of any other time a
17   special prosecutor has been appointed like that?
18      A.  I -- I -- it's not common, but I know it has
19   happened.
20      Q.  Okay.
21      A.  I know a private lawyer has been appointed as
22   special prosecutor.
23      Q.  Okay.  So the criminal trial is going to go
24   forward sometime in -- in the near future, I take it?
25      A.  He's not going to confess, so I think we're
```

18

```
1    going to have a trial.
2       Q.  Okay.  Great.
3           Your -- you just sat through the
4    deposition of your wife, correct?
5       A.  I did.
6       Q.  And she said that -- that after these Troll
7    Tracker articles that are at issue in this case, she
8    believed that your sleepless -- sleep problem -- or
9    inability to sleep through the night increased from one
10   to two times a week to three to four times a week.  Is
11   that true?
12      A.  I had more sleepless nights, I believe, after
13   this --
14      Q.  Okay.
15      A.  -- these articles were published, yes.
16      Q.  Okay.  And do you relate your sleep problems
17   to the articles?
18      A.  The increase in sleepless nights initially ,
19   yes
20      Q.  Okay  And -- and is that because you'd be
21   lying in bed asleep and then you'd wake up thinking
22   about the Patent Troll Tracker?
23      A.  During the four months that we were trying to
24   find out who the Patent Troll Tracker was, yes, because
25   I knew these articles were out there; I knew people were
```

19

```
1    reading them, and so yes, it was something that had me
2    very agitated --
3       Q.  Okay.
4       A.  -- angry, frustrated, upset about.
5       Q.  Okay.  And focusing on the -- on the
6    sleeplessness, your wife estimated that it was three to
7    four times a week that you would wake up, and she
8    attributed it to the Patent Troll Tracker.
9           My question to you, since you're the only
10   one that would know:  Was it three to four times a week
11   that you were waken up for that four-month period?
12      A.  It's hard to pinpoint.  I think it's gotten
13   better over time.  I think she's a better judge, because
14   I -- I have a bad habit of waking her up when I'm having
15   trouble sleeping.  I can't disagree that it was three or
16   four nights because I don't -- I don't have a good feel
17   for it.
18      Q.  And in that -- you say "it's gotten better."
19   When did it get better?
20      A.  Well, she forgot that I take Tylenol PM every
21   night, and I didn't take that before.  It's gotten
22   better since I take Tylenol PM.  I've got a friend who's
23   an ER doctor, and I said:  I'm not sleeping.
24          And I didn't attribute it to -- it to
25   anything but I'm having trouble sleeping.
```

20

```
1    He said:  Try taking Tylenol PM before you
2    get to something harder.
3       Q.  What's the name of the doctor?
4       A.  Brian Mendenhall, a good friend of mine, ER
5    doctor.
6       Q.  And when did you talk to Dr. -- Mendenhall,
7    did you say?
8       A.  Mendenhall.  I know it was when we lived at
9    101 Fountain Valley Court.  I want to say it was over a
10   year ago.
11      Q.  Have you been taking Tylenol PM for a year
12   every night?
13      A.  Yeah, one.
14      Q.  One -- one tablet?
15      A.  One tablet.
16      Q.  Okay.  And now are you sleeping through the
17   night every night?
18      A.  I didn't last night, but pretty much, yeah.
19   I've had --
20      Q.  You were worried about me, right?
21      A.  Well, I was worried about my wife, what -- how
22   my wife was going to --
23      Q.  She seemed --
24      A.  -- hold up.
25      Q.  She seemed okay.
```

Ward, John  8/10/2009  1:21:00 PM

21

1  A. She did great.

2  Q. Okay. So excluding last night, have you been

3  sleeping through the night every night?

4  A. You know, if -- if I've got something going to

5  trial, I'll have some sleepless nights. That's just

6  part of the business, I think.

7  Q. I was going to say if -- if you sleep before a

8  big trial, you're -- you're unusual.

9  A. No.

10  Q. But -- but other than -- you know, other than

11  the normal, you know, wear and tear of practice, have

12  you been sleeping through the night --

13  A. Yeah.

14  Q. -- since you've been taking Tylenol PM?

15  A. Yes.

16  Q. Okay. Now --

17  A. I say that. I mean, there'll be times when,

18  you know, I'm answering this discovery and it gets me

19  worked up again. I try not to read these articles.

20  When I get back into them, it gets me worked up.

21  Q. Sure.

22  A. It gets me worked up right now thinking about

23  them.

24  Q. Okay. And that's as a result of your

25  litigation against Cisco; that's why you're re- --

22

1  rereading them?

2  A. No. It's a result of what they accused me of,

3  I think.

4  Q. Well -- but you don't have a ritual where you

5  sit down every couple of weeks and read these articles,

6  do you?

7  A. Oh, no. I put them -- I try to put them out

8  of my mind.

9  Q. Okay. And the only reason that you have to

10  answer discovery is because of this lawsuit, right?

11  A. That's right.

12  Q. Okay. But prior to your taking the Tylenol

13  PM -- which you said, I think, was maybe a year ago?

14  A. I think so.

15  Q. Okay. Prior to that, was the only thing

16  causing your sleepless nights the Troll Tracker

17  articles?

18  A. No.

19  Q. Okay. What -- what else?

20  A. Stresses of practice, stresses of life.

21  Q. What -- what stressful events in your life do

22  you have other than the stress of your practice?

23  A. I've got kids. I've got three kids. I worry

24  about my kids. I worry about my family. The people at

25  church, they have tough things going on in their lives

23

1  that helps keep things in perspective, but you worry

2  about your friends and family. I think normal stresses

3  that people deal with. Maybe I internalize them more.

4  Maybe I should let them out. I don't know.

5  Q. Would you agree with your wife that your kids

6  are doing fine?

7  A. They're doing great.

8  Q. Okay. So it's nothing about your children

9  that are causing stress in your life?

10  A. No.

11  Q. Okay. I know for some people children can be

12  a huge --

13  A. They're --

14  Q. -- stress problem.

15  A. They're not to that age yet. They still want

16  to hang out with Mom and Dad and generally want to do

17  right.

18  Q. I don't know. When they -- mine were five and

19  six, they were some of the most stressful times, but

20  they evened out. Okay.

21  A. They're -- they're what I enjoy coming home to

22  every night.

23  Q. Okay. Can you recall, when you're waking up

24  at night, any specific instances where you wake up and

25  think about something about the Patent Troll Tracker?

24

1  A. Initially, absolutely.

2  Q. Yeah. Okay. Tell me about initially.

3  A. I just would wake up wondering who's doing

4  this to me.

5  Q. And, in fact, you filed a lawsuit to try to

6  find out who was the author of the Patent Troll Tracker,

7  right?

8  A. As fast as I could, I did, yes.

9  Q. You filed it quickly, but nothing much

10  happened in that case for a while, did it?

11  A. The wheels of justice turn slowly. We were

12  doing everything we could to get a deposition of Google.

13  I don't think I'd ever filed a -- or been involved in a

14  filing of a 202 petition.

15  Q. Right.

16  A. But it sure seemed like it crawled. Although

17  I understand that -- from Google, he was made aware of

18  it real quickly.

19  Q. Who at Google told you that?

20  A. I think we got a letter or -- I don't know

21  how -- how we found out that Google had sent some type

22  of notification to the account holder that there had

23  been a request for information on the -- identity of

24  the account holder and that they would reveal that

25  information to us within 10 days without an objection --

Ward, John 8/10/2009 1:21:00 PM

**25**

1  Q. Okay.

2  A. -- from the account holder. And we never got

3  any information. So I assume that Mr. Frenkel objected.

4  But, again, that's all speculation.

5  Q. Uh-huh. And you're aware that Mr. Niro had

6  offered some money to -- for anybody who would unmask

7  the Troll Tracker?

8  A. We talked about it several times, yes.

9  Q. Did you offer to help contribute to -- to that

10  fund?

11  A. No.

12  Q. Okay. What did you -- what did you say to

13  Mr. Niro about trying to unmask the Troll Tracker?

14  A. We had been involved in some cases together,

15  so I knew Mr. Niro before this event. And I just said:

16  If you find out who it is, let me know; and if I find

17  out who it is, I'll let you know.

18  Q. Did you know why Mr. Niro was trying to find

19  out about who he was?

20  A. My recollection is that they were posting

21  information about his family and where he lived, and he

22  had gotten some kind of threats or something. I mean,

23  there was pretty serious -- what he viewed, and I

24  agreed -- was potential harm to him, that he wanted to

25  get to the bottom of it.

**26**

1  Q. It -- it had nothing to do with the type of

2  practice that he was engaged in?

3  A. They didn't accuse him of a crime or anything,

4  that I know of.

5  Q. Okay. So Mr. Niro never told you that it

6  was -- he was trying to get the identity of the Troll

7  Tracker because of -- he was critical of Niro's practice

8  or the type of clients that he had?

9  A. Well, he was going after Mr. Niro's clients,

10  like he was going after mine. That's why we were all --

11  I say "we." That's why I was reading it, because it was

12  interesting to see what he was going to write about

13  which client next. I don't -- you'd have to talk to

14  Mr. Niro about what his motivation was.

15  Q. Okay. Your wife testified about a dinner that

16  you had with Mr. Niro in Chicago. Do you recall

17  anything else about that dinner?

18  A. He -- he gave me a gift, a -- a cartoon of

19  Niro hopping out of the bush with Frenkel reading a

20  Cisco book. I'm sure you've seen it.

21  Q. I have.

22  A. He framed it, and I think he wrote on it "we

23  got him," which, you know --

24  Q. Do you still have that?

25  A. I do. It's in a -- it's in a moving box,

**27**

1  packed, but I've got it. I'll keep it.

2  Q. Anything else that you recall from that dinner

3  with Mr. Niro?

4  A. I think we were just -- unbelievable that

5  Cisco was behind this. I mean, I remember having

6  that -- that's usually everyone's reaction:

7  Unbelievable that a company like Cisco would do this.

8  Q. And what is the "this"? The fact that the

9  patent -- the -- the Troll Tracker blog?

10  A. The fact that they would accuse a lawyer of

11  engaging in criminal activity and do it anonymously in a

12  case where they were my -- the opposing party, and

13  the -- the person writing it was involved in the

14  negotiations, was an attorney, and that it goes all the

15  way to the top of their legal department, in my opinion,

16  if not further.

17  Q. The -- there were two, maybe three, articles

18  that are at issue in the lawsuit: the 17th, 18th, and

19  then the revised 18th one the next day. Is that your

20  understanding of what --

21  A. I --

22  Q. -- is at issue here?

23  A. Oh, I think there's more at issue, but those

24  are the ones that I think accuse me of a crime. And

25  then I think there were some subsequent ones where he

**28**

1  could have corrected things and he chose not to.

2  Q. Okay. But in terms of what you're suing for

3  defamation, it's the October 17th, 18th, and whatever

4  was revised the next day? I mean, that's what your

5  pleadings say, but --

6  A. Right, that's what the pleadings say. I'd

7  just say, when you say it's "at issue," there are some

8  subsequent statements that have been made that, I think,

9  will be at issue if we try the case.

10  Q. That's --

11  A. As far as the -- the allegations that I

12  engaged in criminal activity, it's the 17th and 18th.

13  Q. Right. Yeah, I just -- when you defend a

14  defamation case, you want to know what the -- what the

15  language is that's being claimed to be defamatory. And

16  it's the 17th -- the articles on the 17th and the 18th

17  that's what you're claiming are -- is defamatory of you,

18  correct?

19  MS. PEDEN: Objection, form.

20  A. I've never defended a defamation case. You're

21  the expert there. And I've never been a plaintiff; I've

22  never represented a plaintiff in a defamation case, so I

23  don't know. I know there's a lot of documents

24  that -- that we've produced that, I think, has some

25  things that are offensive. Now, whether or not they

29

```
1   rise to the level of defamation, I'm going to let you --
2      Q.  (BY MR. BABCOCK)  I'm not -- not trying to
3   make you make a legal conclusion.
4      A.  Okay.
5      Q.  But -- but if we -- if we lined the -- the
6   documents up in front of us and -- and listed what
7   you -- what you want to go to the jury on for what's
8   caused you damage, we would put the October 17th article
9   in the -- in the pile, for sure, right?
10     A.  Right.
11     Q.  And the October 18th article in the pile, for
12  sure, right?
13     A.  Absolutely.
14     Q.  Okay.  What else?
15     A.  Now, again, I don't --
16        MS. PEDEN:  Objection, form.
17     A.  I -- the articles that I've personally
18  other things that have been written, I think, are
19  offensive.  There was a post in November where Frenkel
20  acted like he didn't know why these cases were being
21  dismissed; and he knew all along why they were being
22  dismissed and that Cisco had admitted that jurisdiction
23  was proper --
24     Q.  (BY MR. BABCOCK)  Okay.
25     A.  -- in the Eastern District.  So I -- that
```

30

```
1   leaves a false impression with the -- a reader.
2      Q.  So you're claiming defamation, or falselike,
3   as to that November post?
4         MS. PEDEN:  Objection, form.
5      A.  I don't know what I'm claiming.  I'm telling
6   you which documents I think are --
7      Q.  (BY MR. BABCOCK)  Do you think --
8      A.  -- inaccurate.
9      Q.  Okay.  Do you think the November post of
10  Frenkel has caused you harm, damage?
11     A.  I don't know.
12     Q.  Okay.
13     A.  It's -- it's hard for me to know who's --
14  won't come hire me because of what they read.  Those
15  folks won't call me and say:  Hey, we're not hiring you
16  because we think you're a criminal.
17     Q.  Well, I can -- I can appreciate whether you
18  don't know if you're caus- -- if it's caused you damage
19  or not.  Are you going to claim that it caused you
20  damage?  Are you claiming that the November post caused
21  you damage?
22     A.  I'm going to leave that up to my lawyers.
23  I -- I don't know.
24     Q.  Well --
25     A.  I think it -- it factors in the entire picture
```

31

```
1   of this false impression that Mr. Frenkel was leaving
2   with his readers.  So is it actionable?  I don't know.
3   It's my personal opinion, I think it was false.
4      Q.  And what about the November post was false?
5      A.  If you've got it, I'll take a look at it.
6   There's -- he wrote several things.
7      Q.  Well, it's not -- it's not -- it's not pled, I
8   don't believe.  Maybe it is, but I've never thought
9   until this moment that the November -- the November
10  post, whatever it is, is part of this lawsuit.  So --
11     A.  Okay.
12     Q.  -- you're going to have to give me some more
13  specificity about what it is.
14     A.  Without reading it, I can't tell you
15  precisely; but essentially, Mr. Frenkel wrote that he
16  was checking the docket and ESN had dismissed its case
17  and Cisco had dismissed its case in Connecticut and that
18  somehow the ESN case had been filed again in Texarkana.
19  That's all he knew about it, was the way he wrote, which
20  is a lie.  He knew exactly what was going on, and he
21  didn't write about exactly what was going on.
22     Q.  Okay.  And you think that that -- that that
23  caused you damage?
24     A.  Did it cause me damage?  No.  Did it upset me?
25  Yes, because I knew that those weren't the facts.  Of
```

32

```
1   course, I didn't know it was Cisco at the time.  I was,
2   like:  Wait, there's a lot more going on here.  If these
3   people knew, they'd know what he'd written on the 17th
4   and the 18th, or whatever those two days were -- they'd
5   know that, you know, this happened -- that Cisco had
6   admitted that there was no problem, in my mind.
7      Q.  Okay.  All right.  So you got the October 17th
8   article, the October 18th article, this November post
9   that you just talked about.  Anything else in the stack
10  that we should talk about has caused you damage?
11        MS. PEDEN:  Objection to form.
12     A.  Again, I think you've -- you've had some
13  comments in the press that I think are inaccurate --
14     Q.  (BY MR. BABCOCK)  Okay.
15     A.  -- or that have been attributed to you.
16        MS. PEDEN:  I -- I just need to clarify
17  something, Chip.  When you say "the October 18th
18  article," are you talking about both versions of it?
19        MR. BABCOCK:  I'm not talking about
20  anything; I'm just asking questions.
21     Q.  (BY MR. BABCOCK)  Yeah, there was one -- one
22  thing that, I think, snuck into the pleadings that was
23  attributed to me about -- something about your motives.
24     A.  Yeah, that I was trying to curry favor with
25  the Court -- that this was a baseless lawsuit, and the
```

33

1    only thing you could think of was that I was trying to
2    curry favor with the Court. You tell me: Did they --
3    did you say that?
4        Q. No, not the way it was reported. But is
5    that -- is that one of the things that you're seeking
6    damages for?
7        A. I -- I don't know that I'm seeking damages for
8    it. I think it continues this perception that there's
9    some truth behind the allegations that were made against
10   me --
11       Q. Okay.
12       A. -- that my lawsuit's baseless and that I've
13   got some other motive.
14       Q. Okay.
15       A. There's another one, too. I think you've
16   written in some of these pleadings that I -- this case
17   is just an attempt to get documents for ESN, which --
18   untrue. But --
19       Q. Okay.
20       A. -- you can say that in the lawsuit; I
21   understand that.
22       Q. You -- you've said things in lawsuits about --
23   about your litigation opponents, I assume, from time to
24   time?
25       A. I try to support them with facts, but --

34

1        Q. You would agree that sometimes your litigation
2    opponents don't agree with -- with what you say about
3    them?
4        A. I'm sure they don't.
5        Q. But I'm trying to get to the bottom of what --
6    what you're -- you're suing over. The 17th and the
7    18th. And Ms. Peden reminds everybody that you've
8    amended to allege another article that's the same as the
9    18th, although revised, that was posted the following
10   day. And you've got the November post. Is there
11   anything else?
12       A. That's all I can think of, you know --
13       Q. Okay.
14       A. -- as we -- as we sit here. There's a lot
15   more documents and things that have been written. But
16   as far as --
17       Q. I understand.
18       A. -- what stands out to me, those things stand
19   out to me. Those things --
20       Q. Okay.
21       A. -- irritate me.
22           (Exhibit 3 marked.)
23       Q. (BY MR. BABCOCK) Here's Exhibit 3.
24       A. Okay.
25       Q. And this is a document that was produced to us

35

1    by your lawyers. And I want to ask you first about the
2    bottom notation. It says
3    http://trolltracker.blogspot.com/2007, archive, paren,
4    15 of 47, paren, 11/5/2007, 2:28:33 p.m.
5            Do you see what I -- where I was reading
6    from?
7        A. I see that.
8        Q. Does that represent when you accessed the
9    Patent Troll Tracker to get -- to get the document, this
10   document?
11       A. Maybe. I'm not -- I'm not sure. I remember I
12   started, you know, capturing them, Adobe, PDFs, I think,
13   at -- at some point. I was -- I remember reading it as
14   they were coming out because I was getting phone calls
15   from folks saying: Have you seen what he's written
16   about you?
17       Q. Okay. And the -- first page here is the
18   October 18th one, I believe. And then the one behind it
19   is the October 17th. Would that be right?
20       A. That's what it -- it purports to be. I don't
21   know if these are the ones that are revised or
22   unrevised. I'd -- I'd have to lay them right next to
23   each other --
24       Q. Yeah, I lose --
25       A. -- to figure out.

36

1        Q. -- track of it, too. You can usually tell by
2    whether the "banana republic" thing is in there.
3        A. Yeah, I think this is the revised one because
4    he edits. You can't change history, but you can change
5    a blog --
6        Q. Yeah.
7        A. -- entry.
8        Q. Okay.
9        A. So that would indicate that this --
10       Q. Okay. So this would be the one that was
11   the -- the 19th, or whatever.
12           Let me -- let me ask you about the Oct- --
13   October 17th one.
14       A. Okay.
15       Q. Do you believe that the October 17th article,
16   or post, accuses you of a crime?
17       A. No. I think you have to read them together.
18       Q. Okay.
19       A. I think you have to read the 17th and 18th
20   together to get there.
21       Q. The -- the 17th, in and of itself, doesn't --
22   doesn't accuse you of a crime?
23       A. My recollection is no. I've been through
24   these line by line, obviously, in preparation for my
25   deposition. I think there's a lot of things that are

37

```
 1   inaccurate.  But as far as accusing me of a crime, I
 2   think you have to put them right next to each other.
 3       Q.  Okay.  Let's -- let's go through it and see
 4   what's -- what's inaccurate.
 5       A.  Okay.
 6       Q.  The headline, "Troll Jumps the Gun, Sues Cisco
 7   Too Early," what is -- if anything, is inaccurate about
 8   the headline?
 9       A.  We didn't sue Cisco too early.
10       Q.  Okay.  Anything else?
11       A.  I think -- I don't think ESN meets the
12   definition of what folks think of as a troll, since it's
13   the inventor, as a part of ESN, but --
14       Q.  Okay.
15       A.  I think that's inaccurate, as well.
16       Q.  All right.  The first -- it starts out:  Well,
17   I knew the day would come.  I'm getting my troll news
18   from Dennis Crouch now.  According to Dennis, a company
19   called ESN sued Cisco for patent infringement on
20   October 15th, while the patent did not issue until --
21   until October 16th.
22           Is there anything inaccurate about that?
23       A.  Yeah.  I don't think he was getting his news
24   from Dennis Crouch.  I think he was getting his news
25   from his lawyers.
```

38

```
 1       Q.  Okay.
 2       A.  He might have been getting some from Dennis
 3   Crouch, but he was in charge of the litigation, so I
 4   think he knew about it.
 5       Q.  Okay.
 6           MS. PEDEN:  What about the next sentence?
 7           MR. BABCOCK:  Yeah, I'm -- I'm going to
 8   make sure we cover everything.
 9           THE WITNESS:  Okay.
10           MS. PEDEN:  Thank you.
11       Q.  (BY MR. BABCOCK)  And it says:  According to
12   Dennis, a company called ESN sued Cisco for patent
13   infringement on October 15th --
14       A.  That -- that is untrue.  That statement's
15   untrue.
16       Q.  Okay.  And -- and that's because you think
17   that ESN didn't sue until the 16th, correct?
18       A.  I know for a fact we didn't sue until the
19   16th.
20       Q.  Okay.  "While the patent did not issue until
21   October 16th," that part's true?
22       A.  I believe that's true.
23       Q.  Okay.  The next sentence:  I looked, and ESN
24   appears to be a shell entity managed by the president
25   and CEO of DirectAdvice, an online financial Web site.
```

39

```
 1       Is that inaccurate in any way?
 2       A.  I believe so, because I think he already knew
 3   who ESN was, because I think ESN had been in contact
 4   with Cisco before filing the lawsuit.  So he knew who
 5   ESN was without looking anywhere.
 6       Q.  Okay.  So it -- he should have dropped the --
 7   the "I looked."  He should have just said:  ESN appears
 8   to be a shell entity managed by the president and CEO of
 9   DirectAdvice, an online financial Web site?
10       A.  He knew.  I mean, it should say:  I'm a lawyer
11   representing Cisco, and --
12       Q.  Okay.
13       A.  -- I know who ESN is.  So --
14       Q.  If he --
15       A.  -- I think that's false.
16       Q.  Okay.  But if he'd said that, if he said,
17   "Hey, I'm Rick Frenkel, and I'm here to tell you that
18   ESN is a shell entity managed by the president and CEO
19   of DirectAdvice, an online financial Web site," would
20   that be accurate or not?
21       A.  I don't know -- I don't know enough about ESN.
22   I know they're my client, but I -- I don't know exactly
23   who it is.  I've met one of the principals, but I don't
24   know how it's set up.
25       Q.  Okay.  Have you ever heard of DirectAdvice?
```

40

```
 1       A.  No.
 2       Q.  Do you know who the president and CEO of
 3   DirectAdvice is?
 4       A.  No.
 5       Q.  Do you know whether the principal of ESN that
 6   you've met is the president and CEO of DirectAdvice?
 7       A.  I don't know.
 8       Q.  Okay.  Who is the principal of ESN you've met?
 9       A.  I knew you were going to ask me that.  He was
10   at the -- the hearing on venue, and I can't -- I can't
11   remember his name, sitting here.  If --
12       Q.  Okay.
13       A.  If it's important, we can leave a blank and I
14   can find it, but I don't remember.
15       Q.  And it goes on to say in the -- in the
16   article:  And, yes, he's a lawyer.
17           And I take it, since you don't know who
18   the president and CEO is, you don't know if that's true
19   or not?
20       A.  I don't.
21       Q.  Okay.
22           He clerked for a federal judge in
23   Connecticut and was an attorney at Day, Berry &
24   Howard -- Howard.  Now he's suing Cisco on behalf of a
25   nonpracticing entity.
```

41

1    The part about clerked for a federal judge
2    and was an attorney, you don't know whether that's true
3    or not?
4    A.  I don't.
5    Q.  Okay.  And then:  Now he's suing Cisco on
6    behalf of a nonpracticing entity.
7        You think that maybe ESN is not a
8    nonpracticing entity?
9    A.  I think they're a nonpracticing entity, but I
10   believe that the two principals -- there's a -- the
11   inventor, and then there's someone -- there's another
12   gentleman, the one that came to the hearing, that --
13   Q.  Okay.
14   A.  -- are the two involved in ESN.  I think of
15   nonpracticing entities as folks that acquire patents and
16   prosecute them against --
17   Q.  Okay.
18   A.  -- companies.
19   Q.  "I asked myself, can ESN do this?"
20       Anything false about that?  You don't
21   think he asked himself that?
22   A.  Well, I mean, he's -- he's setting it up:  Can
23   we file it on the 15th, when the patent doesn't issue
24   until the 16th?  So --
25   Q.  Right.

42

1    A.  -- I think that's inaccurate.
2    Q.  Because the premise -- the whole premise of it
3    is that you had filed on the 15th?
4    A.  Correct --
5    Q.  Okay.
6    A.  -- which is not accurate.
7    Q.  Okay.  And then he says:  I would think that
8    the court would lack subject matter jurisdiction since
9    ESN owned no property right at the time of the lawsuit,
10   and the passage of time should not cure that.  And, in
11   fact, I was right, underlined.
12       Again, you'd say because his premise is
13   wrong, that would be wrong.  But other than that?
14   A.  I don't know -- I -- I, maybe embarrassingly,
15   have not researched whether or not you've got a right to
16   file a lawsuit before midnight.  So I don't know if
17   that's an accurate statement.  I know he states that as
18   fact.  I haven't done the legal research to be able to
19   tell you that that's correct.
20   Q.  Okay.  And then he -- there's a block quote
21   from a case called the GAF Building Materials Corp.
22   versus Elk Corp. of Texas, Federal Circuit.  Any reason
23   to believe he miscited that case?
24   A.  I don't know.  I haven't -- I haven't compared
25   it.  I -- I don't put anything past him, but I haven't

43

1    gone to look at it.
2    Q.  Okay.
3        One other -- one other interesting tidbit:
4    Cisco appeared to pick up on this very quickly.  Cisco
5    filed a declaratory judgment action (in Connecticut)
6    yesterday, the day after ESN filed its -- its null
7    complaint.  Since Cisco's lawsuit was filed after the
8    patent issued, it should stick in Connecticut.
9        Anything false about that?
10   A.  Absolutely.  I mean --
11   Q.  Okay.  What's false about that?
12   A.  The -- the very first sentence:  Cisco
13   appeared to pick up on this very quickly.
14   Q.  Okay.
15   A.  I mean, again, he's -- he's acting like, gee,
16   I'm just looking at the dockets, and I don't know what
17   they're picking up on or what they're doing.  He knew
18   exactly what they were doing.
19   Q.  Okay.  It is true that Cisco filed a
20   declaratory judgment action in Connecticut?
21   A.  I believe that's correct.  The same day we
22   filed in -- in Marshall, they filed in Connecticut --
23   Q.  Okay.
24   A.  -- later.
25   Q.  And then he says it ought to stick in

44

1    Connecticut.  And you think that's wrong because it
2    shouldn't have stuck?
3    A.  Well, he said it was a null complaint, which I
4    think is inaccurate.
5    Q.  Okay.
6    A.  And then, again, he's got a conclusion of law,
7    kind of, where he's saying what he thinks --
8    Q.  Right.
9    A.  -- thinks should happen.
10   Q.  Okay.
11       Perhaps realizing their fatal flaw (as a
12   couple of other bloggers, comma [sic], news items have
13   pointed out), comma --
14       Do you know whether there were other
15   bloggers or news items about that?
16   A.  I don't know.
17   Q.  Okay.
18       -- ESN (represented by Chicago firm
19   McAndrews, Held & Malloy and local counsel Eric
20   Albritton and T. Johnny Ward) filed an amended claim --
21   complaint in Texas today - amending to change absolutely
22   nothing at all, by the way, except the filing date of
23   the complaint.
24       MS. PEDEN:  Objection to form.
25       MR. BABCOCK:  What's the objection?

45

1    MS. PEDEN:  You said "Texas" instead of
2    "Texarkana."  You just --
3    MR. BABCOCK:  I'm sorry.
4    MS. PEDEN:  -- misread it.
5    MR. BABCOCK:  All right.  Let me try
6    again.
7    Q.  (BY MR. BABCOCK) -- ESN (represented by
8    Chicago firm McAndrews, Held & Malloy and local counsel
9    Eric Albritton and T. Johnny Ward) filed an amended
10   complaint in Texarkana today - amending to change
11   absolutely nothing at all, by the way, except the filing
12   date of the complaint.
13       Did I read it correctly --
14   A.  I think you --
15   Q.  -- that time?
16   A.  I think you read it correctly.  Untrue.
17   Q.  Okay.  What's untrue about it?
18   A.  We didn't file to change the filing date; we
19   filed it to attach the patent.
20   Q.  The patent.  Okay.  Were there any changes
21   other than attaching the patent?
22   A.  There might have been a reference to the
23   patent number in the complaint.  I don't -- I don't
24   know.  I didn't actually file it.  I remember -- that
25   was probably the -- some of my first involvement in this

46

1    case, was after the initial complaint had been filed.
2    So I remember from reviewing the e-mail, that we filed
3    to attach the patent.
4    Q.  Okay.
5        Survey says?  XXXXXXX (insert "Family
6    Feud" sound here).  Sorry, ESN.  You're on your way to
7    New Haven.  I wonder how Johnny Ward will play there?
8        Did I read that correctly?
9    A.  I think you did.
10   Q.  All right.  And is -- is there anything false
11   about that?
12   A.  No, I don't think so --
13   Q.  Do you ever --
14   A.  -- other than we weren't on our way to New
15   Haven.  Cisco wanted us to be on our way to New Haven,
16   but --
17   Q.  Yeah.
18   A.  -- we beat them.
19   Q.  Ever played in New Haven?
20   A.  No.  Never been there.
21   Q.  Ever litigated in -- in Connecticut?
22   A.  Have not.
23   Q.  Okay.  One of your friends said you thought
24   that -- he thought you'd play fine there.
25   A.  I -- I do recall someone saying that.

47

1    Q.  Okay.  Let me ask you just a couple of things
2    about that last paragraph again.  It says, "represented
3    by Chicago firm McAndrews, Held & Malloy."  ESN was
4    represented by them, correct?
5    A.  Correct.
6    Q.  And it says, "local counsel Eric Albritton and
7    T. Johnny Ward."  You-all were the local counsel,
8    correct?
9    A.  Correct.
10   Q.  What does it mean in the con- -- I know -- I
11   know "local counsel" means different things to different
12   people.  But in this case, what did it mean to be local
13   counsel?
14   A.  I can tell you generally what it means to me.
15   Q.  Sure.
16   A.  Because I -- I had not had any interaction
17   with McAndrews, Held & Malloy up until after the fact.
18   Q.  Okay.  That -- that was Albritton that was
19   doing that?
20   A.  Correct.
21   Q.  Okay.
22   A.  Generally, "local counsel," we're in -- we
23   make sure that everything complies with the local rules
24   and kind of give advice on what local custom and
25   practice are and -- a little bit different than what I

48

1    think of as general local counsel.  Eric and I try these
2    cases very actively and are actively involved in them:
3    jury selection, opening statements, taking witnesses.
4    Q.  Were you -- had it been decided whether you
5    and Eric were going to be actively involved in trying
6    this ENS -- ESN case at this October 17th point?
7    A.  Again, I don't know what they discussed.  I
8    can tell you what our -- the general practice was.  We
9    don't get involved unless we're going to be active
10   and -- so I would assume that that was understood
11   going in.
12   Q.  Were -- were you -- was your involvement in
13   this case through Eric or did McAndrews call you up or
14   did somebody from ESN call you up?
15   A.  It was through Eric.  Now, whether they called
16   and said, "We want to hire you guys" -- I don't know
17   exactly how it went down.
18   Q.  Okay.
19   A.  But Eric -- Eric was kind of in charge of ESN
20   at that time.
21   Q.  Okay.  But you had separate bus- -- law firms
22   at that time; you weren't partners then, right?
23   A.  Correct.  Still -- still have separate
24   businesses.
25   Q.  Yeah.  So the first contact that was made to

Ward, John  8/10/2009  1:21:00 PM

49

1    you was by Eric Albritton, correct?
2        A.  I believe so.
3        Q.  Okay.  And -- and Mr. Albritton and his staff
4    were responsible for filing the -- the pleadings.  And
5    you didn't have anything to do with that, right?
6        A.  That's correct.
7        Q.  Okay.
8        A.  The -- the original complaint --
9        Q.  The original --
10       A.  -- yes.
11       Q.  -- complaint, which there is some
12   documentation on the 15th, some stuff on the docket
13   sheet on the 15th.
14           MS. PEDEN:  Objection to form.
15       Q.  (BY MR. BABCOCK)  Do you agree that there's a
16   docket sheet that shows something was filed on the 15th?
17           MS. PEDEN:  Objection to form.
18       A.  This -- again, embarrassingly, I -- I haven't
19   gone back and looked through all the docket sheets.  I
20   don't know that I've ever looked at the docket sheet.
21   I've looked at the notice of electronic filing well
22   after the fact to see it was filed --
23       Q.  (BY MR. BABCOCK)  Okay.
24       A.  -- when we say it was.
25       Q.  There's -- certainly, within a short period of

50

1    time, within a few days, Cisco filed a declaratory
2    judgment, as you -- as you indicated.  And -- and then
3    there was some filings in -- in Texarkana in front of
4    Judge Folsom.  Did you have any involvement in that, or
5    were you pretty much on the sidelines?
6            MS. PEDEN:  Objection to form.
7        A.  My involvement was pretty limited.  It was,
8    you know, consulting me about should we burn our
9    amendment, or something to that effect, and I think I
10   said "do it."  I mean, we're -- the rules here are you
11   can amend for just about any reason up to a certain time
12   period.  You don't have to seek leave.  That'll be in
13   the docket control order.  So I think I said:  Attach
14   the patent, and file it.
15       Q.  (BY MR. BABCOCK)  Okay.
16       A.  But beyond that, I -- I -- I was not very
17   hands-on this case at that time.
18       Q.  Mr. Albritton's assistant -- I'm not sure if
19   she's a paralegal or -- I think she's a paralegal.
20   Anyway, Amy Mathis, do you know her?
21       A.  Yes, I know her.
22       Q.  Did you know her before this case was filed?
23       A.  Absolutely.
24       Q.  Okay.  Before she filed it, did you talk to
25   her at all about it?

51

1        A.  No.
2        Q.  All right.  After -- after it was filed and
3    she had certain conversations with the clerk's office
4    in -- in both Texarkana and Tyler, did you have any
5    conversation with her during that time period?
6        A.  None that I can recall.
7        Q.  All right.  I asked Mr. Albritton a question
8    about whether or not he fully supported what Amy Mathis
9    did in her contacts with the clerk's office, and he said
10   he did.  I asked him if you did, and he said:  You
11   better ask him at his deposition.  So --
12       A.  All right.
13       Q.  So here we are.
14       A.  I -- I had no problem with what she did.
15       Q.  Okay.
16       A.  I would have done it the same way.
17       Q.  All right.
18       A.  I mean, if it was my -- if we were in charge
19   of filing it and this issue popped up, I'd -- Alecia
20   Kaiser is my primary assistant, and I would say:  Call
21   them and find out what's going on.
22       Q.  You would -- do you know what she says she
23   did, and do you know what the clerk says she did?  In
24   other words, have you reviewed the depositions in the
25   Albritton case?

52

1        A.  No.
2        Q.  Okay.  Every --
3        A.  I know generally, from talking to Eric, what
4    she says she did.  So --
5        Q.  Okay.
6        A.  -- that's really where my knowledge comes
7    from.
8        Q.  Okay.  And at least as you sit here today,
9    you -- you support what Amy Mathis did in her contacts
10   with the clerk's office?
11       A.  Absolutely.
12       Q.  Okay.
13           MS. PEDEN:  Are we at a good breaking
14   point?  Can we take a break?
15           MR. BABCOCK:  Sure.  We can take a break
16   anytime you want to take a break, Patty.
17           MS. PEDEN:  Sorry.  I just have to go to
18   the ladies' room.
19           THE VIDEOGRAPHER:  Off the record, 10:35.
20           (Off the record 10:35-10:42.)
21           (Exhibits 4-19 marked.)
22           THE VIDEOGRAPHER:  Back on the record,
23   10:42.
24       Q.  (BY MR. BABCOCK)  Okay.  Did Ms. Peden take
25   you to the woodshed?  I told her you were doing fine.

Ward, John  8/10/2009 1:21:00 PM

53

1    A. She didn't have to woodshed me.

2    Q. Okay. Well, that's good.

3          Let me hand you Exhibit 17.

4    A. Okay.

5    Q. And this, I think, is the original first-day

6    Patent Troll Tracker and not the revised version that we

7    see in Exhibit 3.

8    A. Okay.

9    Q. And the -- the October 18th, 2007 version that

10   is Exhibit 17 I want to go over with you. It says,

11   ES- -- the headline is "ESN Convinces EDTX Court Clerk

12   To Alter Documents To Try To Manufacture Subject Matter

13   Jurisdiction Where None Existed." Did I read that

14   correctly?

15   A. You did.

16   Q. All right. And I take it you think that's

17   false?

18   A. That lit my fire.

19   Q. And why -- and -- and why do you say it lit

20   your fire?

21   A. Just when I read it, I was like, oh, my gosh,

22   you know. I mean, I was called, saying: Have you seen

23   what they've written about you?

24   Q. Okay. Who -- who called you?

25   A. It was either one or two clients and --

54

1    there's -- there's three names, and I can't remember

2    exactly who it was. Either Terry Fokas, Erich

3    Spangenberg, or David Pridham, who worked for

4    Spangenberg. It was either one or two of those

5    individuals called me. I -- I talked to them all about

6    it, but --

7    Q. Okay.

8    A. -- I -- I don't remember who alerted me to it

9    initially.

10   Q. All right. And they -- and this was all by

11   phone. Fokas, Spangenberg, and David Pridus [sic]?

12   A. Correct.

13   Q. Okay. And was this on the 18th?

14   A. I don't remember, because I remember that

15   we -- you know, everyone was -- I say "everyone." Folks

16   that were doing patent litigation in the Eastern

17   District, it had kind of become required reading to read

18   what the Patent Troll Tracker was writing about folks.

19   So I don't know if someone said "did you see what he

20   wrote about you" on the -- the 17th?

21          And then the 18th, I got another call,

22   going: You really ought to see what -- what's been

23   written.

24          But I don't remember exactly how it

25   happened.

55

1    Q. Okay.

2    A. I was -- I was reading it when I -- I think

3    this was the first time my name popped up. It popped up

4    several times, but I think that was the first I had been

5    called out by name.

6    Q. Okay. The -- actually, the October 18th, 2007

7    article, or post, doesn't mention you by name, correct?

8    A. That's correct.

9    Q. Okay. It was the October 17th one that

10   mentioned your name and wondered how you'd play in -- in

11   New Haven, right?

12   A. It calls me by name in the --

13   Q. Okay.

14   A. -- 17th, correct.

15   Q. Your relationship with Fokas, Spangenberg, and

16   Pridus [sic] has not been affected by this article, has

17   it?

18   A. No.

19   Q. Okay. In fact, Fokas sent you an e-mail and

20   said he -- you were his hero. Do you remember that?

21   A. I do.

22   Q. Okay. So the headline, you think, is false,

23   and it lit your fire because neither E- -- ESN, nor its

24   counsel, in your view, tried to convince the Eastern

25   District of Texas court clerk to alter documents for any

56

1    reason?

2    A. For any reason.

3    Q. Okay.

4    A. Nothing -- nothing was altered.

5    Q. Okay. Well, that last part, that's not true.

6    I mean, the -- the docket sheet was altered, wasn't it?

7          MS. PEDEN: Objection to form.

8    A. No.

9    Q. (BY MR. BABCOCK) You don't think it changed

10   at all?

11   A. I think it changed. You know, you use the

12   word "alter," and I think that's in the criminal

13   statutes; and that's what jumps out to me. Altering

14   something, you're doing some- -- something

15   surreptitiously, is what it connotes to me.

16   Q. Okay. What criminal statute is the word

17   "alter" in?

18   A. I don't know.

19   Q. Well, you just said it was in the criminal

20   statutes. I wondered --

21   A. I've read it in a criminal statute that either

22   Mr. Patton or Ms. Peden had sent to me. So I know I've

23   seen "alter" in some criminal statute. Whether it's the

24   Arkansas statute or the Texas statute or the Federal

25   statute, that's not my cup of tea. But I know I've seen

57

1  it somewhere.

2      Q.  You would admit that -- that the docket

3  changed, if that's the word you prefer?

4      A.  The docket was corrected.

5      Q.  It -- it changed from one thing to another,

6  correct?

7          MS. PEDEN:  Objection to form.

8      A.  Like I told you earlier, I haven't been and

9  even looked at the docket to see what changed.  I

10  understand that the -- there was a correcting entry made

11  by the clerk.

12      Q.  (BY MR. BABCOCK)  Okay.  And whether you call

13  it "correction" or whether you call it something else,

14  the fact is that it was different one day than it was

15  the day before or the minute before, really?

16      A.  I think --

17          MS. PEDEN:  Objection to form.

18      Q.  (BY MR. BABCOCK)  Correct?

19      A.  I believe that to be correct.

20      Q.  Okay.  This says:  I got a couple of anonymous

21  e-mails this morning pointing out that the docket in ESN

22  versus Cisco (the Texas docket, not the Connecticut

23  docket) had been altered.

24          Other than the word "altered," which we've

25  just talked about, do you have any information as to

58

1  anything else in that sentence that's false?

2      A.  Again, I think he's being false when he's

3  saying he's getting anonymous e-mails.  He's the lawyer

4  in charge of the case, so he -- I assume that he's

5  communicating with people about what's going on in the

6  case.

7      Q.  Okay.

8      A.  So I think that's false.

9      Q.  Okay.  Do you know whether he got anonymous

10  e-mails or not?

11      A.  In addition to monitoring the case?

12      Q.  Right.

13      A.  No.

14      Q.  Okay.

15      A.  No, I don't.

16      Q.  It says:  One e-mail suggested that ESN's

17  local counsel called the Eastern District of Texas court

18  clerk and convinced him/her to change the docket to

19  reflect an October 16th filing date rather than the

20  October 15th filing date.

21          First of all, did I read that correctly?

22      A.  I believe you did.

23      Q.  And I assume you don't have any information

24  one way or the other about whether he received an e-mail

25  of this type?

59

1      A.  I don't.

2      Q.  Okay.  And here the word "changed" is used as

3  opposed to "altered."  Do you know whether

4  Mr. Albritton's paralegal, Ms. Mathis, called the

5  Eastern District court clerk?

6      A.  I -- I know that that's who contacted the

7  clerk's office to say:  There's a problem.  How do we

8  correct it?

9      Q.  Okay.  Do you have any information one way or

10  the other whether Ms. Mathis convinced the court clerk

11  to change the docket to reflect the October 16th filing

12  date rather than the October 15th filing -- filing date?

13      A.  Well, that supposes that there was an

14  October 15th filing date, which there was not.

15      Q.  You admit that the docket sheet had the --

16  the -- October 15th as the filing date, don't you?

17      A.  You'd have to show it to me.  But I understand

18  there's something that showed a filing date of

19  October 15th --

20      Q.  Okay.

21      A.  -- and that at some point, it reflected a

22  filing date of October 16th.  But the -- the notice of

23  electronic filing --

24      Q.  Yeah, I --

25      A.  -- has not been changed.

60

1      Q.  I've been -- I've been through this a lot,

2  so --

3      A.  All right.

4      Q.  I think I know what you're saying.

5      A.  Okay.

6      Q.  But -- but my point is:  Do you have any

7  information about the interaction between

8  Mr. Albritton's paralegal, Ms. Mathis, and the court

9  clerk one way or the other?  Do you know?

10      A.  Only what Eric's told me.

11      Q.  Okay.  So --

12      A.  And we were discussing it at that time, and,

13  obviously, we've discussed it since that time.

14      Q.  Okay.  What has Eric told you about it?

15      A.  At that time or, you know, after this --

16      Q.  Let's start with at that time.

17      A.  Okay.  It's -- we had a mediation going that

18  day where we were on opposite sides of the case.  And it

19  seemed like he told me that we'd had a -- there was

20  something that happened on the -- the filing, that we

21  had filed it after midnight and the clerk's office had

22  screwed up, not to worry about it; they were taking care

23  of it.

24      Q.  Okay.

25      A.  And, I mean, I knew it was against Cisco.  I

61

1    knew we were filing -- I knew we had a client named ESN
2    and we were suing Cisco.
3        Q.  Okay.  So he said:  Don't worry about it;
4    we're taking care of it?
5        A.  Pretty much.  That's --
6        Q.  Okay.
7        A.  That's what I recall.
8        Q.  Okay.  And I take it, then, since then, you've
9    had discussions with him about this subject?
10       A.  We had more discussions that day at the
11   mediation, because I was local counsel with Baker Botts
12   for Terry Fokas' company.  Mr. Patton was the mediator.
13   So we --
14       Q.  Kind of a small world?
15       A.  It is a small world.  You know, you never --
16   you look back on it, and it's funny that it worked out
17   that way.
18       Q.  Uh-huh.
19       A.  But we had additional discussions there, so
20   there were additional discussions.
21       Q.  Okay.  Tell me about the additional
22   discussions.
23       A.  I made the bad mistake of popping off to Baker
24   Botts, my -- my cohorts, that I had gotten some more
25   business for them; we had sued Cisco and -- just making

62

1    small talk.  I knew they represented them and -- I knew
2    those guys; I knew they represented them.
3            And Kevin Meek, I believe, said:  Yeah,
4    but y'all've got -- you've got a problem there.
5    Y'all've -- you -- you filed too early.
6            And I made some comment back to him that
7    We've got that taken care of.
8            And then I remember talking to Eric during
9    a break, going, you know:  Cisco thinks we've got a
10   problem.  You know, what -- what happened?
11           And he relayed to me:  They think the
12   docket shows we filed early.  We didn't.  We filed it
13   after midnight.  Don't worry about it.
14           And I didn't worry about it.
15       Q.  Okay.  Anything else -- else you remember
16   discussing with any of the players:  Mr. Patton,
17   Mr. Meek, Mr. Albritton, Terry Fokas?
18       A.  At that -- at that time?
19       Q.  Yes.
20       A.  No.  We were more focused -- focused on that
21   mediation.
22       Q.  Sure.  How about subsequent to that; have you
23   talked to Mr. Albritton about -- about this issue of
24   Ms. -- Ms. Mathis contacting the clerk?
25       A.  I -- it seems like after this came out -- I

63

1    don't think I knew about this at the -- when we were
2    talking.
3        Q.  Okay.
4        A.  That's my recollection.  Then I asked for more
5    detail, you know, when -- when I saw what was written.
6    I -- I said:  Now, tell me exactly what happened.
7        Q.  Okay.  And what did he tell you?
8        A.  Now we're going -- you know, that's -- this
9    has been almost two years ago.
10       Q.  Sure.
11       A.  Generally, I remember him telling me that
12   Amy had to wait up here until after midnight to file it
13   because we had to file it on -- now I know it was the
14   16th, just from me knowing this.  But whatever day, we
15   had to wait until that day, at midnight.  That she had
16   done that, and that he had had to open a shell case the
17   day before; because back then, you had to have the -- a
18   cause number before you could file; and you'd have to
19   open a -- you couldn't wait -- if you want to file at
20   12:01 on the 16th, you have to get it on the 15th;
21   otherwise, you've got to wait until the clerk's office
22   opens at 8:00 a.m. on the day that you're going to file.
23   And you lose your -- that time period; someone on the
24   East Coast can beat you to the courthouse.
25           So he opened up the -- the shell case on

64

1    the 15th.  Somehow they were showing that's the date it
2    got filed, but that we had the notice of electronic
3    filing.  I don't know if he used those words, but we
4    have the file stamp that shows when it was filed.
5        Q.  Okay.  And this was -- it was a few days
6    later, probably after the Patent Troll Tracker articles
7    came out?
8        A.  It would have been -- I would have asked for
9    that much detail when I saw this, you know:  What has
10   this guy written?  And tell me exactly what happened,
11   because I want to know exactly what happened.
12       Q.  Okay.
13       A.  I never went and looked at the docket and
14   looked at the notice of electronic filing.  I've
15   never -- you know, at that time, I have since then.  I
16   did not look at it at the time.
17       Q.  You just relied on what Eric told you?
18       A.  Absolutely.
19       Q.  Any other conversations you've had with
20   Eric about -- about the issue of Ms. Mathis
21   contacting -- calling the -- the Eastern District of
22   Texas court clerk about the -- about the docket sheet
23   changing, altering, whatever word you want to use?
24           MS. PEDEN:  Objection to form.
25       A.  You know, at some point, he -- I think he's

Ward, John  8/10/2009  1:21:00 PM

65

1  asked me, "Would you have done it any differently," you
2  know.  I said:  Absolutely not.  That's -- that's what
3  my assistant does when there's a --
4      Q.  Okay.
5      A.  -- an error in the clerk's office.
6      Q.  Okay.  Have you talked to David Maland about
7  this, the -- the clerk himself, the --
8      A.  Never.
9      Q.  Okay.  Have you talked to any of the deputy
10  clerks or assistant clerks about it?
11      A.  Never.
12      Q.  Okay.  Have we exhausted everything you and
13  Mr. Albritton talked about the issue of Ms. Mathis
14  calling the Eastern District of Texas court clerk
15  regarding the change of the docket?
16      A.  I believe so.
17      Q.  Okay.  Let's keep going on this article.
18      A.  Okay.
19      Q.  Quote:  I checked, and sure enough, that's
20  exactly what happened - the docket was altered to
21  reflect an October 16th filing date, and the complaint
22  was altered to change the filing-date stamp from October
23  15th to October 16th.
24          Did I read that correctly?
25      A.  I believe you did.

66

1      Q.  Is there anything false about that?
2      A.  Yes.
3      Q.  What is it?
4      A.  He says "that's exactly what happened," that
5  we had convinced the clerk to change the filing date.
6  We know that to be untrue.  Whether or not the docket
7  was changed, again, that -- I -- I ascribe a different
8  definition to "altered," which implies criminal conduct.
9  So I don't think that's true.  If you want to say it was
10  "corrected," I think that would be more accurate.  So I
11  don't think --
12      Q.  If -- if he had said, "The docket was
13  corrected to reflect an October 16th filing date, and
14  the complaint was corrected to change the filing-date
15  stamp from October 15th to October 16th," that would be
16  accurate?
17      A.  No.
18      Q.  Okay.  What would be inaccurate about that?
19      A.  If he said, "The docket was corrected to
20  reflect an October 16th filing date" --
21      Q.  Okay.
22      A.  -- I think that would be --
23      Q.  That would be accurate?
24      A.  That would be accurate.
25      Q.  Okay.

67

1      A.  The complaint -- the filing date on the
2  complaint was never altered.  It's incapable of being
3  altered.  So that is categorically false.
4      Q.  Okay.  The -- did the header on the complaint,
5  the thing at the top, did that change?
6      A.  I don't know.
7      Q.  Okay.
8      A.  I know now that that's an allegation, that the
9  header -- I have never gone and printed the header and
10  looked at the different headers and --
11      Q.  Okay.
12      A.  That -- that would not surprise me if the
13  header is -- is different.
14      Q.  Okay.  The last sentence of this paragraph
15  says:  Only the Eastern District of Texas court clerk --
16  court clerk could have made such changes.
17          Do you think that's false?
18      A.  Again, if a filing-date stamp is being
19  altered, I don't know who could make that.  Since it's
20  computer -- computerized and you can do it
21  electronically, I don't know who else is capable of
22  doing that.
23      Q.  Okay.  Do you think that -- that this article,
24  the October 18th, 2007 article, is accusing the -- the
25  district court clerk of anything?

68

1      A.  Being -- yeah.  I think it's accusing the
2  court clerk of being a -- a party to a crime.  I think
3  it later says, witingly or unwittingly, they conspired
4  with us to alter the filing date or we hoodwinked them
5  and -- and tricked her in -- or him/her into altering --
6      Q.  Okay.
7      A.  -- the filing date.
8      Q.  Yeah, the next sentence, actually, says:  Of
9  course, there are a couple of flaws in this conspiracy.
10          And you would say there's no conspiracy?
11      A.  Yeah.  No.
12      Q.  Okay.
13      First, ESN counsel Eric Albritton signed
14  the civil cover sheet stating that the complaint had
15  been filed on October 15th.
16          Anything false about that, to your
17  knowledge?
18      A.  I believe so.
19      Q.  What is that?
20      A.  The civil cover sheet actually gets attached
21  to the complaint on the date that it's filed.  So I
22  don't -- I don't think the civil cover sheet says:  I'm
23  filing on the 15th.  So I think that's --
24      Q.  Do you know whether he signed it on the 15th?
25      A.  I believe he did, so he could open the shell.

Ward, John 8/10/2009 1:21:00 PM

69

```
1    Q.  Okay.
2         Second, there's tons of proof that ESN
3    filed on October 15th.  Heck, Dennis Crouch may be
4    subpoenaed as a witness, exclamation point.
5         Anything false about that?
6    A.  Absolutely.
7    Q.  And what's that?
8    A.  That there's tons of proof that ESN filed on
9    October 15th.  It's the exact opposite of that.
10   Q.  You think there's no proof of that?
11   A.  No, the definitive document for filing is the
12   notice of electronic filing, and that's what you look
13   at.
14   Q.  Okay.  So --
15   A.  So that's untrue.
16   Q.  So the notice of electronic filing is what
17   controls?
18   A.  That's my understanding.
19   Q.  Okay.  And --
20   A.  I say the -- when it says it's filed is what
21   controls.
22   Q.  Dennis Crouch subpoenaed as a witness, you
23   know, that's, I assume --
24   A.  I -- I don't know what --
25   Q.  -- superfluous?
```

71

```
1    court get wind of this, making this post completely
2    irrelevant.)
3         Do you even know what that's talking
4    about?
5    A.  We didn't finish the rest of that.  I don't
6    it's true that this is a banana republic.
7    Q.  Oh, okay.
8    A.  But, you know --
9    Q.  I could have --
10   A.  I'm sorry.
11   Q.  I could have guessed that, but thanks.
12   A.  Right.
13   Q.  The next one, quote:  (n.b.:  Don't be
14   surprised if the docket changes back once the higher-ups
15   in the court get wind of this, making this post
16   completely irrelevant.)
17        Any -- what is that saying to you?
18   A.  It's implying that once we're caught, and
19   we're going to be caught, that the -- the judges will
20   correct this criminal activity.
21   Q.  Okay.  Do you know -- I asked you this a
22   second ago, but in a slightly different way:  Do you
23   know what criminal activity you think this -- this
24   article is accusing you of?
25   A.  I think I do.
```

70

```
1    A.  Right.
2    Q.  Paragraph:  You can't change history, and it's
3    outrageous that the Eastern District of Texas is
4    apparently, wittingly or unwittingly, conspiring with a
5    nonpracticing entity to try to manufacture subject
6    matter jurisdiction.
7         I read that correctly?
8    A.  You did.
9    Q.  And you disagree with that?
10   A.  I think it's all untrue.
11   Q.  Okay.
12        This is yet another example of the abusive
13   nature of litigating patent cases in the Banana Republic
14   of Texas.
15        Did I read that correctly?
16   A.  You did.
17   Q.  Okay.  Do you think that relates to you?  Do
18   you think these --
19   A.  In part.  "Abusive nature of litigating" here.
20   They know -- people know I file a lot of cases on behalf
21   of plain- -- plaintiffs, and absolutely untrue that this
22   is an abusive district.  I've been on both sides of the
23   docket, and just absolutely untrue.
24   Q.  Okay.  And then:  (n.b.:  Don't be surprised
25   if the docket changes back once the higher-ups in the
```

72

```
1    Q.  Okay.  What's --
2    A.  The way I read it, when I -- when I saw it,
3    was that I would think it'd be a crime to go in and
4    change a court filing, scratch out a date and put a new
5    date on it to try and create subject matter
6    jurisdiction.  I think that'd be illegal --
7    Q.  Okay.
8    A.  -- and -- and unethical.
9    Q.  Okay.  And you -- your lawyers have shown you
10   some statutes, but you can't cite us anything?
11   A.  If you pull out my interrogatory -- you've
12   got -- you sent a lot of discovery to me, and I would
13   have looked at it in conjunction with answering my
14   interrogatories.  So that's --
15   Q.  You -- you cited some state bar rules.  I
16   don't think you cited -- cited a statute, but --
17   A.  I think we cite --
18        MS. PEDEN:  Objection to form.
19   A.  I think we cited some statutes.
20   Q.  (BY MR. BABCOCK)  Did you?  Okay.
21   A.  But --
22   Q.  If you did, we won't bother to go over this
23   again.
24        Let's go back to 3 now.  And this thing
25   changes.
```

73

1    A.  And I don't -- which one?  The 18th changes?

2    Q.  The 18th changes.  I don't -- I don't believe

3    the 17th changed.

4    A.  Okay.  I thought there was somewhere where he

5    wrote that he'd gotten a couple of e-mails that were

6    critical of what he'd written about us, and I don't

7    remember which article that's --

8    Q.  Yeah, I think that's the November thing that

9    you're talking about.

10    A.  Okay.  Okay.

11    Q.  But --

12    A.  I don't know what made him change it

13    Q.  Okay.

14    A.  That's -- that's my speculation, but --

15    Q.  Okay.  It looks to me -- but confirm that I'm

16    right -- that it's in the third paragraph.  The first

17    sentence is the same in both Exhibit 3 and Exhibit 17.

18    But then the sentence, "This is yet another example of

19    the abusive nature of litigating patent cases in the

20    Banana Republic of East Texas," that is deleted --

21    A.  Well, there's some -- there were changes

22    before that.

23    Q.  Oh, there were?  Okay.  I'm sorry.

24    A.  He dropped the word "conspiring."

25    Q.  From -- from what paragraph?

74

1    A.  In that third paragraph, he says "conspiring."

2    He drops "conspiring" and says "helped."

3    Q.  Oh, okay.  I'm with you.  You're right.  So he

4    dropped "conspiring" and put "helped."

5    A.  Right.  And then he adds:  Even if this was a

6    "mistake," which I can't see how it could be, given that

7    someone e-mailed me a printout of the docket from Monday

8    showing the case, the proper course of action should be

9    a motion to correct the docket.

10    Q.  Okay.

11    A.  That's -- that's all new.  And then he dropped

12    that last sentence.

13    Q.  Okay.  And then he's still got the "don't be

14    surprised" part?

15    A.  Right.  But, again, I think he's leaving

16    that -- he knows or can easily find out exactly what

17    happened at that point.  He can -- any number of ways,

18    he knows.

19    Q.  Okay.  He says:  The proper course of action

20    should be a motion to correct the docket.

21    Do you see where he -- he wrote that?

22    A.  Yes.

23    Q.  You think that that is not correct, that

24    that -- that's not the proper way to proceed?

25    A.  I think that we were given two options by the

75

1    clerk's office:  file a motion to correct or call Tyler,

2    in the computer department, and raise your complaint

3    with them.

4    Q.  Okay.  And you -- you agree with the way

5    Mr. Albritton and his paralegal handled it, by rejecting

6    the first option of filing a motion, and calling Tyler

7    to talk to the clerk, right?

8    A.  I --

9    MS. PEDEN:  Objection to form.

10    A.  I don't know that they rejected it.  They

11    said:  Here's the two things you can do.  And they said:

12    Well, the most expeditious one is to make a phone call

13    and say:  Can you correct it on your end before we have

14    to file another pleading?

15    So I don't know that they rejected it.  If

16    the clerk's office in Tyler had said, "We can't correct

17    it here; you're going to have to file a motion," they

18    would have filed a motion.

19    Q.  (BY MR. BABCOCK)  Okay.  But -- but you said

20    they were given two options?

21    A.  Right.

22    Q.  And you know for a fact that they didn't

23    pursue Option Number 1.  Whether they rejected it or

24    not, they didn't --

25    MS. PEDEN:  Objection to form.

76

1    Q.  (BY MR. BABCOCK)  -- pursue that, right?

2    A.  Well, your -- your question made it sound like

3    they said:  Well, we're not going to do that.

4    I think they did what -- what we all do,

5    as lawyers, and try and take, you know, what's easiest

6    and quickest and -- and proper, and that is, make a

7    phone call.  If that'll take care of it, then I don't

8    have to file another pleading, you know, draft it and

9    get it filed.

10    Q.  Okay.

11    A.  If the clerk's office had said, "No, you've

12    got to -- they're wrong; you've got to file a motion," I

13    can guarantee you he would have filed a motion.

14    Q.  Sure.  But -- but do you have any information

15    to suggest that -- that Mr. Albritton ever considered

16    filing a motion?

17    A.  I don't know what considered.  I know those

18    were the options --

19    Q.  Okay.

20    A.  -- he was given.

21    Q.  You know, you've talked about how, you know,

22    you guys were at this mediation and then you had other

23    conversations.  Did he ever say to you:  Hey, maybe we

24    should file a motion, or, I want to file a motion, or --

25    MS. PEDEN:  Objection to form.

Ward, John 8/10/2009 1:21:00 PM

77

1      Q.   (BY MR. BABCOCK) -- did the issue of the
2   motion ever come up?
3      A.   I don't think so because we had it corrected.
4   We did what they told us to do.  So we never had to get
5   to the motion.
6      Q.   Yeah, you -- you -- you did one of the things
7   they told you to do?
8          MS. PEDEN:  Objection to form.
9      A.   They didn't tell us to do two things.  They
10  said:  You can do A or B.
11     Q.   (BY MR. BABCOCK)  Right.
12     A.   And we said:  Let's go with A.
13     Q.   Okay.  They said:  You can do A, call the
14  clerk in Tyler, or, B, file a motion.  Right?
15     A.   I think --
16     Q.   That's your understanding?
17     A.   I think that's what the Texarkana clerks
18  told -- if I understand -- who she was talking to.
19     Q.   Right.
20     A.   And she chose to call the Tyler district
21  clerk's office.
22     Q.   Okay.  And -- and you think that was the right
23  way to handle it?
24     A.   Absolutely.
25     Q.   No criticism of that?

78

1      A.   None.
2      Q.   Okay.
3          (Sotto voce discussion between Mr. Babcock
4          and Ms. Parker.)
5      Q.   (BY MR. BABCOCK)  Has -- I know you've --
6   you've produced --
7      A.   Are we through with these?
8      Q.   Yeah, we're done with those.
9          I know you've produced e-mails from a
10  number of people regarding those -- those articles,
11  Exhibit -- Exhibits 3 and 17.  Can you recall any e-mail
12  that you got that was critical of you or of your
13  handling of this -- of this matter?
14     A.   No.
15     Q.   Okay.
16     A.   And to be clear, I don't know exactly what's
17  been produced to you.  I know they turned over some
18  things that I didn't think they should have turned over,
19  but that's their decision.
20     Q.   Are you looking for a lawyer to sue them?
21     A.   Nope, nope.  That's what I've got lawyers for.
22     Q.   Would -- even though -- even though there's
23  been none turned over, have -- did you ever get any that
24  you may have deleted, or whatever, that were critical of
25  you?

79

1      A.   I would have saved it if I'd gotten any.
2      Q.   All right.
3      A.   So I don't think I ever got an e-mail saying:
4   You -- you criminal.
5          Now, that stuff was in the blogs, but I
6   quit reading that.
7      Q.   Did anybody from the U.S. Attorney's Office
8   contact you regarding your being accused of or guilty --
9   possibly guilty of some criminal misconduct?
10     A.   No.
11     Q.   Okay.  How about from the Department of
12  Justice?
13     A.   No.
14     Q.   How about from any state District Attorney's
15  Office?
16     A.   No.
17     Q.   How about the State Bar of Texas; anybody
18  contact you about unethical behavior?
19     A.   No.
20     Q.   Okay.  How about the Eastern District of
21  Texas; did any of the judges contact you about improper
22  behavior?
23     A.   No.
24     Q.   Okay.  Did you get any correspondence from
25  anybody suggesting that you were guilty of criminal or

80

1   unethical conduct?
2      A.   No.
3      Q.   Okay.
4      A.   I -- I don't know how you want to char--
5   I've given you everything that I've got.  I don't -- I
6   don't think you can characterize any of those e-mails in
7   that fashion.
8      Q.   All right.  I didn't, but, you know --
9      A.   Okay.
10     Q.   -- I'm not sitting there, either.
11          Have you had any conversation with anybody
12  that -- that -- listening to them, you thought, that
13  believed you were guilty of criminal or unethical
14  conduct?
15     A.   I've had conversations with people who had had
16  conversations with other people.
17     Q.   Okay.
18     A.   No one directly said:  Hey, I've read this
19  stuff, and I think you're a bad guy.
20     Q.   Okay.  Tell me about the conversation you had
21  with somebody who had a conversation with somebody else.
22     A.   The first one was when my wife and I had
23  dinner with Pete McAndrews and his wife, whose name I
24  can't recall.  A lovely lady.
25     Q.   We'll seal this part of the deposition.  Okay?

81

1    A.  A lovely lady, but I can't recall her name,
2  sitting here.
3    Q.  Okay.  And -- and your wife gave a
4  recollection of that conversation.  Give me yours.
5    A.  Hers was pretty close to mine.  I -- you know,
6  we had gone out there just kind of to keep business
7  contacts going.  It was nice to go have dinner with
8  these folks.  And something came up about the Cisco
9  case.  I mean, that's the only case that Pete and I have
10  together.  And his wife said:  Oh, you're the one.  And
11  clearly, they had talked about it.
12      And I said:  Yeah, I'm the one.
13      And Pete -- I don't think he would have
14  ever told me if he'd known it was going to end up in
15  get-- getting his deposition taken -- told about this
16  time where he was meeting with some in-house counsel at
17  some company.  And I don't know if they were
18  contemplating filing a lawsuit in the Eastern District
19  or what.  And he said:  We've got good local counsel
20  down there, Johnny Ward and Eric Albritton.
21      And they relayed to him they'd have
22  nothing to do with us; they'd read about us; they knew
23  that we were unethical or engaged in bad acts, and not
24  to raise our names again as hiring us as local counsel.
25  That's my recollection of --

82

1    Q.  Okay.
2    A.  -- what was said.
3    Q.  Did you do anything to follow up on that and
4  say:  Hey, you know, I assume you told the in-house
5  counsel that we're good guys and --
6    A.  I didn't -- I mean, I was kind of surprised
7  that I'm hearing this.  I -- I had suspected that that
8  had gone on, but it's hard -- people don't call me and
9  say:  Hey, you were in the running, but we're not hiring
10  you because of what we read about you.
11    Q.  Uh-huh.
12    A.  So it kind of confirmed my suspicion.
13      And I subsequently talked to Pete and
14  said:  I know we were having this over-a-casual-dinner
15  conversation, but it's important to me.  Would you mind
16  me telling my lawyers about it and letting them know
17  that I have confirmation?
18      And he said -- he's a stand-up guy, and he
19  said:  Have at it.  The facts are the facts.
20    Q.  Do you remember the name of the in-house
21  counsel?
22    A.  No.  He -- he -- he would know because he
23  called them by name and company.
24    Q.  Okay.  And you didn't make any effort to
25  contact the in-house counsel or the company yourself

83

1  to --
2    A.  I think that --
3    Q.  -- talk to --
4    A.  I think that'd be improper, but I wouldn't
5  have done that.
6    Q.  Okay.  In any event, improper or not, you
7  didn't do it?
8    A.  I did not do it.
9    Q.  Okay.  And did Pete at dinner specify the
10  Patent Troll Tracker as the source of this in-house
11  counsel's comment to him about you and Mr. Albritton?
12    A.  That's the only place I've been accused of a
13  crime and unethical behavior.  So maybe I just assumed
14  that that's what the source of his information was.
15    Q.  Okay.  But he didn't mention it?
16    A.  I -- I can't recall, sitting here.  I -- I
17  would defer to Pete whether or not he mentioned it or
18  not.
19    Q.  Okay.  As lawyers, we all, from time to
20  tame -- time to time, get -- get in beauty contests,
21  what they call, the counsels -- I mean the companies
22  trying to pick counsel.
23    A.  I -- I understand that goes on in the big
24  firms.  I hear about it because -- Jackson Walker, Baker
25  Botts, or Vinson & Elkins, they get interviewed by

84

1  clients, and I've heard that goes on.  I don't
2  typically -- we're not --
3    Q.  You don't do --
4    A.  -- involved -- my name's brought up, and
5  that's how I found out about another instance where
6  someone had a negative reaction to me.
7    Q.  Okay.  But you typically don't do the beauty
8  contests like the big firms do?
9    A.  No.
10    Q.  Okay.
11    A.  I've got lawyers that use me as local counsel,
12  and they tend to come back to me.
13    Q.  Okay.  You say there was another instance,
14  other than the Peter McAndrews matter, where somebody
15  was reporting what somebody else had said?
16    A.  Right.
17    Q.  And who was that?
18    A.  Bob Chiaviello at Fulbright & Jaworski.
19    Q.  And what did Mr. Chiaviello say?
20    A.  Same general type of thing.  They were
21  enrolled in a beauty contest, and he brought up that:
22  Hey, we use Johnny Ward as local counsel.  We could help
23  you out.
24      You know, it would've had to have been a
25  case filed in Judge Davis' court or Judge Folsom's

85

```
1   court --
2       Q.  Sure.
3       A.  -- defense case.
4           And whoever his contact -- and he said it
5   happened on more than one occasion.  He didn't give a
6   client name to me.  He just said that people have said:
7   We've -- we've heard about that guy; we've read about
8   him; we're not going to use him.
9           And he attributed it to the Patent Troll
10  Tracker specifically.
11      Q.  Okay.
12      A.  So I assume that these folks raised the
13  articles to him.
14      Q.  Okay.  And Chiaviello said that he heard about
15  it from how many clients?
16      A.  I don't know if it was one or several.  It
17  seems like it was on more -- more than one occasion that
18  he had been trying to land some business and had
19  referenced me by name and --
20      Q.  Okay.
21      A.  He did not specify a client, though.
22      Q.  Okay.
23      A.  And I kind of had the same conversation:  Bob,
24  I hate to put you in this situation, but can I give your
25  name to my lawyers?  Would you be willing to talk to
```

86

```
1   them about what's happened?
2       Q.  Uh-huh.  And he -- he said yes?
3       A.  He said --
4       Q.  Okay.
5       A.  -- whatever you need to do.
6       Q.  Is there anybody of this nature, like Pete
7   McAndrews and Bob Chiaviello, who you've asked
8   permission who have denied it, said:  No, you can't give
9   my name to the lawyers?
10      A.  Yes.
11      Q.  Who is that?
12      A.  I don't -- they don't want their names out
13  there, and I -- I don't -- I'm not comfortable giving
14  them to you.  I think it's confidential.  They've had
15  clients who've -- and I can't -- obviously, if I
16  can't -- if I don't give it to you now, I'm not going to
17  get to talk about it at trial, and I understand I live
18  and die by that.
19      Q.  Okay.  Are you claiming economic damages in
20  this case?
21          MS. PEDEN:  Objection to form.
22      A.  I don't believe so.  I think I'm claiming
23  pain, suffering, mental anguish, and reputational
24  damage.  I think I've lost business, but, you know, I
25  can't ever -- again, I can't prove who's not hiring me
```

87

```
1   because of this, so I can't put any dollar value on it.
2       Q.  (BY MR. BABCOCK)  You could prove, however,
3   that a bunch of people are hiring you.  I mean --
4       A.  I've --
5       Q.  -- you've got a pretty active docket.
6       A.  I've got an active docket, yes.  This has, by
7   no means, shut my practice down.
8       Q.  Okay.  So there's Pete McAndrews, Bob
9   Chiaviello, and one or more people that you won't name?
10      A.  One.  One lawyer.
11      Q.  Okay.  One lawyer that you won't name.
12      A.  And Mr. Fokas has told me that he would not
13  have hired me if he did not know me prior to this and
14  know this to be untrue about me.  That's hindsight,
15  but --
16      Q.  Uh-huh.
17      A.  -- he's made that comment to me.  I think he's
18  very happy with my representation of him, so I'm not
19  worried about losing him as a client.
20      Q.  All right.  Okay.  Anybody -- anybody else,
21  other than McAndrews, Chiaviello, the one lawyer you
22  won't tell us, who has said that because of this Patent
23  Troll Tracker article -- were you even quoting somebody
24  else?
25      A.  Quoting some- --
```

88

```
1       Q.  Yeah.
2       A.  Who he would not identify.
3       Q.  Right.
4       A.  He said:  I'm not going to testify.
5       Q.  Okay.  So anybody else other than those
6   people?
7       A.  No.
8       Q.  Okay.
9       A.  Not -- not that I know of.
10      Q.  Okay.  Is there -- is there anybody outside of
11  your professional life -- and I understand the patent
12  bar is a small bar and talks and everything.  But
13  anybody outside of your professional life that has made
14  comments -- disparaging comments to you about the Patent
15  Troll Tracker?  I mean, anybody at church or at school
16  or --
17      A.  Nobody.
18      Q.  Okay.
19      A.  I mean, people, obviously, read about it when
20  we sued and it turned out to be Cisco, but no one's said
21  anything disparaging to me.
22      Q.  Okay.
23      A.  But, obviously, there are folks outside of the
24  profession that have read about it now.
25      Q.  Because there has been -- there has been some
```

Ward, John  8/10/2009  1:21:00 PM

89

1    press comment about the case -- about your case?
2       A.  I think that's fair.
3       Q.  Your very own lawyer, Mr. Patton, was quoted
4    in the Texarkana Gazette.  Did you read that article?
5       A.  I did.
6       Q.  And in that, he said that Frenkel was a
7    coward.  Do you agree with that?
8       A.  Absolutely.
9       Q.  And that Cisco was a bully.  Do you agree with
10   that?
11      A.  Absolutely.
12      Q.  Okay.
13      A.  They've just been caught.
14      Q.  Do you -- do you know -- did you know that
15   Mr. Patton was going to talk to the newspaper prior to
16   him speaking?
17         MS. PEDEN:  Objection.
18         To the extent that that calls for
19   attorney-client-privileged communications, I'm going to
20   instruct you not to answer it.
21      A.  I'm going to follow my lawyer's advice.
22      Q.  (BY MR. BABCOCK)  So you think that that calls
23   for an attorney-client --
24      A.  What --
25      Q.  -- conversation?

90

1       A.  What Mr. Patton and I talked about, whether or
2    not I was contacted by the press?
3       Q.  Sorry.  You misunderstand my question.  Did
4    you --
5       A.  Okay.
6       Q.  -- know before Mr. Patton spoke to the
7    Texarkana Gazette that he was going to speak to them?
8          MR. PATTON:  That's not the question you
9    asked, Chip.
10      A.  The -- the only way I would --
11         MR. BABCOCK:  Go back and read the
12   question I asked before.
13         (Record read.)
14      A.  The only way I would know that is if he told
15   me, and I think that's privileged.
16      Q.  (BY MR. BABCOCK)  Not necessarily.  The
17   reporter could have told you; a lot of people could have
18   told you.
19      A.  Yeah.  No -- no reporter told me that --
20      Q.  Okay.
21      A.  I gave Mr. Patton -- I contacted -- I was
22   contacted by a lot of reporters, and I never gave
23   comment.
24      Q.  Okay.  Did you --
25      A.  As much as I would want -- want to, I know

91

1    better and said:  Contact my lawyer.
2       Q.  All right.  And you gave Mr. Patton authority
3    to speak for you to the press about this case, correct?
4       A.  Absolutely.  He speaks -- he speaks for me.
5       Q.  Is there anything that he has said that you
6    have disavowed or think is improper?
7       A.  Not -- not sitting here.
8       Q.  Okay.  Do you know if the Texarkana Gazette
9    article was after this lawsuit -- was after your lawsuit
10   was filed?
11      A.  I'm guessing, but educated guess is yes, it
12   was after -- after the lawsuit got filed.
13      Q.  Have you ever served on the local rules
14   committee of the Eastern District of Texas?
15      A.  I have not.
16      Q.  Okay.  Let me -- here's Exhibit 18.  I think
17   this is the -- this is the one that maybe you referenced
18   earlier as being a November article by Mr. Frenkel.  It
19   talks about the ESN case on the third page.
20      A.  Right.  Okay.
21      Q.  Is -- is this the one you were talking about?
22      A.  It is.
23      Q.  Okay.
24      A.  And I had forgotten about some of this, so you
25   ask your questions, and I'll answer you.

92

1       Q.  Okay.  It says ESN -- it's -- it's in a larger
2    article about "Troll Call and Other Patent Stats for
3    October 2007."  And then it has a whole bunch of
4    statistics.  And then it lists some cases, and it says
5    "116." Anyway, it says:  116) ESN, LLC versus Cisco
6    (and related company) (Texarkana October 5th [sic];
7    November -- November 15.  No, wait.  Oct-- let me
8    start over again.
9          116) ESN, LLC versus Cisco (and related
10   company) (Texarkana, October 15.  No, wait.  October 16.
11   No, October 15.  When was it "filed" again?).  I posted
12   on it here.  Michael Smith also had a post on the case.
13   I had thought there was a dueling jurisdictional battle,
14   but then I read an article yesterday that ESN dismissed
15   its case against Cisco.  I looked, and the same is true
16   for the Cisco case against ESN:  gone.
17         Aside from his, you know, we don't know
18   whether he read it or not, is it true that both cases
19   were dismissed, right?  Both the Texarkana case and the
20   Connecticut case were dismissed?
21      A.  Okay.  But you said something before that, and
22   you -- you threw me off.  You said we don't know whether
23   or not it's true.
24      Q.  Well, all of his musings about what he was
25   doing or -- do you know anything about whether he was

93

1  listening to Michael Smith or whether he was looking on
2  his computer?
3         MS. PEDEN:  Objection to form.
4     A.  I don't know what he was doing.  I know that
5  the things that he's writing here are false, and he
6  would have known they were false at that time --
7     Q.  (BY MR. BABCOCK)  Okay.
8     A.  -- or should have known.
9     Q.  What -- what was true was that both the
10  Texarkana case and the Connecticut case were dismissed,
11  correct?
12     A.  That's part of the truth, yes.  He knew a lot
13  more, though.
14     Q.  Okay.  But -- but that fact is true?
15     A.  That's -- that's -- that's part of the truth.
16     Q.  Okay.  And what do you think he should have
17  added?  Like, who he was or --
18     A.  Well, no.  And Cisco -- he knew that Cisco had
19  consented to say that jurisdiction is correct in the
20  Eastern District of Texas.  And then in the first line,
21  he's saying:  When is it filed?
22        He knows when it's filed.  He certainly
23  has access to the notice of electronic filing, and he's
24  still saying, oh, we can't -- and he's using the word --
25  he's putting it in quotes -- "filed," because that's a

94

1  very specific meaning.  And he's saying -- he's
2  referring back to his -- and he's linked back to it:  I
3  posted on here.  So go back and look about the
4  article where I said --
5     Q.  Okay.
6     A.  -- they've altered the filing date.
7     Q.  Okay.
8     A.  He's connecting the articles himself.
9     Q.  Okay.  Then he says:  I got some critical
10  e-mails for using the word "altered" with respect to the
11  Texas docket.  Well, let me respond.  If a document
12  appears one day with a date stamp and the next day that
13  date stamp disappears and is replaced with a different
14  stamp, what would you call it?  To the extent the use of
15  the word "altered" implied that anyone did anything
16  illegal, that was not my intent.  I'm positive the court
17  clerk was following local custom, as was the ESN Texas
18  lawyer.  But putting aside the propriety of such actions
19  with respect to local custom, isn't such a "customary"
20  action detrimental to the credibility of the Court?  We
21  have been -- we have to be able to trust the U.S. courts
22  and their ECF system.  How can we trust the courts when
23  date stamps on documents disappear on one day and
24  reappear the next day with a different date?
25        This all could be averted if the local

95

1  rules committee adds a rule that no document shall be
2  replaced without a motion made to correct the docket.
3        Have I read his article -- or blog in --
4  in its entirety -- well, these two paragraphs, I should
5  say?
6     A.  Yes, sir.
7     Q.  Okay.  Did I read them correctly?
8     A.  I believe you did.
9     Q.  Okay.
10     A.  I mean, they pretty much speak for themselves.
11  They say what they say.
12     Q.  Right.  And -- and do you have criticism for
13  what he said in -- in those two paragraphs I just read?
14     A.  Absolutely.
15     Q.  Okay.  What -- what are your criticisms?
16     A.  Do we want to go through it line by line?
17     Q.  Sure.
18     A.  Okay.  I think I've already told you about the
19  criticism about where he's talking October 15th,
20  October 16th.
21     Q.  Okay.
22     A.  No, wait.  October --
23     Q.  Gotcha.
24     A.  -- 15th.
25        He knew there was a dueling jurisdictional

96

1  battle.  He knew that we'd talked to Sam Baxter and that
2  Cisco had conceded that jurisdiction was appropriate in
3  the Eastern District.  He admits all those facts.
4        And he's not telling the truth when he
5  says:  I read an article that ESN was dismissed.
6        We know he's monitoring the docket.  He's
7  the attorney in charge of the ESN case.  We know that's
8  untrue.
9        And he says he's looking to see if the
10  same is true for the Cisco case.  That's untrue.  He's
11  getting reports daily from his lawyers about what's
12  going on, if not hourly, and then he omits what's
13  happened.  So he's not giving the full picture of what's
14  going on, I think.
15     Q.  Okay.
16     A.  I don't know whether he -- or not he got
17  critical e-mails.  My understanding is he says he can't
18  find any of his e-mails, which I find to be incredible.
19        He uses the word "altered."  I -- I don't
20  doubt that people read it the same way I did and that he
21  was criticized for using it.  I'd love to see what those
22  folks wrote him, but I don't know if we'll ever see
23  that.
24        And then this next sentence, he's talking
25  about the date stamp changing and -- and reappearing and

97

```
 1   being replaced. All untrue. The date stamp was never
 2   changed, was never altered. I think he knew what he was
 3   implying when he used the word "altered," that he was
 4   implying illegal activity. That was his intent.
 5          And, again, he's assuming that the court
 6   clerk -- in this next sentence, that the court clerk is
 7   altering the date, which didn't happen.
 8          And he's saying -- he sets aside the
 9   propriety of such actions. Well, there's nothing
10   improper about it, nothing to set aside.
11          Calling into question the credibility of
12   the Court. There's no -- no reason to question anyone's
13   credibility. And, you know, he's supporting this banana
14   republic statement, that we need to be able to trust the
15   Courts and their -- their system, that there's something
16   nefarious going on.
17     Q.  He -- he doesn't mention banana republic
18   again, does he?
19     A.  No, no --
20     Q.  Okay.
21     A.  -- he doesn't. He previously referred to this
22   practice --
23     Q.  Oh, okay. All right.
24     A.  And then he's saying it's -- you know, we have
25   to be able to trust these date stamps; somehow they're
```

98

```
 1   not trustworthy, when, in fact, we know it never
 2   changed. He's saying they disappear and reappear.
 3   Untrue.
 4     Q.  Anything else?
 5     A.  Not that I can think of.
 6     Q.  Okay. You said that you talked to Sam Baxter
 7   and Cisco conceded jurisdiction was proper. Was it you
 8   that talked to Sam Baxter?
 9     A.  No.
10     Q.  Who talked to Sam Baxter?
11     A.  Eric --
12     Q.  Okay.
13     A.  -- talked to Sam.
14     Q.  And reported to you?
15     A.  Yes. They -- they were working out an
16   agreement on how we're going to go forward.
17     Q.  Okay.
18     A.  Now, I've had conversations with Sam since
19   that time, but --
20     Q.  Okay.
21     A.  -- at that time, I had not.
22     Q.  Okay. Tell me about your conversations with
23   Sam Baxter regarding this case -- or regarding this
24   matter.
25     A.  Very brief. It was when we were identifying,
```

99

```
 1   you know, persons with knowledge of relevant facts. We
 2   identified Sam. And I contacted Sam to ask him what he
 3   thought about this post, what his opinion was, was it
 4   accusing me of criminal conduct, and would he come
 5   testify.
 6     Q.  Okay. And what did he say?
 7     A.  Absolutely accused me of criminal conduct, and
 8   he'd be happy to come testify.
 9     Q.  Okay. Was he representing Cisco at the time?
10     A.  At the time of --
11     Q.  Of that conversation.
12         MS. PEDEN: Objection to form.
13     A.  I don't know if he was or not. It was fairly
14   recently.
15     Q.  (BY MR. BABCOCK) But when was it?
16     A.  It would have had to have been shortly before
17   we gave you the list of --
18     Q.  People with relevant knowledge?
19     A.  Well, I say that, because it might have
20   been when we -- I don't know what they've -- what
21   they've done with the pleadings. I know that the
22   conversation took place in the last, I'd say, 90 days.
23     Q.  When you say the date stamp never changed, do
24   you know whether any things on the docket that
25   changed -- I mean on the pleadings that changed at all?
```

100

```
 1         MS. PEDEN: Objection to form.
 2     A.  I don't know it for a fact. I -- my
 3   understanding is that there's something on the docket
 4   entry that reflects a different date. It originally
 5   showed "file," and now it shows the 16th, but I -- I
 6   don't know. If you show it to me, I'll -- I'm not
 7   trying to deny that happened.
 8     Q.  (BY MR. BABCOCK) Okay. All right. Do you
 9   disagree with his last sentence here, that -- that maybe
10   there ought to be a local rule to say that you can't
11   replace a document without a motion made to correct the
12   docket?
13     A.  I disagree with the statement that he said
14   "this could all be averted." This could all have been
15   averted if he'd asked for a copy of the file stamp,
16   which he didn't do.
17     Q.  Okay. But the issue of whether you can change
18   things on the docket, do you think that having a local
19   rule requiring a motion to do that would be a better
20   practice?
21     A.  No. I think the clerk's office needs to get
22   this complete -- computer glitch fixed. But for lawyers
23   who are relying on the filing dates, they know what to
24   look at. But I don't -- I don't know how we can do
25   that.
```

101

```
1      Q.  Okay.  All right.  You produced for us a video
2   of you going onto Google.  Do you remember doing that?
3      A.  I do.
4      Q.  And when did you do that?
5      A.  I'm sure it's -- you can get it off that
6   document.  It would show a -- I don't know.  It was
7   shortly after it happened.  My IT guy said:  I want to
8   capture this to show that now I'm -- you put my name in
9   and "attorney."  The first thing that's popping up is
10  Patent Troll Tracker.
11     Q.  Yeah.  I think you -- you put in "Eric
12  Albritton, patent attorney," and the October 17th post
13  showed up.  Correct?
14         MS. PEDEN:  Objection to form.
15     A.  I think I put --
16     Q.  (BY MR. BABCOCK)  Do you know?
17     A.  I think I put in "Johnny Ward," but I --
18     Q.  Okay.  Yeah.
19     A.  I -- it's been a long time since I've looked
20  at it.
21     Q.  We both should have listened to her objection.
22     A.  Okay.
23     Q.  It's "Johnny Ward" --
24         MS. PARKER:  Patent.
25     Q.  (BY MR. BABCOCK)  "Patent attorney."
```

102

```
1          MS. PARKER:  Not --
2      Q.  (BY MR. BABCOCK)  I said "Eric Albritton."
3          MS. PARKER:  Not "attorney," just
4   "patent."
5      Q.  (BY MR. BABCOCK)  Oh, "Johnny Ward, patent."
6      A.  Okay.
7      Q.  "Johnny Ward, patent."  And then the
8   October 17th article popped up, right?
9      A.  Again, I don't remember exact --
10     Q.  It's whatever it says?
11     A.  It's whatever it says.
12     Q.  Okay.
13     A.  It's --
14     Q.  How many times -- how many different
15  combinations of words did you put into the Google system
16  before you got "Johnny Ward, patent" --
17         MS. PEDEN:  Objection to form.
18     Q.  (BY MR. BABCOCK)  -- if any?
19     A.  I -- I don't remember.  I remember that I did
20  it, and I was shocked that that was what was coming up.
21  And I was like:  I'm going to save this, because
22  there's -- in my mind, it was more sophisticated than
23  just some individual out there blogging.  They had a lot
24  of time.  They were giving lots of stats.  Either this
25  person had -- was independently wealthy or someone was
```

103

```
1   paying them to do this or there was a crew of people
2   doing it.  I don't know.
3      Q.  Do you know whether the -- the March 17th -- I
4   mean the October 17th and 18th, 2007 Patent Troll
5   Trackers can be accessed today?
6      A.  I believe they can be.
7      Q.  Okay.  And how do you think they can be?
8      A.  I know I've played around on the Internet, and
9   I -- you can -- you can see them captured in some spots.
10  Now, whether or not they're the altered ones or the
11  revised ones or not, I -- I -- I think you can still
12  access them.
13     Q.  And have you actually, yourself, accessed
14  them?
15     A.  I don't believe I have.  Well, I don't -- I
16  can't remember.  I know I've looked at them and they
17  were available for -- I haven't done this in a long
18  time, but I think they're still there.
19     Q.  Okay.
20     A.  I kind of operate under the -- the belief that
21  once it's out there, it's always out there,
22  unfortunately, whether it's e-mail or Web sites.  I know
23  we've been involved in cases where we use this deal
24  called the way-back machine and you go and -- I didn't
25  realize this -- you find Web sites that were around 15
```

104

```
1   years ago.  I did it in a case with your firm.
2      Q.  Besides your -- besides yourself -- excuse
3   me -- besides yourself, do you know of anybody who has
4   tried to -- to see the -- see the October 17th or 18th
5   articles after March of 2008?
6          MS. PEDEN:  Okay.  I need to interject
7   and just tell you not to disclose any
8   attorney-client-privileged communications.  So you can
9   answer to the extent that you have any knowledge outside
10  of those.
11     A.  As far as other individuals, other than what
12  my lawyers have told me, I can't.  I -- I know of nobody
13  else.
14     Q.  (BY MR. BABCOCK)  Okay.  Have you retained a
15  testifying expert to -- to testify on this expert -- on
16  this subject?
17         MS. PEDEN:  Again, I'm going to interject
18  and just instruct you not to divulge attorney-client
19  communications.
20     Q.  (BY MR. BABCOCK)  Can't answer it?
21     A.  Well, I have not individually gone out and
22  retained somebody to testify, no.
23     Q.  But do you know of a testifying expert
24  who's --
25         MS. PEDEN:  I instruct you not to answer.
```

105

1    A.  The only way I'd know that is if my lawyers
2    have told me, and I'm not answering that one way or the
3    other.
4    Q.  (BY MR. BABCOCK)  Okay.
5        MR. BABCOCK:  We need a tape change, and
6    so let's --
7        MR. PATTON:  Oh, I'm so glad.
8        MR. BABCOCK:  -- let's take a little
9    break.  Okay.
10        THE VIDEOGRAPHER:  Off the record, 11:37.
11   This is the end of Tape 1 of the deposition of John
12   Ward.
13        (Lunch recess 11:37-12:36.)
14        (Videotape 2.)
15        THE VIDEOGRAPHER:  This is the beginning
16   of Tape 2 of the deposition of John Ward, Jr.  Back on
17   the record, 12:36.
18        Q.  (BY MR. BABCOCK)  Can you tell us, Mr. Ward,
19   who John Olivo is, O-l-i-v-o?
20        A.  Jack Olivo?
21        Q.  Okay.
22        A.  Yeah, Jack Olivo.  He's a lawyer in New
23   Jersey.
24        Q.  And do you recall him telling you that -- that
25   you'd play perfectly in Connecticut?

106

1        A.  Is that who wrote that e-mail?  I don't --
2    maybe.
3        Q.  Okay.  I probably have it somewhere.
4        MR. BABCOCK:  Where -- where are my
5    documents?  Let's see if I can find it.
6        Q.  (BY MR. BABCOCK)  Here's Exhibit 4.  This is
7    an e-mail that Jack Olivo from New Jersey sent to you on
8    November 5th, 2007.
9        A.  Yeah.
10        Q.  Still friends with Mr. Olivo?
11        A.  I am.  I mean, we're -- we're professional
12   acquaintances.
13        Q.  Okay.  But you took this as a -- as a
14   complimentary communication regarding -- following the
15   October 17th e-mail saying:  Wonder how he'll play in
16   Connecticut?
17        A.  That's not how I took it.  It was, yeah,
18   people are reading this, and they're in New Jersey
19   reading it.  So, I mean, it kind of --
20        Q.  You didn't think he was being critical of you,
21   did you?
22        A.  No.  He's saying:  Shake it off.  You'll be
23   all right.
24        Q.  Okay.  David Pridham you've talked about
25   earlier.  Let me hand you Exhibit 5, which is an e-mail

107

1    from him.  And it's dated December 4th, 2007, and it
2    directs you to a -- a Web site or something.  Do you
3    know what it is?
4        A.  I'm sure I clicked it at the time, but I don't
5    know what it is now.
6        Q.  Okay.  Okay.  Let me hand you Exhibit 6.  This
7    is, I think, maybe the cartoon that you -- you referred
8    to earlier --
9        MS. PEDEN:  Chip, do you have another
10   copy?
11        MR. BABCOCK:  Oh, I'm sorry.
12        MS. PEDEN:  That's all right.  Thank you.
13        Q.  (BY MR. BABCOCK)  This is the cartoon that you
14   referred to earlier, where Mr. Niro is jumping out of
15   the bushes and Mr. Frenkel is looking scared, sitting on
16   a stone?
17        A.  Yeah, that's the one I -- I was referring to.
18   He framed it in a little -- it's not blown up.  It's
19   this size, in a frame.
20        Q.  Okay.  And signed it for you?
21        A.  It says:  We got him --
22        Q.  Okay.
23        A.  -- Ray.
24        Q.  And this is dated February 29th of 2008, the
25   e-mail to you; is that correct?

108

1        A.  Correct.
2        Q.  And was the framed cartoon given to you
3    sometime subsequent to that -- subsequent to that?
4        A.  Yes.  It was in that October -- October 2008
5    trip that we took up to Chicago.
6        Q.  Okay.  And here's Exhibit 7.  This is an
7    e-mail from Dennis Crouch to you, dated March 8th, 2008,
8    asking you to comment about your defamation lawsuit
9    against Frenkel and Cisco.
10        MS. PEDEN:  Objection to form.
11        Q.  (BY MR. BABCOCK)  I'll back up.  This is an
12   e-mail from Dennis Crouch, dated March 8th, 2008, to
13   you, subject:  Lawsuit against Frenkel.  Correct?
14        A.  That's what it says.
15        Q.  Okay.  Did you get this?
16        A.  I believe I did.
17        Q.  And then he says he's writing a post on your
18   defamation lawsuit against Frenkel and Cisco.  Any
19   comments?
20        Did you have any?
21        A.  No.
22        Q.  Did you refer to your lawyer?
23        A.  I don't know if I even responded to it.
24        Q.  Okay.  This is the third of three lawsuits
25   that you filed relating to the articles written by

Ward, John  8/10/2009  1:21:00 PM

109

1  Mr. Frenkel.  You filed the first one against Google,
2  trying to find out who Frenkel was, right?
3      A.  Yeah, I don't think of it --
4          MS. PEDEN:  Objection to form.
5      A.  I don't think of it as a lawsuit filed against
6  Google.  It was a lawsuit --
7      Q.  (BY MR. BABCOCK)  Actually, it was a 202, and
8  you gave Google notice?
9      A.  Right.
10     Q.  Okay.
11     A.  It was a lawsuit against John Doe, I think, is
12  how it was --
13     Q.  Right.
14     A.  -- styled.
15     Q.  And then the -- and then the next one was
16  filed in -- in state court in Gregg County, correct?
17     A.  Correct.
18     Q.  And that attached the -- the two articles
19  we've been talking about today, correct?
20     A.  I believe so.
21     Q.  Okay.  And then that was nonsuited, and this
22  case was filed in federal court in Arkansas, correct?
23     A.  Correct.
24     Q.  And that attached the articles to the federal
25  lawsuit initially, correct?

110

1      A.  If you say it did.  I don't doubt that.
2      Q.  Okay.  Why did you not comment to Mr. Crouch,
3  who was trying to seek your -- get your comment about
4  the lawsuit?
5          MS. PEDEN:  I just want to interject.
6  If -- to the extent it doesn't call for any
7  communications you've had with counsel.
8      A.  I really have a rule of not commenting to
9  anybody about anything going on with this case.  I've
10  tried to let my lawyers talk for me.  Kind of the same
11  advice I give my clients.
12     Q.  (BY MR. BABCOCK)  Okay.
13     A.  I try to be a good client.  And I know we're
14  not -- lawyers are, they say, the worst clients, but --
15     Q.  That's what I've always heard.
16     A.  -- I try not to be.
17     Q.  This fellow, Terry Fokas, you said, is a -- is
18  a client?
19     A.  Yes.  Not individually, but his companies are.
20     Q.  His company.  Is that Parallel Networks?
21     A.  Yes, formerly Epic Realm, now Parallel.
22     Q.  Okay.  Here's Exhibit 8, which is an e-mail
23  from Mr. Fokas --
24          MR. PATTON:  Chip, let me have one, too,
25  if you don't mind.

111

1          MR. BABCOCK:  Sure.
2      Q.  (BY MR. BABCOCK)  -- is an e-mail to Larry
3  Carlson and Kevin Meek and you, subject:  Patent Troll
4  Tracker Defamation Suit.  "Johnny Ward is my hero."
5          Did you receive that e-mail?
6      A.  I did.
7      Q.  Who is Larry Carlson?
8      A.  He's an attorney at Baker Botts.  We tried a
9  case together --
10     Q.  Okay.
11     A.  -- for Parallel, and this was leading up to
12  that trial.
13     Q.  Okay.  And Kevin Meek, also at Baker Botts?
14     A.  Yes.
15     Q.  All right.  And did you take it that Mr. Fokas
16  was saying that you're his hero?
17     A.  I mean, that's what he wrote.
18     Q.  Any -- any idea why you were heroic, in his
19  eyes?
20          MS. PEDEN:  Objection to form.
21     A.  I can speculate.  I -- I know that the Patent
22  Troll Tracker had written about Parallel Networks, as
23  well, and -- there were lots -- lots of folks he wrote
24  unflattering things about.  I don't know that they
25  crossed the line into being defamatory, but there were a

112

1  lot of folks who wanted to know who he was.
2      Q.  (BY MR. BABCOCK)  Okay.  And -- and "Johnny
3  Ward is my hero" is right above a -- what appears to be
4  a news article about Mr. Frenkel, under the headline
5  "Down & Outed."
6      A.  Right.
7      Q.  Okay.  Did you believe that Mr. Fokas, in
8  saying that you were his hero, were -- was also
9  commenting about Frenkel and Cisco?
10          MS. PEDEN:  Objection to form.
11     A.  I don't know what you mean.
12     Q.  (BY MR. BABCOCK)  Well --
13     A.  I'm -- I'm his hero for -- maybe I
14  misunderstood you.
15     Q.  Yeah.
16     A.  Ask me that again.
17     Q.  Probably -- well, it probably wasn't a good
18  question.
19          Why do you think Mr. Fokas was saying
20  "Johnny Ward is my hero"?
21     A.  I'd be guessing.  I'm happy to guess why he'd
22  think that.
23     Q.  Well, why don't you first tell me what you're
24  thinking, and then I'll ask you if you talked to him
25  about it.

Ward v. Cisco                    Unsigned                    Page  109 - 112

113

```
1    A.  Okay.  I'll answer your second question first.
2  I didn't talk to him --
3    Q.  Okay.
4    A.  -- about:  Why -- why am I your hero, Terry?
5       I think it was because I was not going to
6  take it.
7    Q.  Got it.
8       Here's Exhibit 9, another one from
9  Mr. Fokas.  Did you receive this e-mail regarding Patent
10 Troll Tracker defamation suit?
11   A.  Yeah, and I re-- I responded to it in
12 between.  And then that would have been his reply.
13   Q.  Okay.  You -- your response in the middle
14 says:  I'm getting drawn and quartered in a bunch of the
15 blogs.
16   A.  Yes.
17   Q.  What -- what did you mean by that?
18   A.  When the lawsuit hit the press, you know,
19 whether it's -- I don't remember what all the blogs
20 were.  Like, the Patent Prospector, Patent Leo.  There's
21 some guy who writes another blog, and maybe it's one of
22 these.  And people post comments to the story.  I mean,
23 it -- there was very unflattering things being said,
24 which, you know, if you just don't read them, they don't
25 get to you quite as bad, and I quit reading them.
```

114

```
1    Q.  Okay.
2    A.  But that -- but that's what I was referring
3  to.
4    Q.  All right.
5    A.  I didn't save those, but I think they're still
6  out there.  If you want to go get them, I think they're
7  still online.
8    Q.  Okay.  And these -- these are not Frenkel
9  blogs, but these are other blogs?
10   A.  Correct.
11   Q.  Okay.  And they're saying unflattering things
12 about you?
13   A.  Yes.
14   Q.  Okay.  And do you remember what the -- what
15 the criticism of you was?
16   A.  Yeah, that I had sued Cisco.  Now, they're all
17 anonymous, so you don't ever know who's doing it, but,
18 you know, people saying that they're patent lawyers and
19 I should be more thick-skinned and let people accuse me
20 of a crime and just let it roll off my back and not do
21 anything about it.
22   Q.  So they were critical of you filing a lawsuit,
23 basically?
24   A.  Generally, yeah.
25   Q.  Okay.  And -- and Mr. Fokas says:  I thought
```

115

```
1  most of them were trying very, very hard to be as
2  objective as possible (heck, they're probably scared
3  they're going to get tagged for defamation - LOL) --
4  which my kids tell me means laugh out loud.
5    A.  That's what I understand, too.
6    Q.  Okay.
7    A.  I don't use it, but some people do.
8    Q.  And was it your understanding that Mr. Fokas
9  was referring to the blogs that -- that you thought
10 were -- were drawing and quartering you?
11       MS. PEDEN:  Objection to form.
12   A.  You'd have to ask him.  I don't --
13   Q.  (BY MR. BABCOCK)  I know.  My question --
14   A.  I -- I didn't -- I didn't -- I didn't follow
15 up and didn't ask him.
16   Q.  So you didn't know what -- when he wrote this,
17 you didn't know what he was talking about?
18   A.  There were a number of articles that were
19 written in a number of magazines and things, so, you
20 know, I don't know what he's referring to specifically.
21   Q.  Okay.  Do you -- do you think these blogs and
22 magazine articles damaged your reputation?
23   A.  I -- I don't know.  I think -- I -- I
24 balanced:  Do I stand up for myself, knowing that when I
25 file a lawsuit, people are going to jump all over me
```

116

```
1  versus sitting there and taking it.
2       So I don't know if it damaged my
3  reputation by suing Cisco or not.
4    Q.  All right, sir.
5    A.  I don't really care.
6    Q.  "Personally, I believe that Rick Frenkel is an
7  idiot," writes Mr. Fokas.
8       Had you ever had any discussions with
9  Mr. Fokas about Rick Frenkel?
10   A.  I'm sure we've talked about this case at some
11 point.  You know, he's asked me, "How is it going," or
12 something, but I'm pretty quiet about what's going on in
13 this case with anybody.
14   Q.  Okay.  Do you share his view that Mr. Frenkel
15 is an idiot?
16   A.  I think the guy is plenty smart.
17   Q.  So not an idiot?
18   A.  No.  He's pretty -- pretty smart.  I've got
19 other -- other things I think about him, but I don't
20 think he's dumb.  I think he knew what he was doing.
21   Q.  Have you ever met him?
22   A.  No.
23   Q.  Never talked to him, I take it?
24   A.  No.
25   Q.  And never corresponded with him?
```

Ward, John  8/10/2009  1:21:00 PM

117

1     A.   No.

2     Q.   Let me hand you Exhibit 10.  And this is an

3   e-mail from Michael Smith to you and Eric Albritton on

4   March 14th, 2008, with the message "I'm sure you've seen

5   this, but just in case."  And it attaches a lengthy

6   article from IP Law 360.  Did you receive this?

7     A.   I'm sure I did.

8     Q.   Without going through this whole IP Law 360

9   article, it appears to be commenting, in part, on your

10  lawsuit against Cisco and Mr. Albritton's lawsuit

11  against Cisco and Frenkel.  Is that a fair summary of

12  it?

13    A.   I --

14         MS. PEDEN:  Objection to, form.

15    A.   If you want me to read through it, I can.  I

16  know I read it at one time.  Generally, I think that's a

17  fair -- fair statement, that it was about the lawsuits

18  and what led to the lawsuits.

19    Q.   (BY MR. BABCOCK)  Okay.  Let me hand you

20  Exhibit 11.  This is an article from, I believe,

21  Law.com, which I think is also The Texas lawyer.  Do you

22  remember seeing this article?

23    A.   Again, I think I probably PDF'd it.

24    Q.   Okay.

25    A.   So I'm sure I saw it.

118

1     Q.   And you know that your -- from looking at it,

2   that your lawyer, Mr. Patton, made certain comments to

3   the press about your case, correct?

4     A.   You -- you're going to have to give me a

5   minute, because there were lots of articles, but --

6     Q.   Yeah.

7     A.   -- I imagine he did.

8     Q.   The second page, two-thirds of the way down:

9   Ward's lawyer, Nicholas Patton, a partner in Patton,

10  Tidwell & Schroeder in Texarkana, says Frenkel's

11  postings about his client on Patent Troll Tracker are a

12  "horrible thing," and Ward had no choice but to sue to

13  protect his reputation.  "Those things are damaging.

14  Those kinds of accusations are seen by literally

15  hundreds of thousands of people.  Those are serious

16  accusations that you just can't let go unaddressed,"

17  Patton says.  "There's no truth to it whatsoever."

18         Did I read it correctly?

19    A.   You read it correctly.

20    Q.   Okay.  And those were comments that Mr. Patton

21  was quoted as saying, in any event?

22    A.   They're attributed to Mr. Patton.

23    Q.   Okay.  And as you said before, he was your

24  spokesperson with respect to this case, correct?

25    A.   Was then and is now.

119

1     Q.   Okay.  Here's Exhibit 12 --

2         MR. PATTON:  Got another one?

3         MR. BABCOCK:  Yeah.  (Handing.)

4     Q.   (BY MR. BABCOCK)  -- from Peter Fenner.  Who

5   is Mr. Fenner?

6     A.   He's an inventor who's also a client.

7     Q.   Okay.

8         Johnny, heat up that poker real hot before

9   you stick in the "Patent Troll Tracker" blogger Rick

10  Frenkel and Cisco System, Inc.'s [sic].

11         Did you receive that from Mr. Fenner?

12    A.   I did.

13    Q.   And you respond "thanks."

14    A.   Yep.

15    Q.   Did you discuss this e-mail with Mr. Fenner at

16  any time? .

17    A.   Never.

18    Q.   Okay.  This is March 2008, correct?

19    A.   Correct.

20    Q.   Do you have any idea what prompted this e-mail

21  from Mr. Fenner about a year after you filed the

22  lawsuit?

23         MS. PEDEN:  Objection to form.

24    Q.   (BY MR. BABCOCK)  I'll take that back.  It

25  wasn't a year later.  It was --

120

1     A.   No, it was right -- right about the time.

2     Q.   Right at the time of the lawsuit.

3     A.   That's kind of when I got e-mails from folks

4   that had been watching the Patent Troll Tracker blog.

5     Q.   Fair enough.

6         Let me hand you Exhibit 13.  This is from

7   Rodney Gilstrap.  Do you know who he is?

8     A.   Yes.  He's a lawyer in Marshall.

9     Q.   And he's sending along an article in The Texas

10  Lawyer, dated March 17th, 2008, with the comment, quote,

11  now you're famous --

12    A.   Yeah.

13    Q.   -- end quote.

14    A.   Yeah.

15    Q.   And how did you take that comment, "now you're

16  famous"?

17    A.   Not -- not what I wanted to be famous for.

18    Q.   I think you may even say that here in a

19  minute.

20    A.   Okay.

21    Q.   Let me hand you 14.

22         MR. BABCOCK:  Nick, I think somebody

23  miscopied here.

24         MR. PATTON:  That's okay.  That's okay.

25         MR. BABCOCK:  Maybe -- maybe not.  Maybe

Ward, John  8/10/2009  1:21:00 PM

121

1  not.  I just didn't staple it.  That was the problem.

2      Q.  (BY MR. BABCOCK)  This is Terry Fokas sending

3  you another article from Business Week about -- about

4  your lawsuit and then the -- Cisco's reaction to it,

5  correct?

6      MS. PEDEN:  Objection to form.

7      A.  I'm not sure.  We can -- if you want me to go

8  through the article, I can.  I know it was an article

9  about the lawsuit.  I haven't read it in a long time.

10  Kind of what led up to the lawsuit.

11     Q.  (BY MR. BABCOCK)  Yeah.  A lengthy article.

12  You don't need to read the whole thing.

13         But you say:  This is the best article

14  I've seen.

15         That's what you said in March of 2008,

16  correct?

17     A.  Correct.

18     Q.  Have you seen any better articles since then?

19     A.  It's -- and when I say "better" and "best," as

20  far as giving a full rendition of what was said, the

21  Forbes article might have -- I might have thought it was

22  more balanced as far as saying exactly what was at

23  issue.  Clearly, someone else had read it the same way I

24  read it.

25     Q.  All right, sir.  Here's Exhibit 15.  And this

122

1  is a letter from George P. McAndrews to Mark Chandler,

2  dated April 7th, 2008.  I don't think you're copied on

3  it, but my question is:  Did you see this letter or a

4  draft of it before it was sent to Mr. Chandler?

5      MS. PEDEN:  And I -- I need to interject

6  and say that communications that you had with ESN may be

7  attorney-client-privileged.  So don't divulge any of

8  your confidential communications with your client.

9      A.  I don't recall whether I saw this or not.  I

10  saw it after the fact --

11     Q.  (BY MR. BABCOCK)  Okay.

12     A.  -- for sure.  I know I saw it after he sent

13  it.

14     Q.  Okay.

15     A.  I had no hand in writing it.  I can tell you

16  that.

17     Q.  That was my next question.

18         Here's Exhibit --

19     A.  Not to distance myself from it, but I -- I --

20  I did not have a hand in writing it.

21     Q.  Right.

22         Exhibit 16.  This is from Mark -- is it

23  Strachan (pronunciation) or --

24     A.  Strachan (pronunciation).

25     Q.  Strachan.  And who is he?

123

1      A.  He's an attorney who used to practice in East

2  Texas and then moved to Dallas, and he's with Mark

3  Werbner.

4      Q.  "I thought you and Eric might enjoy this

5  cartoon.  It was in the National Law Journal.  I hope

6  all is well with you."

7         This is April of 2008.  And the cartoon is

8  on the third page, but I'm wondering if the second page

9  is supposed to be there.

10         MR. PATTON:  It looks like that the

11  second page ends that particular article, Chip.

12         MR. BABCOCK:  It looks like what?

13         MR. PATTON:  The second page, which is

14  99 -- and then you skip to 256 on the --

15         MR. BABCOCK:  Right.

16         MS. PARKER:  What's the --

17         MR. PATTON:  -- Bates number.

18         MS. PARKER:  -- Bates number on the first

19  page?

20         MR. BABCOCK:  98 is the first page.

21         MR. PATTON:  You've got 98, 99, and 256.

22         MR. BABCOCK:  Okay.

23         THE WITNESS:  It looks like it was sent

24  to you.

25         MS. PARKER:  It should only have 256 on

124

1  it.

2      MR. BABCOCK:  Okay.

3      MR. PATTON:  I'm sorry, Crystal?

4      MS. PARKER:  According to your discovery

5  responses, it should only have 256 as the attachment,

6  not --

7      MS. PEDEN:  So just take off the first

8  two pages?

9      MR. BABCOCK:  Take out the middle page.

10     MS. PARKER:  The middle page.

11     MS. PEDEN:  Oh, the middle page.

12     MS. PARKER:  Sorry about that.

13     MR. BABCOCK:  Yeah.

14     MS. PEDEN:  Okay.

15     MR. BABCOCK:  Yeah.

16     A.  Do you want me to remove it from this exhibit?

17     Q.  (BY MR. BABCOCK)  Sure.  Yeah, let's -- let's

18  take it out of there.  It's not supposed to be there.

19     MR. PATTON:  Okay.  So 98 and 256 are

20  Exhibit 16?

21     MS. PARKER:  Yes.

22     MR. BABCOCK:  Right.

23     MS. PARKER:  Sorry about that.

24     Q.  (BY MR. BABCOCK)  And my question is:  Is --

25  is the second page of Exhibit 16 the cartoon from the

Ward, John  8/10/2009  1:21:00 PM

125

1  National Law Journal that Mr. Strachan sent you?
2      A.  I assume it is.  I mean, it says right above
3  it talking about an NLJ column.  So I can't imagine it'd
4  be anything different.
5      Q.  Okay.  It says that -- the headline is Law and
6  Laughter.  "I'd like to know if my blog can be used
7  against me."
8          Did you find that humorous?
9      A.  I don't know how I found it.  I -- you've
10  given it to me as a -- I don't remember looking at it,
11  to be honest with you.
12      Q.  Okay.
13          (Sotto voce discussion between Mr. Babcock
14          and Ms. Parker.)
15          MR. BABCOCK:  What's the next number?
16          MR. PATTON:  17.
17          MS. PARKER:  I've -- I've already marked
18  that one 19.
19          MR. BABCOCK:  Oh, 19.  Okay.
20      Q.  (BY MR. BABCOCK)  The court reporter will have
21  to put this together, but I read you some information
22  from a Web site earlier, and I just want to give you
23  Exhibit 19.  And tell me if -- if that's your -- if
24  that's your Web site.
25      A.  Well, part of it is and part of it isn't.

126

1      Q.  Okay.
2      A.  I'm in the process of redoing my Web site.
3      Q.  Okay.
4      A.  So the Web site that's live, my profile is, I
5  guess, the first part of this exhibit.  And then I was
6  curious as to how you got that because it wasn't live;
7  it's not out there yet.
8      Q.  It must have been the way-back machine.  Did
9  you produce it to us?
10      A.  No.
11      Q.  No?
12      A.  I mean, it's not -- I literally just finished
13  a proof on Friday.
14      Q.  Okay.
15      A.  But it looks -- it's through Find -- FindLaw,
16  and it looks like they've just linked it to my profile.
17      Q.  Okay.  And which is -- which -- the -- the
18  first four pages of the exhibit are the live --
19      A.  What's up right now.
20      Q.  Okay.  And then that's what's coming up,
21  the -- the --
22      A.  This is what's coming up; although there's
23  still some edits that need to be done to -- there's
24  about 30 pages of material on the new Web site that --
25      Q.  Okay.

127

1      A.  -- need to be edited further.
2          MR. BABCOCK:  How did we get that?
3          MS. PARKER:  Google.
4          THE WITNESS:  Okay.
5      Q.  (BY MR. BABCOCK)  We got it from Google.
6      A.  There you go.
7      Q.  First thing that popped up.
8      A.  Yeah.
9          MR. PATTON:  They're after us, Johnny.
10          THE WITNESS:  Yeah.
11      Q.  (BY MR. BABCOCK)  Okay.  Is there anything in
12  the last three pages, what you've got in your hands now,
13  that is inaccurate?
14      A.  No.  It's -- it's -- well, yeah, areas of
15  practice.  I'm not doing medical malpractice, nursing
16  home negligence.  That's one thing; when I read the
17  proof, I'm, like, they've got two things -- railroad
18  injuries, not doing that.
19      Q.  Okay.
20      A.  I don't even have patent infringement listed
21  as an area of practice, so I, you know --
22      Q.  That's an oversight.
23      A.  Yeah, since that's what I'm doing mostly,
24  so...
25          I mean, I can go through this more

128

1  detailed.  I remember looking at it on Friday, going --
2      Q.  Yeah.
3      A.  -- don't go live with this because this isn't
4  accurate.
5          And so that's why, when you started --
6      Q.  Yeah.
7      A.  -- reading, I knew --
8      Q.  You knew where it was coming from?
9      A.  I knew where it was coming from.
10      Q.  Could -- could you go through it with more
11  detail and tell me anything that's inaccurate?
12      A.  Sure, sure.
13          (Sotto voce discussion between Mr. Babcock
14          and Ms. Parker.)
15      A.  All right.  Everything is accurate down to
16  areas of practice.
17      Q.  (BY MR. BABCOCK)  Okay.
18      A.  I'm not doing medical malpractice; I'm not
19  doing nursing home; I'm not doing railroad injuries; not
20  doing federal tort claims.  I say that.  I've handled
21  those in the past, so I guess I could -- that could be
22  listed.
23          Bar admissions are all accurate, with the
24  exception of maybe the Sixth Circuit.  I remember
25  handling a case, but I don't know if I'm admitted there.

129

1  Just don't...

2        I don't know if I'm still a sustained

3  member of the American Association for Justice. And I'm

4  a fellow now with the Texas Trial Lawyers Association,

5  which just means I gave them more money.

6    Q. It's funny how that happens.

7    A. Yeah.

8        And everything else is accurate.

9        Then we get down to "West Practice

10  Categories." Again, I'm -- I'm tak -- that's not what

11  I'm going to have listed there, so -- I've -- I've done

12  all those things, but I'm not going to advertise them.

13    Q. Okay. Very good.

14        You mentioned Bob Chiaviello earlier.

15  There's a communication between you and him on your

16  privilege log dated March 14th of '08. The privilege is

17  said to be work product, but it's regarding this case.

18  Do you know why that document is listed as privileged?

19        MS. PEDEN: Objection.

20    A. I -- I'd have to look at it. And like I said,

21  much of those communications with Mr. Fokas I thought

22  would be privileged, but they've decided what to produce

23  to you, and --

24    Q. (BY MR. BABCOCK) Okay.

25    A. -- I haven't gone back and looked at it.

130

1    Q. Is -- Mr. Chiaviello is the lawyer at

2  Fulbright --

3    A. Chiaviello (pronunciation).

4    Q. Chiaviello. Sorry. He is the lawyer at

5  Fulbright, correct?

6    A. Correct.

7    Q. And he's the one that told you about a

8  conversation he'd had with somebody else about you?

9    A. Correct.

10    Q. Okay. Are you working with him on any case?

11    A. Yes.

12    Q. Are -- is he a -- an attorney on the Ward

13  versus Cisco case?

14    A. No.

15    Q. Okay. Okay.

16    A. But I'm in -- I'm in a number of cases with

17  Mr. Chiaviello and his firm.

18    Q. Is Mr. Pridham, who you referenced earlier, an

19  attorney in the Ward versus Cisco case?

20    A. No.

21    Q. Is he a client?

22    A. He's an attorney for a client -- former client

23  who I'm no longer working for.

24    Q. Okay. Do you recall talking to him about

25  litigation strategy regarding Ward versus Cisco?

131

1        MS. PEDEN: Objection to form.

2    A. I -- I can't reveal to you what we've talked

3  about without revealing attorney-client communications

4  dealing with the client that he worked for.

5    Q. (BY MR. BABCOCK) Okay. Bruce Lagerman, who

6  is he -- or Lagerman (pronunciation)?

7    A. He was a gentleman who contacted me about

8  potential representation who I did not end up working

9  for, I believe.

10    Q. Okay. Are your conversations with him -- do

11  you view them as privileged?

12        MS. PEDEN: Objection to form.

13    A. I do. If he was seeking legal representation,

14  yes, sir.

15    Q. (BY MR. BABCOCK) Okay. So anything he said

16  in that conversation would be covered by the

17  attorney-client privilege?

18        MS. PEDEN: Objection to form.

19    A. I -- I don't know that anything he says in the

20  conversation with me, when he's seeking legal

21  representation, would be privileged.

22    Q. (BY MR. BABCOCK) Okay. Did he -- did you

23  have any discussion with Mr. Lagerman about Cisco?

24        MS. PEDEN: Objection to form. And,

25  also, I -- you know, I don't know -- because I don't

132

1  know specifically the documents we're talking about.

2  I -- I just want you to be very cautious --

3        THE WITNESS: Yeah, I don't --

4        MS. PEDEN: -- since these may be

5  attorney-client-privileged communications.

6    A. I would need to look at the e-mails before I

7  tell you that, because I don't -- I don't recall,

8  sitting here --

9    Q. (BY MR. BABCOCK) Okay.

10    A. -- saying, "Let me tell you about my case,"

11  because I -- I generally would never do that.

12    Q. Here -- here's a -- you know, here's my view of

13  it: I certainly don't want to know -- want to know what

14  you talked to a -- even -- even a potential client

15  about. But if -- if you talked to him about, you know,

16  Frenkel or Cisco or, you know, this thing and that's not

17  anything to do with your representation, then I do want

18  to know about that. So --

19    A. I don't recall having those types of

20  conversations, but I'd need to look at whatever document

21  is on the privilege log and see what -- the context and

22  why I've even produced it to -- to --

23    Q. To them.

24    A. -- to them.

25    Q. Yeah. Yeah, the only -- the only help I can

133

1   give you is it says:  Bruce Lagerman, John Ward, 4/5/08,

2   e-mails, re:  potential case and comment regarding Troll

3   Tracker post.  Attorney client -- or AC and WP, which I

4   assume is attorney client, work product.

5       A.   I'd have to look at the document.

6       Q.   Okay.  But in any event, there's -- there's no

7   con- -- no unprivileged conversation with him that you

8   can share with us actually?

9           MS. PEDEN:  Objection to form.

10      A.   Not that I can recall.

11      Q.   (BY MR. BABCOCK)  Okay.

12      A.   Again, I'm -- I'm surprised we even -- the

13  topic came up, but apparently it's in an e-mail, so --

14      Q.   I tell you, these --

15      A.   Dadgum e-mails.

16      Q.   -- these lawyers, you know --

17      A.   Yeah.

18      Q.   -- you've got to watch them all the time.

19      A.   Not mine.

20      Q.   Have you been -- ever been investigated by the

21  State Bar of Texas, to your knowledge?

22          MS. PEDEN:  Objection to form.

23          Now, let me counsel you on attorney-client

24  privilege and if -- and not to divulge any

25  attorney-client communications.

134

1       Q.   (BY MR. BABCOCK)  Well, now she's got --

2           MS. PEDEN:  Do we need to --

3           MR. BABCOCK)  -- my curiosity up.

4           MS. PEDEN:  No, do you -- do you -- do we

5   need to --

6           THE WITNESS:  Yeah, let's take a break.

7       A.   We're going to --

8           MS. PEDEN:  All right.

9       A.   -- determine privilege and things like that.

10      Q.   (BY MR. BABCOCK)  Sure.

11          THE VIDEOGRAPHER:  Off the record, 1:08.

12          (Off the record 1:08-1:12.)

13          THE VIDEOGRAPHER:  Going back on record.

14  The time is 1:12.

15      Q.   (BY MR. BABCOCK)  I think before the break,

16  the question was:  Have you ever been investigated by

17  the State Bar of Texas?

18          MS. PEDEN:  And I'm going to object.  I'm

19  not going to let the witness answer as to

20  investigations.  Those are absolutely privileged.  If

21  you want to ask him if he's ever been disciplined by the

22  state bar, that's a different question.  But I'm going

23  to instruct him not to answer as to whether any

24  complaints have been filed.

25          MR. BABCOCK:  Well, your instruction just

135

1   changed my question a little bit, but I'll -- I'll

2   change my question.

3       A.   Okay.

4       Q.   (BY MR. BABCOCK)  Have -- have any -- any

5   complaints been filed against you with the State Bar of

6   Texas, to your knowledge?

7           MS. PEDEN:  I object and instruct the

8   witness not to answer.  Complaints are absolutely

9   privileged.  If you want to ask him if he's been

10  disciplined, he can answer that.

11      Q.   (BY MR. BABCOCK)  Do you know the identity of

12  people that have complained about you to the State Bar

13  of Texas?

14          MS. PEDEN:  Objection.

15          Instruct you not to answer.

16      Q.   (BY MR. BABCOCK)  Okay.  I -- I take it

17  whenever your lawyer says those magic words, you're not

18  going to answer.  Correct?

19      A.   When she tells me not to answer, I'm going to

20  follow her advice.

21      Q.   Okay.  So you're not going to answer about

22  whether complaints have been filed or -- or who the

23  complainants were, correct?

24      A.   That's correct.

25      Q.   Okay.  Can you tell me whether you know if the

136

1   State Bar of Texas has ever investigated you?

2           MS. PEDEN:  Objection.

3           I instruct you not to answer.

4       Q.   (BY MR. BABCOCK)  You're not going to answer

5   that?

6       A.   I'm not going to answer.

7       Q.   Okay.  Have you ever been investigated for

8   alleged criminal misconduct?

9           MS. PEDEN:  Objection.  That question is

10  vague.  What -- what do you mean, "investigated,"

11  "criminal conduct"?

12          I mean, honestly, Chip, I'm -- I'm not --

13  these questions are not relevant and they're aimed at

14  embarrassing and humiliating the witness, and we're

15  going to be very careful about what kind of questions we

16  let you delve into here.

17      Q.   (BY MR. BABCOCK)  Are you going to answer that

18  question or not?

19      A.   I'm going to follow my lawyer's advice.

20      Q.   Okay.  She objected on the basis it was vague,

21  so I want to -- want to cure that, if I can.

22      A.   Okay.

23      Q.   Do you know whether you have been the subject

24  of an investigation by a state district attorney?

25      A.   I know I have not been.

Ward, John 8/10/2009 1:21:00 PM

137

1    Q.  Okay.  Have you been the subject of an
2    investigation by a state grand jury?
3    A.  I have not been.
4    Q.  Okay.  Have you been the subject of an
5    investigation by any U.S. attorney or anybody in the
6    U.S. Attorney's Office?
7    A.  Not to my knowledge.
8    Q.  How about the Department of Justice?
9    A.  Not to my knowledge.
10    Q.  How about any federal grand jury?
11    A.  Not to my knowledge.
12    Q.  Okay.  Have you been the subject of any
13    investigation by any law-enforcement agency?
14        MS. PEDEN:  Objection.  Law-enforcement
15    agency?
16    Q.  (BY MR. BABCOCK)  Yeah, an agency of the state
17    or federal government that is charged with enforcing the
18    criminal laws of whatever their jurisdiction is.
19    A.  Why don't we go off the record for just a
20    minute.
21    Q.  Sure.
22    A.  Okay.
23        THE VIDEOGRAPHER:  Off the record --
24    A.  Let me talk to --
25        THE VIDEOGRAPHER:  -- 1:15.

138

1        (Off the record 1:15-1:18.)
2        THE VIDEOGRAPHER:  Back on the record,
3    1:18.
4    Q.  (BY MR. BABCOCK)  Have you ever engaged in any
5    lobbying efforts in Washington regarding patent reform
6    or the patent laws?
7        MS. PEDEN:  Objection, vague and
8    ambiguous.
9        You can --
10    Q.  (BY MR. BABCOCK)  Go -- go ahead and answer.
11    A.  Yeah.
12        MS. PEDEN:  If you can.
13    A.  Yeah.  When you say "have engaged in," have I
14    gone to D.C.?  Have I called congressmen?  You know,
15    what is it that you're wanting to know?
16    Q.  (BY MR. BABCOCK)  All right.  Good questions,
17    all of them --
18    A.  Okay.
19    Q.  -- since you're a trial -- I bet you're a
20    trial lawyer.
21        Have you ever gone to Washington, D.C. in
22    connection with patent law?
23    A.  No.
24    Q.  Have you ever called any members of Congress
25    regarding -- regarding issues of patent law?

139

1    A.  No.
2    Q.  Okay.  Have you ever been involved with any
3    organizations that have been on one side or the other of
4    the patent reform law debate?
5    A.  I think the American Association for Justice
6    got involved, and so -- I send money to them.  I don't
7    believe the Texas Trial Lawyers Association has weighed
8    in on it.  So only the AAJ.
9    Q.  Have you ever been to Washington, D.C. on
10    business?
11    A.  Yes.
12    Q.  And while in Washington, D.C., did you ever
13    meet with a member of Congress, either a senator or a
14    representative --
15    A.  Never.
16    Q.  -- or their staff?
17    A.  Never.
18    Q.  Okay.  Did you ever meet with a lobbyist,
19    somebody who -- either for AAJ or for the -- anybody
20    else who's lobbying Congress?
21    A.  Face-to-face meetings, no.
22    Q.  How about telephone meetings?
23    A.  Never on the telephone.
24    Q.  Okay.  You said that the notice of electronic
25    filing was available online.  Could you tell -- I think

140

1    you said that in your prior testimony.  Could you tell
2    me how you -- how you see that notice of electronic
3    filing?
4    A.  You log in and pull it up.
5    Q.  Have you done that yourself?
6    A.  Yes.
7    Q.  Even for matters where you're -- you're not
8    the lawyer of record?
9    A.  I don't know that.  I did -- I did it to see
10    if I could do it in this case, and I can pull it up.
11    Q.  Okay.  Did you speak to any reporters about
12    the Frenkel Troll Tracker matter before you filed this
13    lawsuit?
14    A.  The instant lawsuit, the one that's filed in
15    Arkansas --
16    Q.  Well, let me say --
17    A.  -- or --
18    Q.  -- the Gregg County one.
19    A.  -- any one?
20        I don't believe I've ever spoken to a
21    reporter, other than to say "contact my lawyer."  And
22    that's usually through a member of my staff or an e-mail
23    inquiry.  I'll say:  No comment.
24    Q.  Okay.
25    A.  Talk to my attorney.

Ward, John  8/10/2009  1:21:00 PM

141

1    Q.  Have you ever lived in Arkansas?

2    A.  No.

3    Q.  Have you ever owned property in Arkansas?

4    A.  No.

5    Q.  Do you have any family in Arkansas?

6    A.  I'm sure I've got some distant family, but no

7    one that I --

8    Q.  No Arkansas jokes, now.

9    A.  No.  My folks came through that area, so...

10   Q.  Have you ever been to Arkansas?

11   A.  Absolutely.

12   Q.  Okay.  You're not a member of any Arkansas bar

13   association?

14   A.  No.

15   Q.  Okay.  Okay.  That's all I have, Mr. Ward.

16   Thank you very much.

17   A.  All right.

18        MS. PEDEN:  Thank you.

19        THE WITNESS:  Thank you.

20        THE VIDEOGRAPHER:  Off the record, 1:21.

21   This concludes the deposition of John Ward.

22        (Deposition concluded at 1:21 p.m.)

23

24

25

143

1    I, THOMAS JOHN WARD, JR., have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4        _____

         THOMAS JOHN WARD, JR.

5

6    STATE OF _____)

7    COUNTY OF _____)

8

9

10   Before me, _____, on this day

11   personally appeared THOMAS JOHN WARD, JR., known to me

12   (or proved to me under oath or through

13   _____) (description of identity card

14   or other document) to be the person whose name is

15   subscribed to the foregoing instrument and acknowledged

16   to me that they executed the same for the purposes and

17   consideration therein expressed.

18   Given under my hand and seal of office this

19   _____ day of _____, 2009.

20

21        _____

          NOTARY PUBLIC IN AND FOR

22        THE STATE OF _____

23   My Commission Expires: _____

24

25

142

1        CHANGES AND SIGNATURE

2        DEPOSITION OF THOMAS JOHN WARD, JR.

3        AUGUST 10, 2009

4    PAGE  LINE    CHANGE        REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

144

1    STATE OF TEXAS   )

2    COUNTY OF DALLAS  )

3

4    This is to certify that I, Stacy L. Jordan,

5    Certified Shorthand Reporter in and for the State of

6    Texas, certify that the foregoing deposition of THOMAS

7    JOHN WARD, JR. was reported stenographically by me at

8    the time and place indicated, said witness having been

9    placed under oath by me, and that the deposition is a

10   true record of the testimony given by the witness.

11   I further certify that I am neither counsel

12   for nor related to any party in this cause and am not

13   financially interested in its outcome.

14   Given under my hand of office on this 17th day

15   of August, 2009.

16

17        _____

          STACY L. JORDAN, CSR 7499

18        Expiration Date: 12/31/10

          Firm No. 593

19

          WEST COURT REPORTING SERVICES

20        221 Main Street

          Suite 1250

21        San Francisco, California 94105

          (800) 548-3668

22

23   Taxable cost of original charged to Defendant:

     $_____

24

25   Atty: Mr. Charles L. Babcock and Ms. Crystal J. Parker,

     Jackson Walker, L.L.P.



# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| JOHN WARD, JR. | § | |
| | § | |
| | § | C. A. NO. 08-4022 |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| CISCO SYSTEMS, INC. | § | |

## CISCO SYSTEMS, INC.'S NOTICE OF DEPOSITION OF BOB CHIAVELLO

TO:   Bob Chiavello, Fulbright & Jaworski, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201

PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure, Defendant Cisco Systems, Inc. will take the oral and videotaped deposition of Bob Chiavello before a certified court reporter on Wednesday, September 23, 2009, beginning at 9:00 a.m. at the offices of Fulbright & Jaworski, 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201.

Said deposition will be taken before a certified court reporter, licensed to administer oaths in the State of Texas, and said deposition will be videotaped. The deposition will continue from day to day until completed.

Jackson Walker L.L.P.

By:  /s/ Charles L. Babcock
     Richard E. Griffin
     Arkansas Bar No.: 63020
     Email: rgriffin@jw.com
     Charles L. Babcock
     Federal Bar No.: 10982
     Email: cbabcock@jw.com
     Crystal J. Parker
     Federal Bar No.: 621142
     Email: cparker@jw.com
     1401 McKinney
     Suite 1900
     Houston, Texas 77010
     (713) 752-4200
     (713) 752-4221 – Fax

ATTORNEYS FOR DEFENDANT
CISCO SYSTEMS, INC.

## CERTIFICATE OF SERVICE

This is to certify that on this 11th day of September, 2009, a true and correct copy of the foregoing was served via electronic mail upon:

Patricia L. Peden
Law Offices of Patricia L. Peden
5901 Christie Avenue
Suite 201
Emeryville, CA 94608
*Attorney for Plaintiff John Ward, Jr.*

Nicholas H. Patton
Patton, Tidwell & Schroeder, LLP
4605 Texas Boulevard
P.O. Box 5398
Texarkana, Texas 75505-5398
*Attorney for John Ward, Jr.*

/s/ Charles L. Babcock
Charles L. Babcock

Case 4:08-cv-04022-JLH   Document 100   Filed 09/11/09   Page 3 of 5

AO 88A  (Rev. 01/09) Subpoena to Testify at a Deposition or to Produce Documents in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of Texas

| | | |
|---|---|---|
| John Ward, Jr. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   08-4022 JLH |
| Cisco Systems, Inc. | ) | |
| | ) | (If the action is pending in another district, state where |
| *Defendant* | ) | Western District of Arkansas |

## SUBPOENA TO TESTIFY AT A DEPOSITION
## OR TO PRODUCE DOCUMENTS IN A CIVIL ACTION

To:  Bob Chiavello, Fulbright & Jaworski
     2200 Ross Avenue, Suite 2800, Dallas, Texas  75201

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Fulbright & Jaworski<br>       2200 Ross Avenue, Suite 2800, Dallas, Texas  75201 | Date and Time:<br><br>       09/23/2009 09:00 |
|---|---|

The deposition will be recorded by this method:  court reporter and videographer

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   09/11/2009

|  | | |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's Signature*   for CLB |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Cisco Systems, Inc.
_____ , who issues or requests this subpoena, are:

Charles L. Babcock, Jackson Walker, LLP
1401 McKinney Street, Suite 1900, Houston, Texas  77010
713-752-4200  cbabcock@jw.com

Case 4:08-cv-04022-JLH    Document 100    Filed 09/11/09    Page 4 of 5

AO 88A (Rev 01/09) Subpoena to Testify at a Deposition or to Produce Documents in a Civil Action (Page 2)

Civil Action No. 08-4022 JLH

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the subpoena on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the subpoena at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the subpoena on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because _____ ; or

☐ Other *(specify):*


Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of
$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____        _____
                                   *Server's signature*

                              _____
                                   *Printed name and title*


                              _____
                                   *Server's address*

Additional information regarding attempted service, etc:

AO 88A  (Rev  01/09) Subpoena to Testify at a Deposition or to Produce Documents in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).



# Exhibit 4

Chiavello, Robert H.  9/23/2009  11:10:00 AM

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF ARKANSAS
2             TEXARKANA DIVISION
3    JOHN WARD, JR.        )
                           )
4                          )  C.A. NO. 08-4022
     v.                    )  JURY TRIAL DEMANDED
5                          )
     CISCO SYSTEMS, INC.   )
6
7
8
9    *****************************************************
        ORAL AND VIDEOTAPED DEPOSITION OF
10        ROBERT H. CHIAVELLO, JR.
             SEPTEMBER 23, 2009
11               VOLUME I
     *****************************************************
12
13
14
15       ORAL AND VIDEOTAPED DEPOSITION OF ROBERT H.
16    CHIAVELLO, JR., produced as a witness at the instance of
17    the Defendant, and duly sworn, was taken in the
18    above-styled and numbered cause on the 23rd day of
19    September, 2009, from 9:06 a.m. to 11:10 a.m., before
20    April R. Eichelberger, CSR in and for the State of
21    Texas, reported by machine shorthand, at the law offices
22    of Fulbright & Jaworski, 220 Ross Avenue, Suite 2800,
23    Dallas, Texas, pursuant to the Federal Rules of Civil
24    Procedure and the provisions stated on the record or
25    attached hereto.
```

**Page 2**

```
1            A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
         Nicholas H. Patton, Esq.
4    PATTON, TIDWELL & SCHROEDER, LLP
         4695 Texas Boulevard
5    Texarkana, Texas  75505
         Phone: 903.792.7080  Fax: 903.792.8233
6        E-mail: nickpatton@texarkanalaw.com
7    FOR THE DEFENDANT:
8        Kurt A. Schwarz, Esq.
         JACKSON WALKER, LLP
9        Bank of America Plaza
         901 Main Street, Suite 6000
10   Dallas, Texas  75202
         Phone: 214.953.6000  Fax: 214.953.5822
11       E-mail: kschwarz@jw.com
12   FOR THE WITNESS:
         Joni Collins, Esq
13   FULBRIGHT & JAWORSKI, LLP
14       2200 Ross Avenue, Suite 2800
         Dallas, Texas  75201
15       Phone: 214.855.8000  Fax: 214.855.8200
         E-mail: lcollins@fulbright.com
16
17   ALSO PRESENT:
18       Paul Young, Videographer
         Kathleen McCurry, Intern
19
20
21
22
23
24
25
```

**Page 3**

```
1                    INDEX
2                             PAGE
3
     Appearances.............................. 2
4
5    Exhibit List............................... 4
6
     ROBERT H. CHIAVELLO, JR.
7       Examination by Mr. Schwarz............... 6
8       Examination by Mr. Patton................ 79
9
     Signature and Changes.......................... 81
10
11   Reporter's Certificate......................... 83
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                    EXHIBIT LIST
2    EXHIBIT NAME  DESCRIPTION                        PAGE
3    Exhibit 26  Cisco Systems, Inc's Notice of      14
                 Deposition of Bob Chiavello
4
5    Exhibit 27  Plaintiff's Initial Disclosure      16
6    Exhibit 28  Plaintiff's First Supplemental      17
                 Disclosures
7    Exhibit 29  Patent Troll Tracker September 24, 2007  33
                 FRENKEL2.000353-364
8
     Exhibit 30  Civil Docket 5:07-cv-156-DF-CMC     43
9                CISCO.000240-241
10   Exhibit 31  Complaint for Patent Infringement   43
                 5:07-cv-156-DF-CMC filed 10/15/2007
11               CISCO.000091-96
12   Exhibit 32  Complaint for Patent Infringement   48
                 5:07-cv-156-DF-CMC filed 10/16/2007
13               CISCO.000165-170
14   Exhibit 33  Docket Report 5:07-cv-00156-DF-CMC  48
                 CISCO.000242-243
15
     Exhibit 34  Patent Troll Tracker October 18, 2007  50
16
     Exhibit 35  Patent Troll Tracker October 18, 2007  50
17
     Exhibit 36  Patent Troll Tracker October 18, 2007  50
18
19
20
21
22
23
24
25
```

5

```
1              PROCEEDINGS
2          THE VIDEOGRAPHER:  Here begins the
3   videotaped deposition of Robert Chiavello, Tape 1,
4   Volume 1, in the matter of John Ward, Jr., versus Cisco
5   Systems, Incorporated.  It's in the U.S. District Court,
6   Western District of Arkansas, Texarkana Division, Case
7   Number 08-4022.  Today's date is September 23rd, 2009.
8   The time on the video monitor is 9:06 a.m.
9          The video operator today is Paul Young,
10  representing West Court Reporting Services.  The court
11  reporter is April Eichelberger from HG Litigation
12  Services, reporting on behalf of West Court Reporting
13  Service.
14         Today's deposition is being taken on
15  behalf of the defendant and taking place at Fulbright &
16  Jaworski at 2200 Ross Avenue, Dallas, Texas.
17         Counsel, please identify yourselves for
18  the record and whom you represent.
19         MR. PATTON:  I'm Nick Patton.  I
20  represent the plaintiff, Johnny Ward.
21         MR. SCHWARZ:  I'm Kurt Schwarz with
22  Jackson Walker, and I represent the defendant, Cisco
23  Systems, Inc.
24         MS. COLLINS:  I'm Joni Collins of
25  Fulbright & Jaworski, and I represent Mr. Chiavello.
```

6

```
1          THE VIDEOGRAPHER:  And the witness may
2   now be sworn in by the court reporter.
3          ROBERT H. CHIAVELLO, JR.,
4   having been first duly sworn, testified as follows:
5              EXAMINATION
6   BY MR. SCHWARZ:
7   Q.  Good morning.  Would you please state your
8   full name for the record.
9   A.  It's Robert M. Chiavello, Jr.
10  Q.  Okay.  Mr. Chiavello, my name Kurt Schwarz
11  I'm with Jackson Walker, and I represent the defendant
12  in this lawsuit, Cisco Systems, Inc.
13         Have you given your deposition or given
14  testimony before?
15  A.  I have.
16  Q.  Okay.  So you're familiar with the basic
17  ground rules?
18  A.  I am.
19  Q.  Okay.  That -- for example, that you're under
20  oath?
21  A.  Of course.  Yes.
22  Q.  Okay.  And I've asked you -- and this is a
23  particular problem for me.  If I say something that --
24  if I ask you a question that's confusing or disjointed
25  or you don't understand in any way, would you please ask
```

7

```
1   me to clarify it?
2   A.  I will.
3   Q.  Okay.  Are you on any medication or do you
4   have any condition that would prevent you from giving
5   true and complete testimony today?
6   A.  I'm not and I do not.
7   Q.  Okay.  Could you please give audible answers
8   to all of my questions so the court reporter can record
9   them?
10  A.  Yes.
11  Q.  Okay.  You notice -- you mentioned that you've
12  been deposed before.  How many times?
13  A.  Twice.
14  Q.  Okay.  And what sort of cases were those?
15  A.  One was a good-faith breach of contract-type
16  case.  I'm not exactly sure what the underlying claims
17  were.  And the other was a trademark case.
18  Q.  Okay.  And were you -- were you deposed as a
19  fact witness or an expert witness?
20  A.  Fact witness.
21  Q.  In both cases?
22  A.  Yes, sir.
23  Q.  Okay.  Do you recall the entities that you
24  were deposed on behalf of?
25  A.  Well, I remember one.  I was deposed in a case
```

8

```
1   involving EDS, and I was deposed by the plaintiff in
2   that case, which was two individuals who claimed EDS had
3   breached an agreement with them.  And then in the other
4   case I was deposed, it was a trademark infringement
5   case, and I was deposed by the accused infringer is my
6   recollection.
7   Q.  Okay.  Where did you go to college?
8   A.  I went to Washington & Lee University.
9   Q.  Okay.  And what was your major?
10  A.  Physics.
11  Q.  And did you grow up in that part of the
12  country?
13  A.  No, sir.
14  Q.  Where did you grow up?
15  A.  I grew up in New Jersey.
16  Q.  Oh, really?  What part?
17  A.  Rutherford, New Jersey, which is in the
18  northeastern part of New Jersey.
19  Q.  And today is Bruce Springsteen's birthday.
20  A.  Okay.
21  Q.  And you went to law school at John Marshall
22  Law School; is that correct?
23  A.  That's correct.
24  Q.  Okay.  I understand that you're licensed to
25  practice law in the state of Texas?
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

9

1   A. That's correct, yes, sir.
2   Q. Okay. And since when?
3   A. 1989, I believe.
4   Q. And are you certified by the Texas board of
5   specialization in any area?
6   A. No, sir.
7   Q. Okay. Well, I understand also that you're
8   licensed to practice law in New York?
9   A. Yes, sir.
10   Q. Okay. And since when have you been licensed
11   in New York?
12   A. I believe it's 1981.
13   Q. And I also understand that you're licensed to
14   practice before the U.S. Patent and Trademark Office; is
15   that correct?
16   A. That's correct.
17   Q. Okay. And since when have you been?
18   A. I believe that's 1986.
19   Q. Would you briefly go through your employment
20   history since you were graduated from law school?
21   A. Sure. I originally went to work for a firm
22   called Penny Edmonds, and it actually was a little bit
23   more complicated than that because I originally started
24   working for a single partner at Penny Edmonds, a man by
25   the name of Stan Lawrence in New Jersey because New

10

1   Jersey, at the time, had some restrictions on New York
2   firms practicing law in the state of New Jersey. But I
3   was actually being compensated by Penny Edmonds. That
4   relationship ended pretty quickly, and I went to work --
5   and I worked for Penny Edmonds until 1985.
6   In 1985, I went to work for IBM as a
7   patent attorney. I left IBM in 1988, and in -- on
8   January 1st, 1981, I started with the firm of Baker
9   Mills & Glast
10   Q. I'm sorry. You said 1981.
11   A. I'm sorry. No, '89.
12   Q. '89, okay.
13   A. Yeah. '88 -- I worked at IBM until 1988,
14   December 31st, and then January 1, 1989, I started at
15   Baker Mills & Glast.
16   Q. And where was that office?
17   A. Here in Dallas.
18   Q. Okay. So when did you move down to Dallas?
19   A. January 1st, 1989.
20   Q. Okay.
21   A. I was at Baker Mills & Glast until April of
22   1990, at which time I joined Baker Botts. I was at
23   Baker Botts until September of 2002, at which time I
24   joined Fulbright & Jaworski.
25   Q. And you've been with Fulbright, obviously,

11

1   since '02?
2   A. Yes, sir.
3   Q. Okay. Would you please describe the nature of
4   your practice here at Fulbright?
5   A. I specialize in intellectual property and
6   primarily handle litigations, court actions involving
7   intellectual property.
8   Q. According to your bio on your firm's website,
9   which I didn't bring today, it says you have personally
10   handled hundreds of patent cases; is that correct?
11   A. I believe so, yes. Yes.
12   Q. Okay. Is it common in patent cases to sue on
13   the exact date a patent issues?
14       MR. PATTON: Object, form.
15   A. No. I would say it's not common.
16   Q. (BY MR. SCHWARZ) Why would one sue on the
17   date a patent issues?
18       MR. PATTON: Object to form.
19   A. Oh, there are lots of reasons. You know,
20   primary reason would be concern that it's well-known in
21   the industry that the patent is going to issue and that
22   the patent owner would be subject to a declaratory
23   judgment action by an accused infringer.
24   Q. (BY MR. SCHWARZ) Okay. What did you do to
25   prepare for your deposition today?

12

1   A. Oh, I -- to prepare for the deposition, I met
2   with my attorney.
3   Q. And who is your attorney?
4   A. Ms. Collins.
5   Q. And she's sitting right next to you, correct?
6   A. Yes, sir.
7   Q. Okay. Did you -- have you read the complaint
8   or the amended complaint in the lawsuit that we're here
9   for?
10   A. I looked at a complaint. I can't tell you
11   whether it was the original complaint or the amended
12   complaint. I did not read it word for word.
13   Q. Okay. And when did you do that?
14   A. Yesterday.
15   Q. Okay. Have you read Cisco's answer?
16   A. No, sir.
17   Q. Okay. Have you read any depositions?
18   A. No, sir.
19   Q. Have you read -- have you reviewed any other
20   documents in preparation for today's?
21   A. No, sir.
22   Q. Did you discuss your testimony or your
23   anticipated testimony here today with Mr. Ward or any of
24   his attorneys?
25   A. No, sir.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

13

1  Q.  Okay.  Have you spoken with Mr. Ward about
2  this case since it was filed?
3  A.  I did.
4  Q.  And when was that?
5  A.  I believe I was served -- I think it was last
6  Thursday.
7  Q.  And you started to say that you were served.
8  Could you please put your conversation with Mr. Ward
9  into context?
10  A.  Sure.  When -- when I was served with the
11  subpoena, I called him to alert him to the fact that I
12  had received a subpoena to make sure that he was aware
13  that I had been -- been noticed.
14  Q.  Okay.  Had he notified you at any time prior
15  to your being served that you had been designated as a
16  witness in this case?
17  A.  Yes, he did.
18  Q.  And do you recall when that was?
19  A.  No, I don't.
20  Q.  Okay.  Do you have any sort of attorney-client
21  relationship with Mr. Ward?
22  A.  Well, Mr. Ward and I are co-counsel on -- on
23  some cases, and so, of course, we have -- I'm not sure
24  it would be attorney-client privilege in those
25  circumstances, but we're certainly co-counsel in some

14

1  matters.
2  Q.  I understand that.  I should have been more
3  clear in my question.
4  Do you have any sort of attorney-client
5  relationship as it relates to the case that we're here
6  for today, the Ward v. Cisco case?
7  A.  No.
8  Q.  Okay.  Are you aware of any communications
9  between you and Mr. Ward that relate to this case that
10  might be privileged?
11  A.  Not that I'm aware of.
12  Q.  Okay.
13  (Exhibit Number 26 was marked.)
14  MR. PATTON:  What number is it?
15  MR. SCHWARZ:  This is 26.  At least
16  that's what I've been told to start with today.
17  Q.  (BY MR. SCHWARZ)  I've just handed you a
18  document that has been labeled Exhibit 26, and is this
19  the deposition notice and subpoena that you received
20  last week?
21  A.  It appears to be, yes.
22  Q.  Okay.  Do you understand that we're here in
23  connection with the case of John Ward, Jr., versus Cisco
24  Systems, Inc., which is pending in the U.S. District
25  Court for the Western District of Arkansas?

15

1  A.  Yes, sir.
2  Q.  Okay.  And do you understand that this case
3  arises out of an underlying patent infringement case
4  pending in the Eastern District of Texas styled
5  ESN v. Cisco?
6  MR. PATTON:  Object to form.
7  A.  I'm not exactly sure I understand your
8  question.
9  Q.  (BY MR. SCHWARZ)  Okay.  We'll get to those --
10  to those matters a little later.
11  Are you aware of being involved in any
12  litigation where your client is adverse to Cisco?
13  A.  Now or in the past?
14  Q.  Let's start with now.
15  A.  No, I'm not aware of -- I am not personally
16  handling any matter where Cisco is adverse.
17  Q.  Okay.  In the past, have you?
18  A.  Yes.
19  Q.  Okay.  And what case or cases would those be?
20  A.  There were two cases.  And I better go back
21  and amend -- amend my answer.  I am involved in one case
22  where a -- as I understand it, a Cisco subsidiary is a
23  named defendant.  Cisco Systems is not a named
24  defendant, but one of its subsidiaries.  The two cases
25  were Fenner Investments, and I can't remember -- I think

16

1  it was Fenner Investments versus Juniper, and QPSX
2  versus -- again, I think it may have been Juniper, but
3  Cisco was a co-defendant in both of those cases.
4  Q.  Okay.
5  (Exhibit Number 27 was marked.)
6  Q.  (BY MR. SCHWARZ)  I've handed you a document
7  which has been labeled Exhibit 27, and it is plaintiff's
8  initial disclosure in the Ward v. Cisco Systems case.
9  And I would ask you to look at page 6.
10  A.  Okay.
11  Q.  You'll note that your name is listed as --
12  next to the Number 23.  Would you please read for the
13  record the description of the testimony you've been
14  designated as a witness for?
15  A.  Starting with my name?
16  Q.  Yeah.
17  A.  "Bob Chiavello has knowledge of damage done to
18  plaintiff's reputation by defendant's statements.  He
19  also has knowledge of plaintiff's reputation in the
20  legal community."
21  Q.  Okay.  Is that description accurate?
22  A.  Yes, sir.
23  Q.  Okay.  Is that description complete?
24  A.  I don't understand.
25  Q.  Well, I should have asked it differently.  Do

Chiavello, Robert H.  9/23/2009  11:10:00 AM

17

1  you have knowledge of any other -- to your knowledge, do
2  you have personal knowledge of any facts, other than
3  these that have been listed in the designation, that
4  relate to Mr. Ward's claims against Cisco Systems?
5      A.  I really don't know because I don't know
6  what -- all of Mr. Ward's claims against Cisco.
7      Q.  Fair enough.  I will note that, on the
8  Certificate of Service on this document, it indicates
9  that this document was served in December of 2008.  Were
10  you contacted by Mr. Ward or his attorney about
11  designated as a person with knowledge of relevant facts
12  at that time?
13      A.  I can't --
14          MR. PATTON:  Object to form.
15      A.  I can't remember.
16      Q.  (BY MR. SCHWARZ)  Okay.  Did you review that
17  description of your anticipated testimony before it was
18  served on other parties in this case?
19      A.  No, sir.
20      Q.  Have you ever seen that before today?
21      A.  No, sir.
22      Q.  Okay.
23          (Exhibit Number 28 was marked.)
24      Q.  (BY MR. SCHWARZ)  I've just handed you a
25  document that's styled Plaintiff's First Supplemental

18

1  Disclosures, and it's been labeled Exhibit Number 28.
2  Would you please turn to page 7 of this first
3  supplemental disclosure.  You are again listed as
4  Number 23, and would you please read the description of
5  your knowledge of facts in this case from that
6  designation?
7      A.  "Bob Chiavello has knowledge of damage done to
8  plaintiff's reputation by defendant's statements.  He
9  also has knowledge of plaintiff's reputation in the
10  legal community.  Mr. Chiavello may have additional info
11  regarding the facts of this case."
12      Q.  You'll note that Mr. Ward added the sentence
13  "Mr. Chiavello may have additional info regarding the
14  facts to this case" to --
15          MR. PATTON:  Object to form.
16      Q.  (BY MR. SCHWARZ)  -- the -- to this
17  designation.  Did Mr. Ward or his attorney discuss this
18  change -- changed description with you before these
19  disclosures were served on Cisco in September of 2009?
20      A.  No, sir.
21      Q.  Okay.  What info, as it says in the
22  description, regarding the facts of this case that
23  you've learned between December 2008, when those initial
24  disclosures were served, and December 2009, when the
25  supplemental disclosures were served?

19

1      A.  I don't know.
2      Q.  Okay.  What information regarding the facts of
3  this case do you have outside of information about
4  plaintiff's reputation in the legal community and the
5  damage done to plaintiff's reputation by defendant's
6  statements?
7      A.  Like I said, I don't know what the -- what the
8  claims are, and so I don't know what facts I may have
9  that would relate to those claims.
10      Q.  Okay.  Well, then how long have you known
11  Mr. Ward?
12      A.  I think 2003.
13      Q.  Do you recall the circumstances of your
14  meeting?
15      A.  I was introduced to Mr. Ward by Mr. Franklin
16  Jones.
17      Q.  And who is Mr. Franklin Jones?
18      A.  Mr. Franklin Jones is deceased now.  He was
19  one of the pillars of the Texas bar.  He was one of the
20  leading attorneys in the state.  He practiced law in
21  Marshall, Texas.  He was a fine lawyer.
22      Q.  And what were the circumstances of your being
23  introduced by Mr. Jones to Mr. Ward?
24      A.  Mr. Jones was working with us on a case and
25  informed me that he was -- he was up there in age at the

20

1  time.  I think he was in his '70s and wanted to cut back
2  a little bit and had suggested that we might want to
3  work with Johnny Ward, who, in his view, was one of the
4  finest young lawyers he had seen in a long time and
5  thought very highly of him and recommended --
6  recommended him to me to work with  And so I was
7  introduced to Johnny by Mr. Jones.
8      Q.  Okay.  Are you personal friends with Mr. Ward
9  or just business acquaintances?
10      A.  We don't see one another socially outside of
11  business, if that's what you mean.
12      Q.  Okay.  How many cases have you worked on with
13  Mr. Ward over the years?
14      A.  I don't remember the exact number.
15      Q.  Can you give me a ballpark?
16      A.  It's probably in the neighborhood of five.
17      Q.  Okay.  Is your relationship with Mr. Ward
18  generally that of your firm being lead counsel and
19  Mr. Ward being local counsel?
20      A.  Yes, sir.
21      Q.  And in light of your previous testimony about
22  the nature of your practice, are the cases that you've
23  been involved with been intellectual property cases?
24      A.  Yes, sir.
25      Q.  How do you and your clients typically use

Chiavello, Robert H.  9/23/2009  11:10:00 AM

21

1    Mr. Ward as local counsel?  What sorts of
2    responsibilities does he assume?
3         MR. PATTON:  Object to form.
4    A.  It varies from case to case and from week to
5    week, but Mr. Ward is -- I view him as a trusted
6    counselor, and so when issues arise, I will call on him
7    for his advice and counsel.
8    Q.  (BY MR. SCHWARZ)  Do you generally ask him to
9    draft pleadings?
10   A.  Not generally, no.
11   Q.  Or discovery?
12   A.  No.  I would say no.
13   Q.  Okay.  To interview witnesses?
14   A.  That's a task that I would ask him to do --
15   Q.  Okay.
16   A.  -- and I believe he has done for me.
17   Q.  Does he draft motions for you?
18   A.  I think that's something that I would call on
19   him to do from time to time.
20   Q.  And take depositions?
21   A.  Yes.
22   Q.  Okay.  Draft jury charges?
23   A.  He would assist, yes.
24   Q.  Argue before the court?
25   A.  Yes.

22

1    Q.  I know this may vary from case to case, but
2    let me ask, in general, do you make the decision as to
3    whom to hire as local counsel or do your clients?
4         MR. PATTON:  Object to form.
5    A.  It does vary from case to case, and I would
6    say it's usually a collaborative affair.
7    Q.  (BY MR. SCHWARZ)  Do you typically recommend
8    several for a client to choose from or say let's hire
9    Johnny Ward because he's really good?
10        MR. PATTON:  Object to form.
11   A.  Again, it varies from case to case.
12   Q.  (BY MR. SCHWARZ)  Okay.  You mentioned you've
13   probably worked with him on the -- on about five cases.
14   Can you recall any of them in particular, which clients
15   you represented?
16   A.  Yes.  The Antor -- what we call the Antor
17   cases, there were a number of cases.  We represented
18   Antor Media in an infringement action against a number
19   of defendants, and there were a number of separate cases
20   that were filed.
21        Another case I recall, the Fenner versus
22   Juniper case is one and another case involved -- Fenner
23   versus Microsoft.  And I believe Mr. Ward is helping us
24   with the Fenner versus 3Com case.
25   Q.  And in -- let's start with the first one.  Did

23

1    you say it was Antor?
2    A.  Yes, sir.
3    Q.  Did you represent the plaintiff or the
4    defendant in that?
5    A.  Plaintiff.
6    Q.  And do you recall the process by which you and
7    your client decided to retain Mr. Ward in that case?
8    A.  Yes, sir.
9         MR. PATTON:  Objection, form.
10   A.  I do recall that.
11   Q.  (BY MR. SCHWARZ)  Would you describe it for
12   us, please.
13   A.  That was the matter where Mr. Jones
14   recommended that we associate with Mr. Ward.
15   Q.  Okay.  And how about the Fenner versus Juniper
16   case?
17   A.  We were very pleased with Mr. Ward's
18   assistance in the Antor case, and so we recommended him
19   in the Fenner case to the -- to the plaintiff in that
20   case, who we represented.
21   Q.  Okay.  And was that also true in the other two
22   Fenner cases that you mentioned?
23   A.  Yes, sir.
24   Q.  Okay.  What are your criteria for choosing
25   local counsel?

24

1         MR. PATTON:  Object to form.
2    A.  Well, I'm sure you appreciate we -- there are
3    a lot of different factors that go into the decision on
4    who to associate with as associate counsel in any
5    matter.
6    Q.  (BY MR. SCHWARZ)  Can you list some of those
7    criteria, for example, in the Fenner versus 3Com case?
8    A.  Well, I would say certainly the most important
9    matter is the person's legal -- legal skills, his
10   ability or her ability as a lawyer.  Certainly their
11   reputation as an upstanding person.  Knowledge of the
12   local court is also an important -- important factor.
13   Q.  When you say "knowledge of the local court,"
14   does that -- are you referring to the judges or just the
15   system as a whole?
16   A.  Both.
17   Q.  Okay.  So would you say that Mr. Ward has a
18   good relationship with the judges in East Texas?
19        MR. PATTON:  Object to form, calls for
20   speculation.
21   A.  Yeah, I -- you know, you're asking me what the
22   judges think, and they don't share that with you.
23   Q.  (BY MR. SCHWARZ)  I'm asking -- I'm asking you
24   your perception.
25        MR. PATTON:  Object to form.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

25

1    A.  Yeah, I believe he's well respected by the
2  judges in the Eastern District.
3    Q.  (BY MR. SCHWARZ)  And he's the son of a
4  federal judge, correct?
5    A.  Yes, he is.
6    Q.  Do you have personal knowledge of Mr. Ward's
7  reputation in the legal community?
8    A.  I believe I do.
9    Q.  Okay.  And let me back up.  When I said "legal
10  community," the reason I used that phrase is because
11  Mr. Ward used it in his -- in the two designations I put
12  before you as Exhibits 27 and 28.  Would you define your
13  understanding of legal community?
14    A.  Okay.  I would say I personally am associated,
15  you might say, in two communities.  One community would
16  be the lawyers who practice in Texas and particularly in
17  the Eastern District of Texas generally.  And then the
18  second community I would -- I'm associated with would be
19  on a more national level involving intellectual property
20  cases, and so these would include lawyers who do not
21  routinely practice in the Eastern District of Texas, if
22  they ever practice there.
23    Q.  Okay.  What do you consider to be -- excuse
24  me.  Let me back up.
25    You've just basically kind of defined two

26

1  kind of separate groups of lawyers.  Do you -- what do
2  you consider to be the universe of lawyers who might
3  care about Mr. Ward's reputation?
4    MR. PATTON:  Object to form.
5    A.  Well, I would say both of those groups.  You
6  can appreciate there's some overlap between the two
7  groups.
8    Q.  (BY MR. SCHWARZ)  Right.  So please, tell me
9  your understanding of Mr. Ward's reputation.
10    A.  My understanding is that -- well, let me --
11  let me ask you to pin down a time.
12    Q.  Let's start with today.
13    A.  I think he generally has a -- has a good
14  reputation, certainly from my perspective.
15    Q.  How about -- you've said you first met him --
16  I'm sorry -- in 2003?
17    A.  Yes, sir.
18    Q.  How would you evaluate his reputation in 2003?
19    A.  Well, when I -- when I first met him, I mean,
20  his -- the -- it was a community of one or two that --
21  well, I would say he had a good reputation at that time
22  and -- yes, I'd say he had a very good reputation at
23  that time.  I would distinguish between before I knew
24  him and afterward.  Before -- before I was introduced, I
25  didn't know him.

27

1    Q.  Okay.  You had not heard of him before that
2  time?
3    A.  That's correct.
4    Q.  Okay.  And if I understand you correctly, you
5  think highly of him today?
6    A.  I do.
7    Q.  And you believe his reputation today is that
8  of a well-respected honorable attorney?
9    MR. PATTON:  Object to form.
10    A.  Well, again, you have -- you know, among most
11  people, I think that's true.  I think there are some
12  people that -- where that's not true.
13    Q.  (BY MR. SCHWARZ)  And who would those people
14  be?
15    A.  You know, I've had people question his
16  reputation as a result of the comments that your client
17  made that bring us all here today.
18    Q.  Okay.  Did you ever have -- and you made
19  reference to the comments that were made that are -- you
20  understand that they're the basis of this lawsuit,
21  correct?
22    A.  I do.  I believe I do.
23    Q.  I mean you did -- you mentioned that you
24  were -- I'm not saying you studied it, but you did at
25  least briefly review the -- a petition or a complaint in

28

1  this case, correct?
2    MR. PATTON:  Object to form.
3    A.  I briefly reviewed a complaint, yes.
4    Q.  (BY MR. SCHWARZ)  Okay.  Do you understand
5  that certain statements were made by the author of a
6  blog called the Patent Troll Tracker?
7    A.  I know that that's -- could you restate the
8  question?
9    Q.  Fair enough.
10    A.  I'm sorry.
11    Q.  Do you understand that certain comments were
12  made to which Mr. Ward has raised objection by an
13  anonymous blogger or a person who was then anonymous
14  called the Patent Troll Tracker?
15    A.  Yes, I understand that.
16    Q.  Okay.  Did you ever have occasion to read the
17  blog Patent Troll Tracker?
18    A.  Yes.
19    Q.  Okay.  And do you recall when you first read
20  it?
21    A.  It would have been, I believe, in 2007
22  sometime.
23    Q.  Do you recall how you found out about the
24  Patent Troll Tracker blog?
25    A.  One of my colleagues informed me about it.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

29

```
1    Q.  Do you recall who that was?
2    A.  I believe it was Kirby Drake.
3    Q.  Do you recall why he recommended that you read
4    it?
5    A.  Well, it's a she.
6    Q.  Oh, I'm sorry.
7    A.  In -- I believe it was.  It was a blog that
8    was getting a lot of attention in the -- in the
9    community, and I had heard about -- heard about it and
10   asked her to show me how to find out what it was about.
11   Q.  Okay.  When you -- you mentioned -- you used
12   the word "community."  Would you explain to us what you
13   mean by the -- by your use of that word?
14       MR. PATTON:  Objection, form.
15   A.  Well, I would use it -- I'm sorry.  The two
16   communities I would -- mentioned before, the national
17   patent bar and the -- and the Texas bar.
18   Q.  (BY MR. SCHWARZ)  Okay.  Did you read the
19   Patent Troll Tracker often?
20   A.  No, sir.
21   Q.  Okay.  Did you ever e-mail the Patent Troll
22   Tracker or otherwise try to communicate with it?
23   A.  No, sir.
24   Q.  Okay.  Did you ever recommend to others that
25   they read the Patent Troll Tracker?
```

30

```
1    A.  I don't think I ever did that.
2    Q.  Okay.  Were any of the cases that you've been
3    involved with ever discussed by the Patent Troll
4    Tracker?
5    A.  I believe that -- I believe at least one of
6    them has, maybe two of them.
7    Q.  And do you recall which cases?
8    A.  I believe one of the Fenner cases and I
9    believe one of the Antor cases.
10   Q.  Do you recall what the Patent Troll Tracker
11   said about the Fenner case?
12   A.  I don't remember the details other than it was
13   a negative and misleading, if not false, comment about
14   the case.  And my recollection was it was -- it was not
15   a -- not a positive statement.
16   Q.  You said it was misleading.  Do you recall in
17   what way you considered it misleading?
18       MR. PATTON:  Object to form.
19   A.  My recollection was he just misstated the
20   facts.
21   Q.  (BY MR. SCHWARZ)  And was that the Fenner
22   case?
23   A.  I believe it was.
24   Q.  Okay.  How about the Antor case?  Do you
25   recall the coverage there?
```

31

```
1    A.  I don't have a clear recollection of him
2    having said anything about the Antor case, other than
3    just maybe reporting on -- well, now that -- now that I
4    think about it, I think he had -- he made some comments
5    about our fact that the case was filed with one named
6    defendant and then multiple defendants were added at a
7    subsequent time.
8        And as I recollect, he accused us of doing
9    something in violation of the rules with respect to
10   those -- that pleading.  That's -- you know, it's been a
11   while since I reviewed it, and I never did anything
12   about it after that.
13   Q.  And I believe you've already answered this,
14   but did you complain to the Patent Troll Tracker about
15   any of this coverage?
16       MR. PATTON:  Object to form.
17   A.  No, sir.
18   Q.  (BY MR. SCHWARZ)  Are you aware that the
19   Patent Troll Tracker blog has been discontinued?
20   A.  No, I'm not aware that it's been discontinued.
21   Q.  Okay.
22   A.  Well, I should remand that.  As I understand,
23   he's no longer blogging, but it's my understanding his
24   blog is still available, that if you -- if you seek it
25   out on the internet, you can find the blog.
```

32

```
1    Q.  And I probably should have asked this a while
2    ago.  We've been referring to -- we've been using the
3    word "blog."  Would you explain for the jury what --
4    what you mean by the term "blog."
5    A.  Well, I'm not sure I have any -- any meaning
6    for that term, other than what I think is generally
7    understood.  It's a -- it's a website where an
8    individual or group of individuals can share their
9    views, publish their views, make public statements about
10   one or more topics of interest.
11   Q.  Okay.  Do you know who Raymond Niro is or
12   Niro?
13   A.  I do.
14   Q.  And would you tell the jury who he is?
15   A.  Mr. Niro or Niro -- I think it's pronounced
16   Niro -- is one of the pillars of the national patent
17   bar.
18   Q.  Okay.
19   A.  Or national intellectual property bar.
20   Q.  Were you aware that he offered a reward to
21   anyone who could reveal the identity of the Patent Troll
22   Tracker?
23   A.  Yes.
24   Q.  And how did you learn about that?
25   A.  When it -- when the Troll Tracker's identity
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

33

1  was revealed and it became -- there was some publicity
2  over it at that time, and Mr. Niro's reward was
3  mentioned in some of the articles I read.  At least one
4  of the articles I read.
5       (Exhibit Number 29 was marked.)
6    Q.  (BY MR. SCHWARZ)  Do you recall -- I'll
7  represent to you this is Exhibit Number 29.  It is a
8  printout of part of the Patent Troll Tracker blog.  And
9  do you recall -- by any chance, did you read any part of
10  this at the time it was published, in particular the
11  matter concerning Mr. Niro on the first page?
12    A.  I don't recall ever -- ever seeing this
13  before.
14    Q.  Okay.  You mentioned that the Patent Troll
15  Tracker's identity was exposed.  Do you know the name of
16  the Patent Troll Tracker?
17    A.  I don't recall it, no.
18    Q.  If I represented to you that his name was
19  Richard Frenkel, would that refresh your recollection?
20    A.  That's -- that sounds like the name I've heard
21  before, yes.
22    Q.  And do you recall when you learned that the
23  Patent Troll Tracker was Mr. Frenkel?
24    A.  I don't recall the date, no, sir.
25    Q.  Do you know anything else about Mr. Frenkel?

34

1    A.  I know that he's a lawyer and that he works
2  for Cisco.
3    Q.  Okay.
4    A.  Or worked for Cisco at a time.
5    Q.  Would you describe for the jury at least your
6  understanding of what the Patent Troll Tracker blog was
7  about?
8       MR. PATTON:  Object to form.
9    A.  Well, my understanding of it at the time was
10  it was a vehicle to, to put it bluntly, cast aspersions
11  on a category of patent owner and to -- that it -- that
12  there was an agenda to -- that he had an agenda that was
13  against people trying to enforce their patents.
14    Q.  (BY MR. SCHWARZ)  You made reference to "a
15  category of patent owner."  Could you explain for the
16  jury what you meant by that phrase?
17    A.  Typically sole inventors, individuals who made
18  inventions and obtained patents for their inventions
19  and, for one reason or another, were seeking to enforce
20  their patents against infringers.
21    Q.  Okay.  What is your understanding of the
22  meaning of the term "patent troll"?
23       MR. PATTON:  Object to form.
24    A.  I find it to be a very derogatory term, and I
25  oppose its use by those who do use it because I think

35

1  they use it as a derogatory term.  My understanding is
2  that it's essentially used by anyone who doesn't like a
3  patent owner seeking to enforce his or her patents
4  against them.
5       MR. PATTON:  Could we take a two-minute
6  break?
7       MR. SCHWARZ:  Sure.  No problem.
8       THE VIDEOGRAPHER:  We're off the record.
9  It's 9:46 a.m.
10       (Break was taken.)
11       THE VIDEOGRAPHER:  Back on the record,
12  it's 9:50 a.m.
13    Q.  (BY MR. SCHWARZ)  Okay.  You mentioned just a
14  few moments ago that you felt that the Patent Troll
15  Tracker had an agenda.  Would one way of describing that
16  agenda be that the Patent Troll Tracker advocated
17  certain types of patent reform?
18       MR. PATTON:  Object to form.
19    A.  I don't know.
20    Q.  (BY MR. SCHWARZ)  Okay.  You mentioned that
21  the Patent Troll Tracker was against persons who wanted
22  to enforce their patent rights.  Could you expand on
23  that answer?
24       MR. PATTON:  Object to form.
25    A.  I don't know in what sense.  I mean --

36

1    Q.  (BY MR. SCHWARZ)  I guess let me -- let me ask
2  a better question.  Was -- in your opinion, was the
3  Patent Troll Tracker against all persons who wished to
4  enforce their patent rights?
5       MR. PATTON:  Object to form.
6    A.  I think against -- it seemed to me against
7  people that would enforce them against his client.
8    Q.  (BY MR. SCHWARZ)  Okay.
9    A.  Or the client and those similarly situated
10  with his client.
11    Q.  Okay.  And prior to the disclosure of the
12  Patent Troll Tracker's identity, how would you describe
13  the persons or entities about which the Patent Troll
14  Tracker had favorable views?
15    A.  Based on what I had seen and heard, it was
16  apparent that he represented a large company -- a large
17  company or companies such as Cisco.
18    Q.  Are you aware -- are you aware of the fact
19  that one of the issues in Mr. Ward's case against Cisco
20  concerns the propriety of a clerk or deputy clerk of the
21  United States District Court for the Eastern District of
22  Texas changing the dates on a complaint and docket sheet
23  to reflect a different date of filing?
24    A.  Yes.
25       MR. PATTON:  Object to form.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

37

```
1     A.  Yes, sir.
2     Q.  (BY MR. SCHWARZ)  In your almost 30 years
3  experience as a lawyer, have you ever been involved in a
4  case where the clerk of a court has changed the date of
5  a filing of a complaint?
6         MR. PATTON:  Object to form.
7     A.  Yes, sir.
8     Q.  (BY MR. SCHWARZ)  And what -- would you
9  describe the circumstances of that case.
10    A.  Yeah, it's happened on a couple of occasions
11 where -- sometimes they fail to change the stamp at the
12 beginning of the day.  Sometimes clerks make mistakes in
13 terms of -- you know, they put the wrong month on the
14 stamp.  It typically happens when, you know, we change
15 months or dates.
16        And so we received, I'm thinking in two
17 instances, a complaint that had the wrong date on it.
18 And it was brought to the attention of the clerk, and
19 the clerk fixed it.
20    Q.  Okay.  And do you recall how it was brought to
21 the attention of the clerk?
22    A.  In -- in one instance, I know it was simply a
23 telephone call, and you know, and it was fixed.  In the
24 other instance, I believe a messenger was sent or a
25 legal assistant was sent down to the clerk's office.
```

38

```
1     Q.  Okay.  And would you explain for the jury why
2  the date of a filing of a complaint can be of
3  importance?
4         MR. PATTON:  Object to form.
5     A.  Well, I mean, there are lots of -- lots of
6  reasons, but we all want -- want to be accurate in what
7  we do in terms of the court system, I would think.  I
8  would say yes.
9     Q.  (BY MR. SCHWARZ)  Well, in terms of a patent
10 case, subject matter jurisdiction wouldn't exist if a
11 complaint was filed before the patent issued, correct?
12        MR. PATTON:  Object to form.
13    A.  You know, I don't know.
14    Q.  (BY MR. SCHWARZ)  Well, in other cases, the
15 statute of limitations may run, correct?
16    A.  That could be a -- certainly an issue, yes,
17 sir.
18    Q.  Okay.  And in cases removed from state court
19 to federal court, there are deadlines for removal,
20 correct?
21    A.  There are deadlines, yes, sir.
22    Q.  Okay.  And just in general, courts can impose
23 deadlines on parties to cases, and when you file
24 something can be -- if you miss a deadline, that can
25 have significant consequences, correct?
```

39

```
1         MR. PATTON:  Object to form.
2     A.  Deadlines are important, yes.
3     Q.  (BY MR. SCHWARZ)  Do you regularly refer to
4  docket sheets for information about cases?
5         MR. PATTON:  Object, form.
6     A.  Yes, sir.
7     Q.  (BY MR. SCHWARZ)  And it's important to be
8  able to rely on a court's docket sheet, isn't it?
9     A.  Absolutely, yes, sir.
10    Q.  Okay.
11    A.  Though I will tell you there are often
12 inaccuracies on them, so no one would rely entirely on
13 the docket sheet.
14    Q.  And what else would you rely on?
15    A.  Well, that's a -- that's one of the challenges
16 in the practice of law is that there's probably no one
17 thing one can rely on.  It's a -- it's a group of --
18 it's a group of things.
19    Q.  And could you describe some of the members of
20 that group of things?
21    A.  Well, you would rely on your own file.  You
22 would rely on the court's file.  You would rely on --
23 occasionally rely on your opponent's file.
24    Q.  And you're familiar with the ECF systems,
25 correct?
```

40

```
1         MR. PATTON:  Object to form.
2     A.  Is that the electronic docketing system?
3     Q.  (BY MR. SCHWARZ)  Yeah, the electronic -- I
4  believe it stands for electronic case filing.
5     A.  Yes, I'm familiar with it, yes, sir.
6     Q.  Have you ever filed something using an ECF
7  system?
8     A.  I personally have never done that, no, sir.
9     Q.  Have you had either an associate or a staff
10 member do it for you?
11    A.  Yes, sir.
12    Q.  Okay.  And you have seen, I would -- let me
13 ask you this way:  Have you ever seen a document that
14 has been filed through the ECF system?
15    A.  Yeah, I think -- yes.
16    Q.  And do those documents not have a banner at
17 the top containing some information about the filing?
18        MR. PATTON:  Object to form.
19    A.  They certainly do now, yes.  They frequently
20 have a banner at the top of the document.
21    Q.  (BY MR. SCHWARZ)  Okay.  If I wanted to find
22 out some information about a case that you're involved
23 with, at least a case in federal court, one of the first
24 places I'd look is the docket sheet prepared and
25 maintained by the clerk; wouldn't be the case?
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

41

1    MR. PATTON:  Object to form.
2    A.  You could do that, yes.
3    Q.  (BY MR. SCHWARZ)  Okay.  Would you explain for
4    the jury your understanding of the duties and
5    responsibilities of a United States district clerk?
6    MR. PATTON:  Object, form.
7    A.  I don't think I've ever really looked at it,
8    but, from my experience, their responsibilities are to
9    maintain the files of the United States federal court
10    for whichever district and division they are charged
11    with that responsibility.
12    Q.  (BY MR. SCHWARZ)  Would you say that it's the
13    case that a clerk's duties are determined and assigned
14    by the court for which he or she works?
15    MR. PATTON:  Object to form.
16    A.  I would think so.
17    Q.  (BY MR. SCHWARZ)  Okay.  In fact, I'll
18    represent to you that 28 USC Section 956 states that --
19    and I'm quoting -- The clerk of each court and his
20    deputies and assistants shall exercise the powers and
21    perform the duties assigned to them by the court, end
22    quote.
23    A.  Well, I was going to -- you mentioned the
24    statute.  I was going to say the clerk's duties are also
25    probably provided by -- almost certainly provided by

42

1    statute, obviously, the constitution, rules of court, as
2    well as the orders of the court.
3    Q.  Okay.  And based on the statute that I just
4    quoted to you, would it be fair to say that a clerk
5    isn't authorized to act beyond the scope of authority
6    granted to him by the court?
7    MR. PATTON:  Object to form.
8    A.  I think a clerk always has to work under
9    whatever authority he or she may have.
10    Q.  (BY MR. SCHWARZ)  Okay.
11    A.  I don't mean to suggest that that's the
12    only -- that that statute that you read is the only
13    authority that they would operate under.  I don't -- I
14    just don't know.
15    Q.  Okay.  I'd like to go back to those two
16    instances you mentioned of clerks getting the date wrong
17    on a filing.
18    A.  Right.
19    Q.  And you mentioned that in one case there was a
20    phone call and another case there was -- I believe you
21    said a courier was sent?
22    A.  Correct.
23    Q.  In those cases, were both parties aware of the
24    discrepancy on the docket sheet?
25    MR. PATTON:  Object to form

43

1    Q.  (BY MR. SCHWARZ)  I mean -- or the filing?
2    A.  I don't think so.
3    Q.  Okay.  So are you saying, in those cases, one
4    side simply unilaterally had the clerk change a date on
5    a document?
6    A.  I don't agree with the way you stated it, so
7    I --
8    Q.  Then please -- are you saying that, in those
9    cases, one side had the clerk change the date on the
10    document without informing the other side?
11    MR. PATTON:  Object to form.
12    A.  Maybe I should tell you what happened.
13    Q.  (BY MR. SCHWARZ)  Fair enough.
14    A.  The fact of the date on the document was
15    pointed out to the clerk.  The clerk realized the date
16    was wrong and corrected the error.
17    Q.  Okay.
18    MR. SCHWARZ:  What is this, 30?  Let's go
19    ahead and do 31, too.
20    MR. PATTON:  I have 30.
21    MR. SCHWARZ:  I'm about to give them to
22    you.  Hang on.
23    MR. PATTON:  Oh, okay.
24    THE WITNESS:  30 and 31.
25    (Exhibit Number 30 and 31 were marked.)

44

1    Q.  (BY MR. SCHWARZ)  I've just handed you
2    documents that have been labeled Exhibits 30 and 31.
3    Could you just describe them for the jury for us?
4    A.  Well, 30 appears to be a copy of a docket
5    sheet, and 31 appears to be a complaint.
6    Q.  Okay.  And looking at these two exhibits, can
7    you determine what date the complaint that is Exhibit --
8    I believe it's 30 -- 31 was filed?
9    MR. PATTON:  Object to form.
10    A.  The date that it was filed?
11    Q.  (BY MR. SCHWARZ)  Right.
12    A.  Well, based on what's printed at the top of
13    the document, it appears to have been filed on
14    October 15, 2007.
15    Q.  And on the docket sheet, can you tell the jury
16    what date it appears the complaint was filed?
17    MR. PATTON:  Object to form.
18    A.  Well, it appears to be October 15, 2007.
19    Q.  (BY MR. SCHWARZ)  Okay.  Is there anything on
20    either document that suggests that the complaint was
21    filed on October 16?
22    MR. PATTON:  Are you talking about
23    Exhibit 31?
24    MR. SCHWARZ:  30 or 31.
25    MR. PATTON:  You said the other document,

45

1  and I'm not sure which one of the two you're talking
2  about.
3         MR. SCHWARZ:  Fair enough.  I appreciate
4  that.  I want to be clear.
5     Q.  (BY MR. SCHWARZ)  Is there anything on -- on
6  Exhibit 30 that would suggest that the complaint was
7  filed on October 16?
8     A.  No.
9     Q.  And how about is there anything on Exhibit 31
10  that suggests that that document was filed on
11  October 16?
12     A.  No.  And again, I haven't seen these documents
13  before; and 31 is a six-page document, I guess, and I
14  haven't read it.  But just looking at the cover page and
15  the last page, I don't see anything that would suggest
16  that it was filed on other than October 15, 2007.
17     Q.  In your view, would it be unreasonable for a
18  person viewing these documents to conclude that this
19  lawsuit, ESN versus Cisco, was filed on October 15th?
20         MR. PATTON:  Object to form.
21     A.  Well, there is a fact that would raise a
22  question in my mind, and that's Mr. Ward's notice of
23  appearance on the 16th.
24     Q.  (BY MR. SCHWARZ)  And why does that raise a
25  question for you?

46

1     A.  Because typically notices of appearance are
2  filed at the same time as the complaint.
3     Q.  Is there any way -- in your experience with
4  the ECF system, is there some way to kind of look behind
5  what's on the -- on the face of the system, so to speak,
6  to determine whether the dates listed there are correct?
7         MR. PATTON:  Object.
8     A.  Well, certainly, yes.
9         MR. PATTON:  Object to form.
10     Q.  (BY MR. SCHWARZ)  And how is that?
11     A.  Call the clerk.
12     Q.  Okay.  So do you think it's incumbent on
13  persons to call the clerk and check with every filing
14  that's made to make -- to confirm that the date that's
15  displayed on the ECF system is correct?
16     A.  I wouldn't say with every filing, but with --
17  with something that might be of importance where that --
18  you mentioned earlier that dates are important.  When
19  those -- if there's a filing where there's an important
20  date, absolutely.
21     Q.  Okay.  And what sorts of filing dates are
22  important?
23         MR. PATTON:  Object to form.
24     A.  Well, you mentioned things like statute of
25  limitations, and you mentioned there are rules that

47

1  set -- the courts set rules in terms of dates to
2  respond.  The statute sets rules on when you can
3  respond.  For example, a plaintiff has 20 days -- I'm
4  sorry.  A defendant has 20 days to answer a complaint
5  once they're served with a complaint and summons.  And
6  so those types of dates, as I say, there are court
7  orders that require you to do things by -- by certain
8  dates, and those dates are important.
9     Q.  (BY MR. SCHWARZ)  Okay.  So in any given case,
10  there could be many, many important dates?
11     A.  Absolutely
12     Q.  And do you believe that it's incumbent on
13  parties to double-check all of those?
14         MR. PATTON:  Object to form.
15     A.  Well, not all of them.  But -- but frequently,
16  it is important to double-check those, those dates, yes,
17  sir.
18     Q.  (BY MR. SCHWARZ)  And do you do that
19  frequently?
20     A.  You know, not to quibble with your term
21  "frequently," but it happens with a high degree of
22  regularity, yes, sir.
23     Q.  Okay.  So if -- if one called a clerk about
24  Exhibits 30 and 31, how would the clerk determine that
25  there was anything incorrect about what was displayed

48

1  there?
2         MR. PATTON:  Object to form.
3     A.  You know, I really don't know all of the
4  details and all of the procedures that clerks -- that
5  the clerks of the various district courts follow.  But I
6  do understand that they have -- they do have procedures
7  that are what I would view as backup systems and that
8  they have a way of double-checking entries is what I
9  would call it.
10         (Momentary off-the-record discussion.)
11         (Exhibit Numbers 32 and 33 were marked.)
12     Q.  (BY MR. SCHWARZ)  Would you please describe
13  the documents that have been handed to you that are
14  labeled Exhibits 32 and 33?
15     A.  32 appears to be a complaint, and 33 appears
16  to be a docket sheet.
17     Q.  Okay.  And if you'd like the time to actually
18  compare them word for word, feel free and we'll go off
19  the record and you can do that.  But does the complaint
20  that is -- that has been labeled Exhibit 32 appear to be
21  the same complaint as Exhibit Number 31?
22     A.  Yeah, I would just -- quickly scanning it,
23  Mr. Schwarz, they do appear to be essentially the same.
24  I mean, you know, there are -- there's a difference, of
25  course, at the top.

Chiavello, Robert H.  9/23/2009  11:10:00 AM

49

1    Q.  And would you describe what that difference
2    is?
3    A.  The exhibit -- Exhibit 32 bears the date of
4    October 16, 2007, at the top.
5    Q.  And --
6    A.  And on each page.
7    Q.  And on Exhibit 33?
8    A.  Exhibit 33, you're saying in comparison to
9    Exhibit 30?
10    Q.  Correct.
11    A.  Well, first, there at least would appear to be
12    three additional entries on the docket, and the date --
13    let me say Exhibit 33 appears to have at least three
14    more entries than Exhibit 30, and the date filed for the
15    complaint is October 16, 2007, on Exhibit 33.
16    Q.  Okay.
17    A.  You know, you asked me a question about
18    Exhibit 30 and whether there was anything on the -- on
19    the docket that appeared that the date of October 15,
20    2007, might be wrong.  And in looking at it, there's --
21    there's the statement on -- in the -- what they call the
22    docket text at the end of Docket Entry Number 1.
23        It says "entered October 16, 2007," so
24    that -- if I had been looking at this docket, that would
25    tell me there's -- there's something inconsistent, and

50

1    that would -- that would raise a question in my mind as
2    to what the -- whether which date -- which of the two
3    dates was the -- was the right date.
4    Q.  Fair enough.  Would it be unreasonable for
5    someone comparing the two docket sheets and the two
6    complaints that I've handed you that collectively are
7    exhibits, I believe it's 30 through 33, would it be
8    unreasonable to conclude that the filing date was
9    changed?
10        MR. PATTON:  Object to form.
11    A.  The filing date was changed --
12    Q.  (BY MR. SCHWARZ)  Okay.
13    A.  -- in one -- in one respect, yes.
14    Q.  Okay.  Are you familiar with the Patent Troll
15    Tracker blogs at issue in this lawsuit?
16    A.  I don't understand your question.
17    Q.  Okay.
18    A.  You mean the specific blogs that made the --
19    made the statements that bring us all here today?
20    Q.  Correct.
21    A.  Yes, I'm generally familiar with those
22    statements.  Let me say I'm generally familiar with
23    the -- with that blog, those blog entries, statements,
24    yes.
25        (Exhibits 34, 35, and 36 were marked.)

51

1    Q.  (BY MR. SCHWARZ)  Mr. Chiavello, I've handed
2    you three documents that have been labeled Exhibits 34,
3    35, and 36, and I will represent to you that these three
4    documents are exhibits to Mr. Ward's amended complaint
5    in the case that we're here about today.  That is not
6    exactly explained, but if you look at the very top, the
7    banner notes that it's Document 66-1, 66-2, and 66-3.
8    And I'll represent to you that Document 66, to which
9    these are attachments, are Mr. Ward's amended complaint
10    in the present lawsuit.
11        Have you seen any of these blogs before?
12    A.  You know, yes, I've -- well, I've seen papers
13    that would look like this.  You know, again, I don't
14    remember reading them in this form.  You know, as I look
15    at it, as I read this first -- these first couple of
16    statements, I don't think I ever read this before,
17    frankly, because, in reading this, I'm really outraged
18    by what I've read, and I don't recall being outraged
19    before.  In particular, the comment about the Banana
20    Republic of East Texas I think is just absolutely
21    outrageous.
22        MR. PATTON:  Could we maybe clear
23    something up here?  You've given 34 and 35, and I would
24    assume that the -- the first blog is at the bottom of
25    the page on 34.  That's the 17th.

52

1        MR. SCHWARZ:  Yes, I agree with that.
2        MR. PATTON:  Okay.  Sometimes people
3    separate them out.  It's a separate document.  But you
4    have the 17th and the 18th both on 34 and 35?
5        MR. SCHWARZ:  That is correct.
6        MR. PATTON:  Okay.
7        MR. SCHWARZ:  And as I represented to
8    Mr. Chiavello, I'll simply say that this is how they've
9    been filed with the amended complaint.
10        MR. PATTON:  Okay.
11    Q.  (BY MR. SCHWARZ)  So I take it that you feel
12    that the -- the reference to the Banana Republic of East
13    Texas is a derogatory and untoward expression?
14    A.  Yes, sir.
15    Q.  If you would compare -- and you'll note that
16    that reference is made in a blog that is dated Thursday,
17    October 18th, under the title "ESN convinces EDTX court
18    clerk to alter documents to try to manufacture subject
19    matter jurisdiction where none existed."  Is that
20    correct?
21    A.  That's what it says, yes, sir.
22    Q.  Okay.  I'd ask you to look at the following
23    two exhibits, 35 and 36.  And under the same Thursday,
24    October 18th entry with the same -- the same title, do
25    you see any reference to the Banana Republic of East

Chiavello, Robert H.  9/23/2009  11:10:00 AM

53

```
1   Texas?
2         MR. PATTON:  And this is what I'm trying
3   to clear up and want to make certain, because the top
4   one on 35 does have the Banana Republic on the first
5   page.
6         THE WITNESS:  Right.
7         MR. PATTON:  But I think what you're
8   referring -- you're wanting to refer to is right
9   underneath it, which is the October 17th or it will be
10  the next one, which is dated the 18th, but was actually
11  corrected on the 19th.
12        MR. SCHWARZ:  Okay.  Perhaps we should go
13  off the record for a second just to clarify this.
14        MR. PATTON:  That's probably a good idea.
15        MR. SCHWARZ:  Okay.
16        THE VIDEOGRAPHER:  We're off the record
17  at 10:17 a.m.
18        (Momentary off-the-record discussion.)
19        THE VIDEOGRAPHER:  We're back on record
20  at 10:19 a.m.  Please proceed.
21        Q.  (BY MR. SCHWARZ)  Mr. Chiavello, while we were
22  off the record, Mr. Patton and I had a discussion and we
23  clarified these exhibits.  There are some questions
24  about these exhibits.  And I'll ask him to -- I will try
25  to put our understanding on the record, and I'll ask
```

54

```
1   Mr. Patton to correct me or expand upon it if he sees
2   fit.
3         But I believe we've agreed that Exhibit 34
4   was -- Exhibit 34 and Exhibit 35 are identical copies.
5   And on each of them, there is, at the bottom of the
6   first page of Exhibit 34 and the bottom of the first
7   page of Exhibit 5 [sic] there is an October 17th, 2007,
8   blog entry.  And above that is an October 18th, 2007,
9   blog entry.  And those are identical.
10        Exhibit 36 has, on one page, a changed
11  version of the blog entry, which is on -- at the top of
12  the first page of Exhibits 34 and 35.
13        MR. SCHWARZ:  Is that -- is that our
14  understanding, Mr. Patton?
15        MR. PATTON:  It is, except you've got to
16  understand that the October -- Exhibit 36 was the
17  amended or edited version of the October 18th blog, and
18  while it shows October 18th on the face of Exhibit 36,
19  that blog was edited on the 19th.
20        MR. SCHWARZ:  While I don't believe there
21  is any dispute about that, I'd simply comment --
22        MR. PATTON:  Right.  I can promise you
23  there is no dispute about that.
24        MR. SCHWARZ:  Right.  I don't believe
25  there's --
```

55

```
1         MR. PATTON:  Sorry to interrupt you.
2         MR. SCHWARZ:  No, that's okay.  We want
3   everything to be clear about it.
4         Q.  (BY MR. SCHWARZ)  Like I said, while I don't
5   think there's any dispute about that, for today, I'm not
6   going to be referring -- the dates are not going to be
7   significant other than what's posted on there; and if
8   they are, I'm sure Mr. Patton will correct me.
9         But in any event, to get back to the
10  question which led into this morass of clarifications,
11  if you would compare the October 18th, 2007, entry that
12  is on Exhibit 34 with that on Exhibit 36, which
13  Mr. Patton has just explained was edited, I believe you
14  said, on the 19th --
15        MR. PATTON:  That's correct.
16        Q.  (BY MR. SCHWARZ)  -- do you see that the
17  reference to the Banana Republic of East Texas is no
18  longer there?
19        A.  I see that omission, yes, sir.
20        Q.  Okay.  If -- if I understand what you said
21  earlier, this is the first time you've actually read
22  these blogs?
23        A.  I believe -- I believe that's to be the case.
24        Q.  Okay.  I'd ask you to look at the blog entry
25  dated October 17th.
```

56

```
1         A.  On which -- on Exhibit 34?
2         Q.  Yeah, on 34 or 35, because they're identical.
3   And I'd ask you to read it, and then I'll have a very
4   good question for you.
5         A.  I've read it, and in reading it, it jogged a
6   recollection.  You asked me earlier today whether you
7   could file a lawsuit on a patent -- before a patent
8   issues, and there's a reference here to GAF versus Elk.
9   I recall that case, and the answer is, no, you cannot
10  file a patent infringement suit before the patent
11  issues.
12        Q.  Right.  Thank you.
13        Having read the October 17th blog, is
14  there any mention of Mr. Ward in it?
15        A.  I believe so, yes.  In the last paragraph,
16  he's mentioned twice.
17        Q.  Okay.  And in what context is he mentioned?
18        A.  What do you mean by "in what context"?
19        Q.  Well, how was he referenced in that last
20  paragraph?
21        A.  Rudely, I would say.
22        Q.  He's referenced twice, correct?
23        A.  Yes, sir.
24        Q.  And are you saying that -- stating that he is
25  local counsel is referencing him rudely?
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

57

```
1    A.  The last sentence says, "Wonder how I don't
2    Johnny Ward will play there," question mark.  I read
3    that as a negative comment about Johnny Ward.
4        Q.  So do you think that that -- that comment
5    would harm Mr. Ward's reputation?
6        A.  It's a negative comment, yes, and negative
7    comments can harm a person's reputation.
8        Q.  I'd ask you to look at now the October 18th
9    blog, either on Exhibit 34 or 35, again because they're
10   identical.
11       A.  Okay.  I'm looking at 34.
12       Q.  That's fine.
13       A.  Okay.  I've read it.
14       Q.  Is there any mention of Mr. Ward's name there?
15       A.  I don't -- I don't see one, no, sir.
16       Q.  I'd ask you to look at the October 18th blog
17   on Exhibit 36.
18       A.  I'm looking at it.
19       Q.  If you wouldn't mind reading it.
20       A.  Okay.
21       Q.  And is there any mention of Mr. Ward's name
22   there?
23       A.  His name?
24       Q.  Correct.
25       A.  No, no, his name is not mentioned.
```

58

```
1        Q.  Mr. Ward has testified that you told him that
2    there were clients or potential clients, and I believe
3    he's testified that -- that there were -- in his
4    recollection, that this happened more than once, but in
5    any event, that there was at least one client who -- who
6    refused to hire Mr. Ward because of the patent troll --
7    Patent Troll Tracker blogs.  Is that true?
8        A.  Yes, sir.
9        Q.  And do you recall how many -- first, how many
10   clients or potential clients there were?
11       A.  By my recollection, there were three
12   instances.
13       Q.  Okay.  And who were those?  Could I simply
14   call them clients, for the sake of our discussion here?
15       A.  Yes, sir.
16       Q.  Okay.  And who were those clients?
17           MS. COLLINS:  Objection, privileged.
18       A.  Yeah, I'm not going to reveal the names.
19       Q.  (BY MR. SCHWARZ)  Okay.  When did these --
20   when did these events occur?
21       A.  My recollection is it was at the end of 2007,
22   early part of 2008.
23       Q.  Without naming the clients -- let me back up
24   for a moment.  Let's just make sure our record's clear.
25           Would you please name those clients for
```

59

```
1    us?
2            MS. COLLINS:  Objection, privileged.
3        A.  I will not name the clients.
4        Q.  (BY MR. SCHWARZ)  Okay.
5            MR. SCHWARZ:  Are you instructing your
6    client not to answer the question?
7            MS. COLLINS:  Yes, sir.
8            MR. SCHWARZ:  Okay.
9        Q.  (BY MR. SCHWARZ)  Did these clients -- if --
10   did any of these clients say that they did not want to
11   retain Mr. Ward solely because of the Patent Troll
12   Tracker blogs?
13       A.  In all three instances, that was identified as
14   the reason, yes, sir.
15       Q.  When you said "the reason," was it the only
16   reason?
17       A.  To the best as I recall, that was the stated
18   reason.
19       Q.  Okay.  Did you try to convince them otherwise?
20       A.  Yes, sir.
21       Q.  And could I ask you first what it was
22   that they said was their reason for not wanting to
23   retain Mr. Ward?
24       A.  Well, again, I -- the specific communication
25   is privileged, and I don't remember the exact -- exact
```

60

```
1    words.  But in all three instances, there was -- there
2    was mention of these statements and the concern about
3    Mr. Ward being somebody to -- a concern about his
4    honesty and their willingness to have him act as their
5    attorney.
6        Q.  Okay.  And what did you tell them, to the
7    extent that you can, to disabuse them of the notion that
8    there was a problem with Mr. Ward's integrity?
9        A.  Well, again, in all three cases, I was
10   outraged and tried to defend Mr. -- Mr. Ward's
11   integrity.  But in those cases, I was unsuccessful.
12       Q.  Okay.  Did you say that the blogs were untrue?
13       A.  Yes.
14       Q.  Had you actually read them at the time?
15       A.  No.  I was familiar with them, though.
16       Q.  And how was it that you were familiar with
17   them?
18       A.  You know, Mr. Schwarz, in reading these, now
19   that I've read them a couple of times, the one on the
20   17th I may have read at the time.  I don't think I read
21   the one on the 18th.  I'm pretty confident I don't
22   recall having read the one on -- well, I just don't
23   remember the one on the 36 -- Exhibit 36.
24           That Banana Republic comment really kind
25   of sticks out at me, and as I say, I just don't recall
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

61

1  having seen that before or the comment about Mr. Ward in
2  the -- in the one dated the 17th.  So I just don't
3  recall whether I read them or not.
4      Q.  Do you know whether these clients had actually
5  read the blogs?
6          MR. PATTON:  Object, form.
7      A.  You know, I believe they represented that they
8  had, yes, sir.
9      Q.  (BY MR. SCHWARZ)  And if I recall your
10  testimony from just a few moments ago you believe all
11  of this -- all three of these clients declined
12  Mr. Ward's representation either in late 2007 or early
13  2008, correct?
14      A.  Correct.
15      Q.  Okay.  By early 2008, do you know what time
16  frame -- could you explain what time frame you have in
17  mind?
18      A.  First quarter 2008.
19      Q.  So the first three months of 2008?
20      A.  That's correct.
21      Q.  Do you have -- can you recall with any greater
22  specificity when that might have been?
23      A.  I believe one was in December of 2007, and I
24  believe the other two were either in December or
25  January/February time frame.

62

1      Q.  Okay.  Mr. Ward has testified that he is
2  currently working on several cases with you and your
3  firm; is that correct?
4      A.  Yes, sir.
5      Q.  And what cases is he working on?
6      A.  I thought we went over this before, but
7  it's -- he is co-counsel with us on a -- on a various
8  number of the Antor cases, and he is co-counsel with us
9  on at least one -- on the Fenner case, which we call
10  Fenner 3.
11      Q.  Okay.  And I apologize if I asked the question
12  twice.
13          And did any of those clients retain
14  Mr. Ward after the -- after October of 2007?
15      A.  I believe for sure the Fenner 3 case.  I
16  believe that that's the case.
17      Q.  Do you know if the folks at Fenner knew about
18  those blog posts at the time they retained Mr. Ward?
19      A.  I think -- I think they did.
20      Q.  Okay.  Did they express any opinion about
21  those posts?
22      A.  They -- you mean about the specific posts
23  about Mr. Ward or about the -- about the Patent Troll
24  Tracker blog in general?
25      Q.  Fair question.  Let's start with the Patent

63

1  Troll Tracker in general.
2          MR. PATTON:  Object to form.
3      A.  I believe the comments had been that they had
4  been treated just as improperly as Mr. Ward had been
5  treated.  I think he had made negative statements about
6  Fenner Investments.
7      Q.  (BY MR. SCHWARZ)  Okay.  So at least as to
8  those clients, is it fair to say Mr. Ward's reputation
9  is intact?
10          MR. PATTON:  Object to form.
11      A.  It's hard -- hard for me to say.  I mean, they
12  were aware that -- that there had been some negative
13  statements made about -- about him.
14      Q.  (BY MR. SCHWARZ)  Since those blog posts, the
15  Patent Troll Tracker blog posts that we've discussed,
16  has Mr. Ward's performance as a lawyer diminished in any
17  respect?
18          MR. PATTON:  Object to form.
19      A.  You mean his performance as advocating for
20  clients?  I'm not sure I understand your --
21      Q.  (BY MR. SCHWARZ)  Correct.
22      A.  I'm not aware of his performance changing,
23  other than it gets better as time goes on, I think.
24      Q.  Okay.  So he still works his cases
25  effectively?

64

1      A.  To my knowledge, yes.
2      Q.  Okay.  Has your opinion of Mr. Ward changed as
3  a result of the poll -- Patent Troll Tracker blog?
4      A.  Yes.
5      Q.  And in what respect?
6      A.  I had a high regard for him before.  I have
7  higher regard for him now, standing up to face Cisco in
8  this matter.  It takes an -- it's an act of courage to
9  take on a big company like Cisco.
10      Q.  Okay.  You said earlier that there were some
11  clients who -- who declined to hire Mr. Ward because of
12  the Patent Troll Tracker blogs, correct?
13      A.  I said that, yes, sir.
14      Q.  Okay.  And I assume, based on our earlier
15  discussion, that you had given those clients your
16  typical high praise and expressed your admiration for
17  Mr. Ward; is that correct?
18      A.  Yes, sir.
19      Q.  And despite the fact that you, with 30 years
20  experience in IP law and a partner at easily one of the
21  most prestigious firms ever -- I mean anywhere, they
22  chose to -- apparently chose to believe the expressions
23  of an anonymous blogger over your recommendation?
24      A.  I guess you could say that, yes, sir.
25      Q.  Okay.  Were those clients that we were

Chiavello, Robert H.  9/23/2009  11:10:00 AM

65

1  discussing, are they presently your clients?

2     A.  Two of them are, yes, sir.

3     Q.  You stated a moment ago that you actually

4  think more highly of Mr. Ward as a result of the events

5  that started the Patent Troll Tracker's blogs, correct?

6     A.  Yes, sir.

7     Q.  Okay.  Isn't it possible that Mr. Ward's

8  reputation actually has been enhanced because of the

9  controversy?

10       MR. PATTON:  Object to form.

11     A.  Well, again, I guess you have to be specific

12  as to who you are -- who you are referring to.

13     Q.  (BY MR. SCHWARZ)  Well, has anyone spoken to

14  you saying that they respect Mr. Ward even more because

15  of the events that have transpired since the Patent

16  Troll Tracker blogs have -- were posted?

17     A.  I think one or more of my colleagues here at

18  the firm have voiced similar expressions.

19     Q.  Okay.  And could you be a little bit more --

20  could you expand on that and tell me what sorts of

21  things your colleagues have expressed to you?

22     A.  Generally that they are impressed -- again

23  I'll use the word Mr. Ward's courage in standing up to

24  Cisco and a regard for his willingness to try to remedy

25  the evil that this Troll Tracker perpetuated against the

66

1  administration of justice in the federal system and in

2  the Eastern District of Texas, in particular, and stand

3  up for the many people who I believe were victimized by

4  the Troll Tracker.

5       And Mr. Ward and Mr. Albritton, by the

6  way, as well, I think it was an act of bravery on their

7  part to take on this individual and Cisco to try and

8  remedy the wrong that they perpetuated against --

9  certainly against Mr. Ward and Mr. Albritton.

10     Q.  Have you ever filed a patent infringement

11  case, for want of a better expression, amended after

12  midnight, when/ particularly on the date of patent

13  issue?

14     A.  Yes, sir.

15     Q.  And why do you do that?

16     A.  To avoid a defendant infringer from filing a

17  declaratory judgment action against you, against the

18  patent owner.

19     Q.  And would you say that that is a sign of an

20  effective and aggressive litigator?

21     A.  I would say it's an effective litigator.  It's

22  certainly something you have to be concerned about, and

23  in some instances, it's necessary.

24     Q.  Okay.  And so the Patent Troll Tracker, at

25  least in part, publicized the fact that Mr. Ward was an

67

1  effective litigator, didn't he?

2     A.  Well, I don't know about -- I mean -- I think

3  it's his intent, from reading these statements that

4  you've handed me, was just the opposite, that he had --

5  he and Mr. Albritton had done something dishonest.  I

6  don't view people who do things dishonestly as being

7  effective at all.

8       MR. SCHWARZ:  Objection, nonresponsive.

9     Q.  (BY MR. SCHWARZ)  Has Mr. Ward told you that

10  he's received some very positive messages in response to

11  the Patent Troll Tracker controversy?

12     A.  I don't recall.

13     Q.  Okay.  Did he tell you that one message that

14  he received called him a hero?

15     A.  He did not tell me that, no, sir.

16     Q.  Okay.  Would that expression, referring to

17  someone as a hero, be considered a symptom of an injured

18  reputation?

19     A.  It would -- actually, I would think it's a

20  symptom of an injured -- of an injury, yes, sir.  Heroes

21  tend to be injured in the actions that they undertake.

22  That's why we call them heroes.

23     Q.  Do you -- would you describe for the jury the

24  damage that you believe has been done to Mr. Ward's

25  reputation?

68

1       MR. PATTON:  Object to form.

2     A.  I believe there are members of the

3  community -- by that, the -- certainly the national

4  patent community, that believe that there were questions

5  about his ethics and integrity sufficient enough that

6  they would be unwilling to retain him as counsel.

7     Q.  Okay.  And we've discussed a few of those,

8  correct?

9     A.  Yes, sir.

10     Q.  Are you aware of any others?

11     A.  Not that I can recall.

12     Q.  Do you have any other knowledge or information

13  about Mr. Ward's claim that Cisco injured his

14  reputation?

15     A.  Other than what we've discussed here today?

16     Q.  Correct.

17     A.  I don't -- again, I mean, I don't know what --

18  I may know some fact that -- and it may relate to his

19  claim.  I just don't know, you know, what specifically

20  you're asking.

21     Q.  Well, you've been designated as a fact witness

22  as to his reputation, and I believe you answered those

23  questions pretty fully, correct?

24     A.  I tried to.

25     Q.  Okay.  And you've also been designated as a

69

1  witness as to the injury to his reputation. And have
2  you told us everything that you can think of today
3  concerning the injury to Mr. Ward's reputation?
4      A.  Well, you know, obviously we did not discuss
5  the privileged communications, and you know, there may
6  be some other facts that -- that I would recall if you
7  would ask me questions that were directed at certain
8  facts. I think your question is a hard one to answer.
9      Q.  And I appreciate -- I appreciate that fact.
10  On the other hand, I'm dealing with a designation that
11  simply says reputation and injury to reputation.
12      A.  Uh-huh.
13      Q.  Can you think of any other clients or
14  potential clients that Mr. Ward has not gotten in whole
15  or in part because of the Patent Troll Tracker blogs?
16      A.  I am not specifically aware on a first-hand
17  basis, but I definitely perceived in the community and
18  in the national community that there were concerns.
19          And in fact, last week I attended the
20  Intellectual Property Owners conference, and a speaker,
21  whose name I do not recall, but she was discussing
22  patent venue or venue in patent cases, and she referred
23  to the Eastern District in what I would consider a
24  negative manner, which I attribute to the comments of
25  the Troll Tracker.

70

1          It was -- it is my perception that he
2  created this negative view of the Eastern District of
3  Texas and the local -- as they would say, the local
4  counsel and the lawyers who practice in that district.
5  So I mean, it's out there. People sort of treat it as
6  an assumed fact that they don't get a fair shake in the
7  Eastern District, which I find to be just absolutely
8  outrageous.
9      Q.  Okay. You -- I believe you've already
10  answered this, but you don't recall the name of the
11  speaker at the IP conference?
12      A.  No, I don't remember her name. No, sir.
13      Q.  Okay. And what would lead you to believe that
14  she had ever seen the Patent Troll Tracker blogs that
15  we're talking about here?
16      A.  Well, what would lead me to believe is that,
17  in the community, the national patent community, it was
18  given quite a bit of prominent -- prominence and treated
19  with some -- some authority. In a number of instances,
20  members of the national patent community would refer to
21  the Patent Troll Tracker as almost authority for things
22  going on in the Eastern District and other places.
23      Q.  Who would treat it as authority? Do you
24  recall?
25      A.  Aside from the clients that I've mentioned,

71

1  who I won't -- won't mention, let me think here for a
2  second. The names just don't -- don't come to me at the
3  moment. I mean, I -- and I would not limit it, by the
4  way, to the national patent community. It was -- it
5  received commentary here in the Dallas area as well.
6  Lawyers at other law firms, in-house counsel.
7      Q.  Can you identify any of them?
8      A.  I can't remember anybody specifically.
9      Q.  Okay. You said --
10      A.  I believe --
11      Q.  I'm sorry.
12      A.  I will tell you I believe there was one or
13  more presentations at the Dallas Bar, and I believe Bart
14  Showalter referred to the -- to the Troll Tracker in
15  a -- as somewhat of an authority on this topic, and he's
16  an attorney at Baker Botts.
17      Q.  Right. And --
18      A.  As I say, I just have a vague recollection of
19  those comments.
20      Q.  That's fine. I appreciate that. You
21  mentioned that Mr. Showalter is at Baker Botts. Does he
22  have a good reputation in the legal community?
23      A.  Sure.
24      Q.  I've just been handed a note saying we're
25  almost out of tape.

72

1          MR. SCHWARZ:  Why don't we take just a
2  short break.
3          THE VIDEOGRAPHER:  And this ends Tape
4  Number 1, Volume 1 of the Robert Chiavello deposition.
5  Going off record at 10:51 a.m.
6          (Break was taken.)
7          THE VIDEOGRAPHER:  We're going back on
8  the record at 10:58 a.m. This marks Tape Number 2,
9  Volume 1 on Robert Chiavello's deposition. Please
10  proceed.
11      Q.  (BY MR. SCHWARZ)  Mr. Chiavello, before we
12  broke to change the videotape, we were discussing
13  comments by a number of people, including a woman whose
14  name you can't recall who you heard at -- I believe you
15  said it was an IP -- IP Owner's conference.
16      A.  It's called the Intellectual Property Owners
17  Annual Meeting, and it was in Chicago. The -- it was
18  the 14th and 15th of September. She spoke on the 15th,
19  I recall.
20      Q.  Okay.
21      A.  She was the moderator, as I recall.
22      Q.  Okay. And you said that she made some
23  references to the Eastern District of Texas, and I just
24  want to kind of focus on -- on just what she said. Do
25  you recall, with any greater specificity than you've

73

1  already described, what she said about the Eastern
2  District of Texas?
3      A. Yes, sir.  She used it as -- she was giving a
4  talk about the top ten districts where patent cases were
5  filed, and she was discussing the reasons why cases were
6  filed in the various districts.  And she said the reason
7  people filed in the Eastern District of Texas was to
8  strike fear in the hearts of defendants.
9      Q. And do you disagree with that?
10     A. Absolutely.
11     Q. And in your opinion, why do people file in the
12  Eastern District of Texas?
13     A. There are a variety of reasons, and they've
14  changed over time.  I would say on one of the most
15  important reasons is the fact that the judges assign
16  specific trial settings and stick to those trial
17  settings.  That is a very important consideration.
18         Number two, the judges in the Eastern
19  District have significant experience with patent
20  matters.
21         Number three, there are rules specifically
22  directed to patent matters in the Eastern District, and
23  there's a body of law that's developed over time.  So
24  there's a high degree of predictability in terms of what
25  rules will apply and how those rules will apply in

74

1  particular circumstances.
2          I would say that those three -- those
3  three factors -- well, the fourth factor I would
4  identify is the -- what we call the file-to-trial time.
5  That's increased a bit over the years, but it is
6  generally -- and by the way, this professor pointed out,
7  it's roughly in the middle of the pack.  And so those
8  four factors together generally make it a cost-effective
9  venue to resolve a patent dispute.
10         I would say the judges in the Eastern
11  District are -- the three judges that handle patent
12  cases are three good men.  They try to get it right.
13  They're fair-minded -- they're fair-minded, I would just
14  say, good judges and believe that they are some of the
15  best judges in the -- in the U.S. system.
16         So I'm a -- I've been a huge fan of the
17  Eastern District since 1990 when I first had a case in
18  front of Judge William Wayne Justice in Tyler and
19  have -- another factor is the court clerks are
20  effective.  They do a very good job, and they're very
21  knowledgeable and helpful.
22         And then a fifth fact -- sixth factor, I
23  would say, is it has the best electronic filing system
24  in the country, to my -- in my experience.  So those are
25  just, you know, what I can think of off the top of my

75

1  head.
2      Q. We've got six things to hang the ED Texas hat
3  on.
4          And I'd like to get back, you mentioned in
5  your last response, that the woman who gave this talk
6  was a professor?
7      A. I believe that's right.  I believe that's
8  correct.
9      Q. Do you believe she's a professor of law?
10     A. Yes, sir.
11     Q. Okay.  Have any recollection as to where?
12     A. As to where?
13     Q. As to where.
14     A. I don't.
15     Q. Okay.  Did she mention by name the Patent
16  Troll Tracker?
17     A. No, sir.
18     Q. And by name, I should say I meant the name
19  "Patent Troll Tracker."
20     A. She did not.
21     Q. Did she mention the name "Mr. Frenkel"?
22     A. She did not.
23     Q. Has -- have you ever heard negative views of
24  the Eastern District of Texas before?
25     A. Yes, sir.

76

1      Q. Had you heard them before the Patent Troll
2  Tracker expressed his views about the Eastern District
3  of Texas?
4      A. I don't know when he started.
5      Q. Well, let's just pick a date of October 2007.
6      A. I believe I had heard -- I believe I had heard
7  negative comments before that date.  I'm trying to think
8  back.  I believe I had, yes.
9      Q. Okay.  I mean, isn't it common for anyone
10  who's at least on the losing side of a case to find
11  fault everywhere but with themselves?
12         MR. PATTON:  Object to form.
13     A. Oh, that may be true, but that's not what
14  we're talking about.  We're talking about people who
15  have lawsuits filed against them, not necessarily who
16  have gone to -- gone to judgment.
17     Q. (BY MR. SCHWARZ)  Okay.  So apart from the
18  professor at the IP meeting that you discussed, you
19  mentioned earlier that -- you made reference to the
20  national community when I asked you about --
21     A. Yes, sir.
22     Q. -- Mr. Ward's reputation.  And could I ask you
23  to describe any other instances where you heard of
24  something or otherwise received information that
25  suggested that Mr. Ward's reputation had been -- had

77

1  been injured or diminished in any way?

2    A.  You know, in -- as a result of your questions,

3  I do recall another instance where we gave a

4  presentation to a client and had recommended Mr. Ward

5  and received a very harsh response.  And it was very --

6  it was a troubling meeting because one of my colleagues

7  mentioned to me later that I was probably too aggressive

8  in trying to defend him in that meeting.

9    Q.  Did anyone in -- well, first, let's run

10  through this.  Would you please identify the folks that

11  you were speaking with?

12    A.  I will not.  It's a client of the firm.

13    Q.  Okay.  And so you're invoking privilege?

14    A.  Yes, sir.

15    Q.  Okay.  You said there was a harsh response and

16  that it was -- it was a troubling meeting.  Did anyone

17  in that meeting make reference to the Patent Troll

18  Tracker blog?

19    A.  As I'm recalling it now, yes, sir.

20    Q.  And could you tell us what was said about the

21  Patent Troll Tracker blog?

22    A.  Again, without disclosing a privileged

23  communication, it was cited again as an authority for --

24  a reason for not wanting Mr. Ward to be on the trial

25  team.

78

1    Q.  And I believe you said that you defended

2  Mr. Ward's reputation in that meeting?

3    A.  I was -- I was, again, truly outraged by it.

4    Q.  I take it Mr. Ward was not retained in that

5  case?

6    A.  That's correct.

7    Q.  Okay.  I just want to make sure.  I don't

8  think we had covered that -- that small detail.

9      So that makes a total of four clients who

10  have declined to retain Mr. Ward?

11    A.  Yeah.  And just to be specific, one of them is

12  not a client.  It was a -- it was another lawyer who

13  would -- who we were investigating co-counsel together.

14    Q.  Okay.  But someone had come to you with the

15  intention of at least possibly retaining your services

16  and those of Mr. Ward?

17    A.  That's correct, yes, sir.

18    Q.  Okay.  Can you think of any other instances,

19  now that we've gone through those four, where anyone has

20  declined to retain Mr. Ward?

21    A.  No, sir.  There may have been some others, and

22  certainly if I can recall them, I'll tell you.

23    Q.  Okay.  Can you tell me when this last

24  conversation or meeting took place that you referred to

25  as a troubling meeting?

79

1    A.  I believe it was in January or February of

2  2008.

3    Q.  January or February of 2008.  Have you

4  recommended Mr. Ward to be counsel for any other clients

5  since January or February of 2008?

6    A.  I would be reasonably confident -- I'd have to

7  think about it, you know, for specific instances, but

8  I'm sure I have.

9    Q.  Okay.  Have you received any negative feedback

10  when you've made those recommendations?

11    A.  Well, that's the -- I can't remember any

12  specific instances since -- since the early part of

13  2008, and so I just don't -- I just don't recall any

14  particular instances.

15    MR. SCHWARZ:  No further questions.  I

16  pass the witness.

17    MR. PATTON:  I just have a couple of

18  questions.

19      EXAMINATION

20  BY MR. PATTON:

21    Q.  In the instances that you have described,

22  Mr. Chiavello, when you were told these things about

23  Johnny Ward, did you form an impression about what they

24  meant?

25    A.  Yes, sir.

80

1    Q.  Was that a positive impression of Johnny Ward

2  or a negative impression?

3    A.  It was a negative impression.

4    Q.  Okay.  And if I understand your prior

5  testimony, none of these people agreed with you that

6  Johnny Ward should be hired?

7    A.  That's correct.

8    MR. PATTON:  I'll pass the witness.

9    MR. SCHWARZ:  That's all I have for

10  today.  Thank you.

11    THE WITNESS:  Thank you.

12    THE VIDEOGRAPHER:  And this concludes the

13  video deposition of Robert Chiavello, consisting of two

14  tapes.  We're now going off the record.  The time is

15  11:10 a.m.

16      (Proceeding concluded.)

17

18

19

20

21

22

23

24

25

Chiavello, Robert H.  9/23/2009  11:10:00 AM

81

```
1       CHANGES AND SIGNATURE
2   WITNESS: Robert Chiavello Jr.  DATE: September 23, 2009
3   PAGE   LINE  CHANGE        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

82

```
1       I, ROBERT H. CHIAVELLO, JR., have read the
    foregoing deposition and hereby affix my signature that
2   same is true and correct, except as noted above.
3
4
    _____
5           ROBERT H. CHIAVELLO, JR.
6
7
8   THE STATE OF _____ )
    COUNTY OF _____ )
9
        Before me, _____, on
10  this day personally appeared ROBERT H. CHIAVELLO, JR.,
    known to me (or proved to me under oath or through
11  _____) (description of identity
    card or other document)) to be the person whose name is
12  subscribed to the foregoing instrument and acknowledged
    to me that they executed the same for the purposes and
13  consideration therein expressed.
        Given under my hand and seal of office this
14  _____ day of _____, _____.
15
16
17      NOTARY PUBLIC IN AND FOR
        THE STATE OF _____
18      COMMISSION EXPIRES: _____
19
20
21
22
23
24
25
```

83

```
1       IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF ARKANSAS
2               TEXARKANA DIVISION
3   JOHN WARD, JR.        )
                          )
4                         )  C.A. NO. 08-4022
                          )  JURY TRIAL DEMANDED
5   v.                    )
                          )
    CISCO SYSTEMS, INC.   )
6
7
8
9
10          REPORTER'S CERTIFICATION
11      DEPOSITION OF ROBERT H. CHIAVELLO, JR.
12            SEPTEMBER 23, 2009
13
14
15      I, April Eichelberger, Certified Shorthand Reporter
16  in and for the State of Texas, hereby certify to the
17  following:
18      That the witness, ROBERT H. CHIAVELLO, JR., was duly
19  sworn by the officer and that the transcript of the oral
20  deposition is a true record of the testimony given by
21  the witness;
22      That the deposition transcript was submitted on
23  _____ to the witness or to the attorney
24  for the witness for examination, signature and return to
25  me by _____.
```

84

```
1       That the amount of time used by each party at the
2   deposition is as follows:
3       MR. SCHWARZ.....1 hour, 51 minutes
4       MR. PATTON......1 minutes
5       MS. COLLINS.....0 minutes;
6       That pursuant to information given to the deposition
7   officer at the time said testimony was taken, the
8   following includes counsel for all parties of record:
9       FOR THE PLAINTIFF:
10      Mr. Nicholas H. Patton
11      FOR THE DEFENDANT:
12      Mr. Kurt Schwarz
13      FOR THE WITNESS:
14      Ms. Joni Collins
15      That $_____ is the deposition officer's charges
16  to the Defendant for preparing the original deposition
17  transcript and any copies of exhibits;
18      I further certify that I am neither counsel for,
19  related to, nor employed by any of the parties or
20  attorneys in the action in which this proceeding was
21  taken, and further that I am not financially or
22  otherwise interested in the outcome of the action.
23      Certified to by me this _____ day of
24  _____, 2009.
25
```

Chiavello, Robert H.  9/23/2009  11:10:00 AM

85

1
2
April Eichelberger
3       Texas CSR No. 7495
        Expiration Date:  December 31, 2009
4       HG Litigation, Firm No. 69
        As certified partner for
5       West Court Reporting Services
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25